**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

DENVER EMPLOYEES RETIREMENT PLAN,

     Plaintiff,

v.

QWEST COMMUNICATIONS INTERNATIONAL,
INC.;
PHILIP F. ANSCHUTZ;
CRAIG D. SLATER;
JOSEPH P. NACCHIO;
ROBIN R. SZELIGA;
ROBERT S. WOODRUFF;
STEPHEN M. JACOBSEN;
MARC B. WEISBERG;
DRAKE S. TEMPEST;
JAMES A. SMITH;
LEWIS D. WILKS; and
ARTHUR ANDERSEN LLP

     Defendant.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 2 of
191
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 2 of 187

## TABLE OF CONTENTS

I.      INTRODUCTION........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................ 5

III.    THE PARTIES........................................................................................... 6

        A.      Plaintiff ......................................................................................... 6

        B.      Defendants..................................................................................... 7

                2.      Individual Defendants ................................................. 7

                        a.      Members of Qwest's Board of Directors ........................... 7

                        b.      Senior Management ........................................................ 8

                3.      Arthur Andersen LLP ................................................. 13

IV.     BACKGROUND..................................................................................... 13

        A.      Qwest's Formation and Growth ................................................ 14

                1.      Qwest Communications International, Inc. is Formed................ 14

                2.      Qwest Acquires US West in a Reverse Merger ......................... 15

                3.      Qwest Promotes an Image of a Dynamic Company with
                        Significant, Sustainable Growth ................................................ 16

        B.      Qwest Restates its Financials for 2000, 2001, and First Quarter 2002.... 21

        C.      Andersen's Role in the Qwest Fraud ......................................... 24

V.      QWEST'S UNLAWFUL MANIPULATION OF ITS FINANCIAL RESULTS
        THROUGH IMPROPER TRANSACTIONS AND ACCOUNTING................ 25

        A.      IRU Capacity Sale Transactions............................................... 25

                1.      STAR Telecommunications, Inc. Transaction............................ 26

                2.      Electric Lightwave Inc. Transaction ......................................... 27

                3.      CAIS Internet Inc. Transaction ................................................. 27

                4.      Novus Networks, Inc. Transaction ............................................ 28

                5.      ICG Communications Inc. Transaction ..................................... 28

                6.      UUNet Transaction ................................................................... 29

                7.      Enron IRU Transactions ........................................................... 32

        B.      Use of Reciprocal Transactions with KMC to Manipulate Financial
                Results ......................................................................................... 36

        C.      Warwick Valley Telephone Company Improper Revenue Recognition . 37

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 3 of
197
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 3 of 187

D.    Concealment of Qwest's Pension Credit ................................................ 37

E.    Directory Services Manipulations ........................................................ 38

F.    Undisclosed Suspension of Depreciation on Certain Assets................... 41

G.    Consumer and Small Business Services Manipulations ......................... 41

H.    Improper Revenue Recognition on Bill and Hold Transactions ............. 42

I.    Genuity Contract Income Overstatement............................................... 43

J.    Pension Assumptions ........................................................................... 44

VI.    QWEST'S ADDITIONAL FINANCIAL STATEMENT IMPROPRIETIES .... 44

A.    KPNQwest Investment.......................................................................... 46

B.    Qwest Improperly Avoided Recording Charges of $2.1 Billion from
Losses on its Property and Equipment and Accrued Liability ................ 49

VII.    QWEST RESTATES ITS FINANCIAL STATEMENTS ................................. 50

A.    IRU Sales Manipulations ...................................................................... 52

B.    Equipment Sales ................................................................................... 53

C.    Directory Publishing Services Revenues and Costs .............................. 56

D.    KPNQwest Valuation............................................................................ 57

E.    Investment in Qwest Digital Media ...................................................... 57

F.    Other Accounting Improprieties............................................................ 58

G.    Qwest's Financial Statements Violated Fundamental Concepts of GAAP
.................................................................................................. 58

H.    Qwest Admits Publishing Materially Incorrect Financial Results .......... 60

VIII.    THE UNITED STATES CONGRESS INVESTIGATES QWEST ................... 61

A.    Cable & Wireless.................................................................................. 64

B.    FLAG Telecom...................................................................................... 65

C.    Global Crossing .................................................................................... 66

IX.    THE SEC INVESTIGATES QWEST.............................................................. 69

X.    THE DEPARTMENT OF JUSTICE INVESTIGATES QWEST ..................... 71

XI.    THE FALSE AND MISLEADING STATEMENTS ISSUED BY
DEFENDANTS PRIOR TO AND DURING THE RELEVANT PERIOD ....... 73

XII.    SCIENTER ................................................................................... 145

A.    Individual Defendants' Insider Trading................................................ 147

B.    Qwest/US West Merger Stock Price Terms.......................................... 151

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 4 of
Case 1:06-cv-01539-REB        Document 171   Filed 08/07/2006     Page 4 of 187
187

XIII.   ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD .................... 151

    A.   Arthur Andersen's False Statements as to Qwest's 1999 Financial
        Statements .................................  .................................  .......................... 153

    B.   Arthur Andersen's False Statements as to Qwest's 2000 Financial
        Statements .................................  .................................  .......................... 154

    C.   Arthur Andersen Ignored the Audit Evidence It Gathered  .................. 155

    D.   Arthur Andersen's Audit Procedures with Respect to Qwest's Failure to
        Properly report Its Swap Transactions ................................  ................ 156

    E.   Arthur Andersen Knew Qwest's Financial Statements Were Not Free of
        Material Misstatements ...............................  ...............................  ...... 159

XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE
    MARKET DOCTRINE ...............................  ...............................  ................. 160

XV.   TOLLING OF THE STATUTE OF LIMITATIONS ...............................  ...... 161

    A.   Defendants Actively Concealed and Denied the Existence of Any
        Accounting Improprieties ...............................  ...............................  .... 161

    B.   Tolling of Statute of Limitations by the Filing of The Class Action ..... 162

XVI.   STATUTORY SAFE HARBOR ...............................  ...............................  .... 164

FIRST CLAIM FOR RELIEF  FOR VIOLATION OF SECTION 10(B) OF THE 1934
    ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS ........................... 165

SECOND CLAIM FOR RELIEF  FOR VIOLATION OF SECTION 20(A) OF THE
    1934 ACT AGAINST DEFENDANTS ANSCHUTZ, NACCHIO, WOODRUFF,
    AND SZELIGA ...............................  ...............................  .............................. 166

THIRD CLAIM FOR RELIEF  FOR VIOLATIONS OF SECTION 18 OF THE 1934
    ACT AGAINST QWEST, WOODRUFF, ANSCHUTZ, NACCHIO, SLATER,
    AND SZELIGA ...............................  ...............................  .............................. 167

FOURTH CLAIM FOR RELIEF  FOR VIOLATIONS OF SECTION 18 OF THE 1934
    ACT AGAINST ARTHUR ANDERSEN ...............................  ........................ 169

FIFTH CLAIM FOR RELIEF  FOR VIOLATION OF SECTION 20A OF THE 1934
    ACT AGAINST NACCHIO, ANSCHUTZ, SZELIGA, WOODRUFF,
    JACOBSEN, TEMPEST, WEISBERG, SMITH, WILKS, AND SLATER ..... 171

SIXTH CLAIM FOR RELIEF  VIOLATION OF COLORADO SECURITIES ACT
    C.R.S. §§ 11-51-501 AND 11-51-604(3) AGAINST ALL DEFENDANTS.... 172

SEVENTH CLAIM FOR RELIEF  VIOLATION OF COLORADO SECURITIES ACT
    C.R.S. § 11-51-501 AND 11-51-604(5)(B) AGAINST DEFENDANTS
    ANSCHUTZ, NACCHIO, WOODRUFF, AND SZELIGA ........................... 174

554065.1

EIGHTH CLAIM FOR RELIEF  AIDING AND ABETTING QWEST'S VIOLATION OF C.R.S. § 11-51-501 AND 11-51-604(5)(C) AGAINST ARTHUR ANDERSEN ................................. ................................. ................................. .. 175

NINTH CLAIM FOR RELIEF  COMMON LAW FRAUD AGAINST ALL DEFENDANTS ................................. ................................. ............................. 175

TENTH CLAIM FOR RELIEF  AIDING AND ABETTING COMMON LAW FRAUD AGAINST ALL DEFENDANTS EXCEPT QWEST................................. ...... 176

ELEVENTH CLAIM FOR RELIEF  NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS ................................. ................................. ... 177

TWELFTH CLAIM FOR RELIEF  FOR COMMON LAW CIVIL CONSPIRACY AGAINST ALL DEFENDANTS ................................. ................................. ... 179

PRAYER FOR RELIEF ................................. ................................. ............................. 181

JURY DEMAND ................................. ................................. ................................. ....... 181

554065.1

## I.  __INTRODUCTION__

1.      Denver Employees Retirement Plan (hereinafter referred to as "Plaintiff"), brings this action (the "Action") against Qwest Communications International, Inc. ("Qwest"), Philip  F. Anschutz, Craig D. Slater, Joseph  P. Nacchio, Robin R. Szeliga, Robert  S. Woodruff, Stephen M. Jacobsen, Marc  B. Weisberg, Drake S. Tempest,  James A. Smith, Lewis O. Wilks, and Arthur Andersen LLP (collectively, "Defendants").

2.      The Action arises out of Defendants' fraudulent and unlawful practice of significantly and materially overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share between at least as e arly as March 31, 1999 and July 28, 2002 (the "Relevant Period").  Defendants' unlawful conduct was intended to, and did, artificially inflate the value and price of Qwest's securities to the detriment of Plaintiff.

3.      During the Relevant Period:

a.      Qwest entered into transactions with little or no legitimate business purpose, and engaged in improper accounting practices, with the result  that Qwest's financial results as publicly reported were inaccurate, false and misleading;

b.      Qwest filed with the Securities and Exchange Commission ("SEC"), and published and distributed for public review, annual, quarterly and other reports, as well as registration statements and prospectu ses in connection with securities issuances, which contained false and misleading information;

c.      Defendants issued press releases, made public statements, held or appeared at investor conferences and similar events or otherwise publicly communicated false

- 1 -

and misleading information about Qwest's business, business prospects, investments, financial results and similar matters; and

        d.      Defendants assured Wall Street analysts and others that Qwest's business and financial results were sound, even as similarly situated telecommunications companies were experiencing revenue and earnings declines, causing their securities prices to fall.  Defendants orchestrated this fraud to create a false perception that Qwest was a dynamic, growing business that consistently met or  exceeded Wall Street expectations.

      4.      Defendants' unlawful conduct during the Relevant Period served to maintain Qwest's common share price at artificially high levels and enabled (i ) Qwest to acquire US West, Inc. ("US West") in July 2000 in a stock for stoc k transaction valued in excess of $44 billion and (ii) various of the Individual Defendants (as hereinafter defined) to sell their personally held Qwest shares for proceeds in excess of five hundred million dollars.  Certain of the Individual Defendants so ld their Qwest common shares at inflated values at about the same time that Plaintiff DERP was purchasing its Qwest shares.

      5.      Both in number and magnitude, Qwest's improper transactions and accounting violations as alleged herein are substantial.  They demo nstrate Defendants' fraudulent intent to deceive the investing public as to the true nature of Qwest's business.  Qwest's accounting violations include, but are not limited to:

        a.      Fraud relating to transfers of optical capacity, including, but not limited to  , optical capacity transfers with (i ) Global Crossing; (ii) Enron; (iii) FLAG Telecom Holdings Ltd. ("FLAG"); and (iv) Cable & Wireless, Inc. ("C&W");

554065.1

b.      Fraud relating to equipment sales, including, but not limited to, over stated

equipment sales with (i)  Genuity, Inc.; (ii) the Arizona School Facilities Board ("ASFB"); and

(iii) KMC Telecom Holdings, Inc. ("KMC");

c.      Fraud relating to the shifting of delivery dates of telephone directories

published by QwestDex, Inc. ("QwestDex") for the purpose of boosting reve nue as needed to

meet various Wall Street earnings estimates and guidance;

d.      Fraud relating to the retention of an inflated value of Qwest's investment

in KPNQwest; and

e.      Fraud relating to the overstatement of Qwest's property, plant and

equipment in 2000 and 2001.  Instead of writing down the fair value of these assets in

accordance with General Accepted Accounting Principles ("GAAP") when it became clear that

their value was impaired, Qwest continued to carry the assets on its books at inflated values.

6.      During the Relevant Period, and in connection with publishing false and

misleading financial statements, Qwest violated numerous applicable accounting standards,

principles, rules and regulations, including but not limited to, GAAP, interpretative publications

and opinions of the American Institute of Certified Public Accountants' Financial Accounting

Standards Board ("FASB"), Statements of Financial Accounting Standards ("SFAS") and

Accounting Principles Board ("APB") opinions, and SEC Ru le 4-01(a) of SEC Regulation S-X

(17 C.F.R. 9210.4-01 (a) (1)).

7.      Arthur Andersen LLP ("Andersen") issued unqualified audit opinion letters with

respect to Qwest's annual financial statements for the years 1999, 2000 and 2001 and designed,

approved of and/or "passed" on numerous  Qwest accounting improprieties.  In connection with

- 3 -

performing its independent public accounting services, as alleged herein, Andersen violated

Generally Accepted Auditing Standards ("GAAS").  In its capacity as Qwest's auditor, during

the Relevant Period, Andersen earned millions in fees from Qwest, all to the detriment of

Plaintiff.

       8.     In early 2002, Qwest came under increasing regulatory and public scrutiny.  In

March 2002, Qwest announced that the SEC had begun an investigation of its accounting

practices.  In April 2002, Qwest announced that the SEC had issued a formal notice of

investigation.  Then, on July 28, 2002, Qwest announced that it would need to restate prior

period financials.  In separate disclosures in October and December 2003, Qwest admitte d to

overstating its revenues by $2.874 billion and understating its losses by $25.488 bi llion during

the period January 1, 2000 through March 31, 2002.  Income was overstated by $2.497 billion in

2001 and by $1.432 billion in 2000, and Qwest's pension fund "surplus," reported to  be $4.1

billion as of December 31, 2000, had become a deficit of $314 million by December 2002.  The

restatements involved revenue recognition issues related to optical capacity asset transactions,

equipment sales and directory pub lishing procedures, as well as Qwest's purchase accounting for

the US West transaction, Qwest's maintenance of assets on its financial statements at excessive

values at a time when Qwest knew that the values of such assets were impaired, and numerous

other accounting improprieties and errors.

       9.     As the truth concerning Qwest's use of accounting manipulations and improper

transactions to manage its financial results began to be revealed, Qwest's stock price dropped to

a fraction of the amount at which Plaintif f had acquired its securities.  Revelations of the fraud

led to investigations of Qwest by the United States Congress and the United States Department

of Justice ("DOJ") in addition to the SEC.  In July 2002, Defendant Joseph Nacchio resigned as

Qwest's CEO and co-chairman of the board.  Shortly thereafter, Qwest was forced to sell its

profitable directory publishing units, QwestDex, to raise funds to survive.

10.    As a result of Qwest's unlawful conduct, to date:

a.    Qwest has settled civil fraud charges brought b y the SEC and agreed to

pay the SEC $250 million as part of that settlement;

b.    Four former Qwest executives have pled guilty to criminal charges,

including securities fraud, in proceedings initiated by the DO J.  These individuals are Robin R.

Szeliga, who s erved as Qwest CFO fro m April 18, 2001 through August 28, 2003, and who

succeeded Robert  S. Woodruff in that position; Marc  B. Weisberg, Qwest Executive Vice

President responsible for mergers and certain Irrevocable Right of Use ("IRU") sale transactions;

Thomas Hall, Senior Vice President of Qwest's Global Business Market Unit ("GBMU"); and

Grant Graham, CFO of the GBMU.  Qwest's former CEO, Joseph Nacchio, was indicted on

December 20, 2005 after a three-year investigation on 42 counts of criminal insider trading; and

c.    Qwest has agreed to settle federal securities fraud class litigation pending

in the District of Colorado for $400 million.

11.    Plaintiff purchased or acquired Qwest securities during the Relevant Period and

has suffered many millions of dollars of losses as the result of Defendants' unlawful acts as

alleged herein.

## II.    JURISDICTION AND VENUE

12.    Jurisdiction over those claims arising under the Securities Exchange Act of 1934

is conferred by §  27 of that Act, 15 U.S.C.A. §78aa.

13.     The federal claims asserted herein arise under 15 U.S.C. § 78j(b) (Section 10(b)

of the 1934 Act); 15 U.S.C. § 78r (Section 18 of the 1934 Act); and 15 U.S.C. § 78t(a) (Section

20(a) of the 1934 Act); and 15 U.S.C. § 78t-1 (Section 20A of the 1934 Act).

14.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the

Colorado Securities Act claims alleged herein (Colo. Rev. Stat. §§ 11 51 501, *et seq.*) and the

common law claims alleged herein.

15.     Venue is proper in this District pursuant to § 27 of the Securities Exchange Act of

1934, 15 U.S.C.A. § 78aa.  Many of the false and misleading statements were made in or issued

from this District.

16.     Qwest's principal executive officers are in Denver, Colorado, where the day -to-

day operations of the Company are directed and managed.

## III.    <u>THE PARTIES</u>

### A.     <u>Plaintiff</u>

17.     The Denver Employees Retirement Plan is a defined benefit retirement plan

established in 1963 for the purpose of providing benefits for its members and beneficiaries upon

retirement, disability, or death.  The City and County of Denver , Colorado and the Denver

Health and Hospital Authority, as well as their employees, contribute a percentage of the

employees' wages to the trust fund.  Contributions, plus income from investments, fund the

benefits for members and beneficiaries.  As of January 1, 2006, there were 18,377 total

participants or members in the Plan.  This number was comprised of 8,634 active members,

3,543 terminated vested members, 522 members in the Deferred Retirement Option Plan

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 12 of
187
Case 1:06-cv-01539-REB       Document 1       Filed 08/07/2006       Page 12 of 187

(DROP) and 5,678 retired members.  As of Jun e 30, 2006 the Plan had over $1.7 billion in
assets.

18.     From June 1999 to July 28, 2002, Plaintiff purchased 58,800 shares of Qwest
stock.  As a result of these purchases of  Qwest stock, Plaintiff suffered losses in the amount of
approximately $ 1.2 million.

**B.     Defendants**

19.     Defendant Qwest is a Delaware corporation with its corpora  te headquarters
located at 1801 California Street, Denver, Colorado 80202.  Qwest is a telecommunications and
internet services company.  The Company files annual, quarterly and other  reports with the SEC,
and its common stock is listed and traded on the New York Stock Exchange ("NYSE" ) under the
symbol "Q" .  The NYSE is an efficient market.

**2.     Individual Defendants**

**a.     Members of Qwest's Board of Directors**

20.     During the Relevant Period, Defendan t Philip F. Anschutz ("Anschutz") was co -
chairman of the Qwest board of directors.  Through his ownership of the Anschutz Company,
which, during the Relevant Period, owned approximately 284 million shares of Qwest, and other
Anschutz entities, Anschutz is  Qwest's largest shareholder.  According to a   Qwest Form 13D
filed on October  23, 2003, on that date Anschutz and his companies beneficially owned 17.1% of
Qwest.  In May 1999, Anschutz sold 33.3 million shares of his Qwest stock for proceeds in
excess of $ 1.5 billion.  In May and June 2001, Anschutz sold a total of 5.1 million shares of
Qwest st ock for $213.5 million.  On May 2, 2001, according to a *Business Week* article

examining insider trades at Qwest, Anschutz sold approximately 10 million shares of Qwest for $408 million.

21.    Defendant Craig D. Slater ("Slater") is a director of Qwest.  During the Relevant Period Slater served as President of Anschutz Investment Company and Executive Vice President of The Anschutz Company and The Anschutz Corporation.  Slater collected over $38.4 million from the sale of Qwest shares between April 2000 and April 2001.  On April 26, 2001, Slater (i) acquired 350,000 Qwest shares through the exercise of options at $15.00 per share and (ii) sold these shares for $38.94.  He collected $13.6 million from that sale.

### b.    Senior Management

22.    Defendant Joseph P. Nacchio ("Nacchio") joined Qwest in January 1997 as President and Chief Executive Officer.  From February 1999 until June 2002, Nacchio was Chairman and Chief Executive Officer of Qwest.  Between August 1999 and May 2001, Nacchio sold 4,983,467 shares of his Qwest stock for proceeds of $213.48 million.  Between January and June 2001, Nacchio sold 3.9 million Qwest shares for $140.8 million.  During the Relevant Period, Nacchio was also paid millions of dollars in salary and bonuses.  At the request of Qwest's Board of Directors, Nacchio resigned as an officer and as a member of the board as of June 16, 2002.  Nacchio received severance pay of $12.2 million in addition to his $1.1 million salary for the first half of 2002.  He also received additional compensation of $479,964.  In October 2003, Nacchio agreed to pay $400,000 to settle charges brought by the New York State Attorney General for improperly profiting from initial public offering ("IPO") shares offered to him by Solomon Smith Barney ("SSB") in exchange for him to give Qwest's banking business to

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 14 of
187
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 14 of 187

SSB, a division of Citigroup, Inc.  In December 2005, after a three -year investigation, the
Department of Justice indicted Nacchio o n 42 counts of criminal insider trading charges.

23.     Defendant Robin R. Szeliga ("Szeliga") was Qwest's Chief Financial Officer
from April 18, 2001 until July 7, 2002.  Prior to her appointment as CFO on April 18, 2001,
Szeliga was Senior Vice Presi dent of Fin ance, and from March 1, 2001 through April 18, 2001,
following the dep arture of the prior CFO, Robert S. Woodruff, Szeliga was Interim Chi ef
Financial Officer.  On April 30, 2001, Szeliga sold 10,000 shares of her Qwest stock for
proceeds of $410,000.  In July 2002, Szeliga resigned as Qwest CFO to take a lesser position in
the company, executive vice president of finance.  Szeliga left Qwest in August 2003.  In June
2004, the Department of Justice indicted Robin Szeliga for insider trading.  She subsequent ly
entered into a plea agreement and agreed to cooperate with prosecutors.

24.     Defendant Robert S. Woodruff ("Woodruff) was Qwest's Chief Financial Offic er
until his departure on March 2, 2001.  In his capacity as Qwest's Chief Financial Officer,
Woodruff was directly responsible for the accuracy and truthfulness of Qwest's financial
statements, and for the accounting treatment accorded by Qwest to the numerous improper
transactions during the Relevant Period through at least Dece mber 31, 2000, as alleged herein.
During the Relevant Period, Woodruff sold 1,155,000 shares of his Qwest stock f or proceeds of
$52.79 million.

25.     Defendant Steven M. Jacobsen ("Jacobsen") was Executive Vice President of the
Qwest GBMU.  Jacobsen participated in a scheme to inflate Qwest  revenues from transactions
with Genuity Inc. and was also aware of the improper "flash" revenue recognition practices, as

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 15 of
187
Case 1:06-cv-01539-REB   Document 174   Filed 08/07/2006   Page 15 of 187

alleged herein.  During the Relevant Period, Jacobsen sold 1,036,900 shares of his Qwest stock

for proceeds of $49.57 million.

26.     Defendant Marc B. Weisberg ("Weisberg") was, until September 2001, Executive

Vice President of Corporate Development at Qwest.  Weisberg was responsible for mergers and

acquisitions at Qwest, and was involved in Qwest merger with U.S. West.  In June 2001,

Weisberg and other Qwest employees persuaded Sonus Networks and Broadband Utility

Resources to buy a $20 million IRU from Qwest.  In return, Qwest was to buy $33.6 million in

equipment from Sonus Networks.  During the relevant period, Weisberg sold 793,750 share s of

his Qwest stock for proceeds of $37.84 million.  In 2004, Marc Weisberg, a former Qwest EVP,

was indicted by the Department of Justice on wire fraud and money l aundering charges.  On

December 28, 2005, six days before his scheduled trial, Weisberg ple d guilty to one count of

wire fraud and agreed to pay a $250,000 fine.

27.     Defendant Drake S. Tempest ("Tempest") was Qwest's Executive Vice President,

General Counsel, Chief Administrative Officer and Corporate Secretary.  Between November

1999 and April 2001, during the peak period of Qwest's stock prices, Tempest sold 476,600

shares of Qwest stock for proceeds of approximately $21.48 million.  Tempest resigned from

Qwest on December  8, 2002.  He received $1.8 million in severance pay and $155,696 in "other"

pay, including $54,480 for "travel and living" expenses.

28.     Defendant James A. Smith ("Smith") was Qwest's Executive Vice President for

Small Business and Consumer Markets.  Smith sold 281,826 shares of his Qwest stock for

proceeds of $11.48 million between  August 2000 and April 2001.  Smith realized most of his

gains on April 26, 2001, before Qwest's stock dropped precipitously in the summer of 2001,

when he sold 208,130 shares for approximately $8.11 million.

29.     Defendant Lewis O. Wilks ("Wilks") was President, Internet and Multi-Media

Markets at Qwest until October 2000 when he became Executive Vice President, Internet

Business Development and Chief Strategy Officer of Qwest.  Wilks was involved in several

improper "bill and hold" transactions as alleged here in.  Wilks resigned from Qwest in

September 2001.  During the Relevant Period, Wilks sold 1,415,000 shares of his Qwest stock

for proceeds of $65.16 million.

30.     Defendants Anschutz, Slater, Nacchio, Szeliga, Woodruff, Jacobsen, Weisberg,

Tempest, Smith, and Wilks, will be referred to herein as the "Individual Defendants."

31.     By virtue of the Individual Defendants' positions within the Company, they had

access to undisclosed adverse information about its business, operations, operational trends,

finances, revenue recognition policies and practices, markets, and present and future business

prospects.  The Individual Defendants would ascertain such information through Qwest's

internal corporate documents (including the Company's operating plans, budgets, forecasts,   and

reports of actual operations compared thereto), conversations and connections with other

corporate officers and employees, conversations and connections with vendors and customers,

attendance at sales, management, Office of the Chair and board of dire ctors' meetings, including

committees thereof, and through reports and other information provided to them in connection

with their roles and duties as Qwest officers and directors.

32.     It is appropriate to treat the Individual Defendants collectively each as a   group for

pleading purposes and to presume that the materially false, misleading, and incomplete

information conveyed in the Company's public filings, press releases and other publications as alleged herein was the result of the collective actions of the  Individual Defendants identified above.  The Individual Defendants, by virtue of their high -level positions within Qwest, directly participated in its management, were directly involved in its day -to-day operations, and were privy to confidential proprieta ry information concerning Qwest and its business, operations, prospects, growth, finances, and financial condition.

33.     The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating materially false and misleading statements and information concerning Qwest, including SEC filings, press releases, and other public documents; were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding Qwest, and approved  or ratified these statements, in violation of federal securities law, Colorado and New Jersey securities laws, and common law.

34.     As officers and controlling persons of a publicly -held company whose common stock was, and is, registered with the SEC pursuant t o the Securities Exchange Act of 1934, and was traded o n the NASDAQ, and since January 3, 2000 on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthf ul information with respect to Qwest's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Qwest's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions violated these specific r equirements and obligations.

35.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Qwest were able to and did control the content of the various SEC filings, press releases, and other public statem ents pertaining to Qwest.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be  corrected.  Accordingly, they are responsible for the accuracy of the SEC filings, public reports, and press releases detailed herein.

### 3.     Arthur Andersen LLP

36.     Defendant Andersen, during the Relevant Period, was a limited liability partnership headquartered in  Chicago, Illinois, and maintained offices in various states and places, including New York and Colorado.  Andersen partners resided in various states across the country and throughout the world.  Andersen served as Qwest's "independent auditor" from 1999 through 2001, and provided accounting, tax, and consulting services to Qwest.  Qwest paid Andersen millions in fees during the Relevant Period.  For example, in 2001 alone, Qwest paid Andersen $1.4 million for auditing, $2.2 million for related services, i ncluding preparing or reviewing certain SEC filings, and $8.3 million for tax-related and consulting services.

## IV.     BACKGROUND

37.     Each Defendant is liable for (i) making false statements, and/or (ii) failing to disclose adverse facts known to him/her about Qwest.   Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Qwest publicly traded securities was a success, as it (i) deceived the investing public regarding Qwest's prospects and business; (ii) artificially inflated the prices of Qwest's pu blicly traded securities; (iii) caused

- 13 -

Plaintiff to purchase or otherwise acquire Qwest publicly traded securities at inflated prices;
(iv) allowed the Individual Defendants to sell over 11 million shares of their Qwest stock for
proceeds in excess of $500 million; and (v) allowed the Qwest/US West merger to be
completed.

### A.   Qwest's Formation and Growth

#### 1.   Qwest Communications International, Inc. is Formed

38.   In 1988, Anschutz purchased the Southern Pacific Railroad ("SPR") for
approximately $1.8 billion. Shortly thereafter, an SPR subsidiary, Southern Pacific Telecom
("SP Telecom"), began to lay high technology telecommunications cables along SPR's railroad
lines. SP Telecom leased the fiber to AT&T and other carriers for long distance
telecommunications services.

39.   In 1995, Southern Pacific Telecom combined with Qwest Corporation, a small
Dallas-based digital microwave firm, to form Qwest. In 1996 Anschutz sold SPR to Union
Pacific; Qwest, however, retained railroad rights of way necessary to continue laying fiber along
both SPR's and Union Pacific's railroads.

40.   In January 1997, Nacchio joined Qwest as CEO. In June 1997, Qwest stock was
offered to the public in an initial pubic offering, raising approximately $320 million. Qwest's
annual revenues had grown from $125 million in 1995 to almost $700 million in 1997.

41.   In 1998, Qwest acquired LCI International, Inc., Icon CMT Corp., EUnet
International, Inc. and Phoenix International Inc. By March 1998, following Qwest's acquisition
of LCI International, a long distance telephone company, for $4.4 billion, Qwest had become the
fourth largest long-distance carrier in the United States. In November 1998, Qwest and Royal

- 14 -

KPN, the Dutch telephone company, announced a $1.2 billion joint vent ure under the name of KPNQwest to build a fiber -optic Internet Protocol network in Europe.

### 2. Qwest Acquires US West in a Reverse Merger

42. In June 1999, Qwest launched a hostile takeover of both US West, a former Regional Bell Operating Company that provided lo cal telephone service to 14 states, and Frontier Corp., then the nation's fifth largest long distance company.  At the time, both US West and Frontier had signed merger agreements with Global Crossing, a company that was building an undersea international fiber optic network.  Shortly thereafter, Global Crossing agreed to acquire Frontier and not to acquire US West and Qwest and US West agreed to merge.  US West paid a break-up fee of $140 million to Global Crossing once it agreed to merge with Qwest.

43. Qwest used its stock as currency in its merger with US West.  Pursuant to the merger agreement, US West could cancel the merger if Qwest's share price fell below $22 per share, and Qwest was obligated to pay US West cash consideration if Qwest's share price fe ll below $38.40 per share.  This was known by the parties to be a "collar" provision in the merger agreement and was designed to protect US West in the event that Qwest's share price fell.  The Qwest and US West boards of directors approved the merger in 1 999 and the merger became effective in June 2000.

44. The merger was accounted for as a reverse acquisition, with US West deemed the acquirer and its historical financial statements were carried forward as those of the newly combined company.  This was signifi cant because it meant that Qwest, when it restated its financials for the period January 1, 2000 through March 31, 2002, was not required to restate

- 15 -

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 21 of
187
Case 1:06-cv-01539-REB     Document 47     Filed 08/07/2006     Page 21 of 187

1999 and prior period financials, even though it had engaged in the same kinds of inappropriate transactions in 1999 that it engaged in subsequently during the Relevant Period.

### 3.   Qwest Promotes an Image of a Dynamic Company with Significant, Sustainable Growth

45.     Beginning in 1999 and continuing through early 2002, Qwest and various Defendants promoted Qwest to analysts and the investing public as a high margin technology company as opposed to a low margin, low growth telephone company.  Qwest's earnings releases emphasized the Company's significant projected earnings and revenue growth. Defendants encouraged investors to consider revenue growth as sound earnings indicators of Qwest's business performance.

46.     In Qwest's 1999 Annual Report, issued on March 10, 2000, Nacchio targeted 30-35% annual growth in revenue and 40-50% annual growth in earnings before interest, taxes, depreciation and amortization ("EBITDA").  (Letter to Shareholders, 1999 Annual Report at 6).

47.     In Qwest's 2000 Annual Report, issued on March 6, 2001, Nacchio stated, "Our pro forma revenue in 2000 grew more than 14% to $19 billion.  Pro forma earnings before interest, taxes, depreciation and amortization (EBITDA) grew more than 17% to $7.4 billion.  . . . We expect our 2001 revenues in the business market to grow 25 to 30 percent."  (Letter to Shareholders, Qwest 2000 Annual Report at 3).  Qwest announced as a "strategic priority" that it would meet or exceed its financial targets of 15 to 17% revenue growth and 20% growth in EBITDA annually for the next five years (Qwest 2000 Annual Report, at 23).

48.     In Qwest's 2001 Annual Report, issued on March 8, 2002, Qwest announced that the Company's total revenues grew by 18.6% over revenue figures for 2000.

- 16 -

49.     In each Annual Report for fiscal years 1999, 2000, and 2001, Qwest emphasized that it was on track to increase revenue by more than 14% annually.

50.     Until the end of second quarter 2001, with one ex ception (quarter ended December 31, 1999) Qwest also reported pro forma Earnings Per Share that met, or exceeded, Wall Street expectations.  This is illustrated in the following Table:

| QUARTER | REPORTED EPS | CONSENSUS |
|---------|--------------|-----------|
| 6/30/99 | $0.02 | $0.01 |
| 9/30/99 | $0.03 | $0.03 |
| 12/31/99 | $0.04 | $0.05 |
| 3/31/00 | $0.04 | $0.04 |
| 6/30/00 | $0.05 | $0.03 |
| 9/30/00 | $0.14 | $0.10 |
| 12/31/00 | $0.16 | $0.13 |
| 3/31/01 | $0.13 | $0.13 |
| 6/30/01 | $0.08 | $0.11 |

51.     On June 20, 2001, Morgan Stanley & Co. Inc. ("Morgan Stanley") publ ished an analysts' report that questioned Qwest's ability to sustain its double -digit growth rates. ("Morgan Stanley's June 20, 2001 Report" or the "Report").  Morgan Stanley suggested that Qwest's earnings and rates of growth were not sustainable because  Qwest would need to write down its carrying value in KPNQwest from in excess of $7 billion to approximately $2 billion. The Report also identified certain aggressive accounting techniques used by Qwest, the effect of which were to boost Qwest's revenue.   For example, in 2000, Qwest raised the assumed rate of return on the investment of its pension assets from 8.8% to 9.4%.  This action caused this aspect of Qwest's operations to contribute to Qwest revenues of $405 million for fiscal year 2000 as opposed to a loss of $8.0 million for 1999 under the previously assumed rate of return.

52.     As the result of its findings, Morgan Stanley lowered Qwest's earnings estimates and downgraded the stock.  On June  20, 2001, Qwest stock fell over 9% intra -day, amid heavy volume of 26 million shares—more than four times the average daily trading volume.

53.     Within hours of Morgan Stanley's June  20, 2001 Report's release, Nacchio convened an analysts' conference call.  During this call he stated:

> Number one, there are no accounting  issues or improprieties in Qwest's financial reporting.  Let me repeat that, there are no accounting issues or  improprieties in our reporting. . . .  Two, innuendoes on our integrity are not going to be tolerated, irrespective of who makes them including  what I used to believe was a reputable firm, Morgan Stanley.  Thirdly, and very importantly, as a fiduciary of your investment money, the unsupportable assertions made in this report about our ability to generate future growth in revenues, cash flow and ea rnings are inaccurate and unsupportable.

54.     On the analysts' call, Nacchio "reiterate[d] guidance" issued previously, and called the Morgan Stanley report "inaccurate and unsupported," and "hogwash."  Szeliga stated that she was "surprised and perplexed" that  the problems listed could be the basis for a downgrade.

55.     Morgan Stanley issued a second report on July  28, 2001, this time examining Qwest's disclosures concerning IRU sales.  The report suggested that Qwest should disclose the amount of revenue it derived  from capacity swaps.  Morgan Stanley analyst Simon Flannery wrote, "We would like to know how much, if any, of this [revenue] was purchased through capacity swaps.  This would determine how much, if any, of the revenues for the quarter were due to one -time capacity swaps."

56.     In August 2001, Morgan Stanley issued a third analysts' report on Qwest and questioned again the completeness of Qwest's disclosures about its capacity swap transactions.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 24 of
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 24 of 187
187

The report did not challenge Qwest's accounting for swaps or indi cate that the accounting was

not in accordance with GAAP, but questioned whether Qwest could sustain its 12 % revenue

growth if it was booking revenue from capacity swaps.  Qwest responded to Morgan Stanley's

report by denying the significance of the issue s raised.  Shortly after the August 2001 report was

released, Nacchio appeared on television channel CNBC and stated:  "It is sad, the quality of

analysis going on at that firm."

57.     Qwest also denied that its capacity swap transactions or accounting for such

swaps were improper.  As the *Denver Post* reported on September  22, 2001, Qwest engaged in a

public relations campaign to assure investors and analysts that its accounting and financials were

sound:

> Qwest for its part, blitzed the subject in the past 10 day s,
> commenting in public and fleshing out financial details in a
> quarterly filing made late Tuesday with the U.S. Securities and
> Exchange Commission.  Chief financial officer Robin Szeliga
> spent three days in Boston last week speaking with major investors
> about accounting questions.  During the same trip, chief executive
> officer Joe Nacchio fielded questions on the subject at a U.S.
> Bancorp Piper Jaffrey Conference.
>
> 'In some situations, we sell optical capacity and we also purchase
> capacity from the same (co mpany), Szeliga said Wednesday.
> 'That has been deemed swaps by some.  That's inappropriate.
> When we sell, we book revenue and the associated costs.  And we
> realize margin on that service.'  If we purchase from the same
> person, it's a separate transaction ,' she said.  When we purchase an
> asset, we book a capital expenditure (as an investment in property,
> plant and equipment) and pay cash for it.'

58.     On September  10, 2001, Qwest announced for the first time that it would not meet

analysts' expectations for the  summer.  Nacchio blamed Qwest's failure to meet its earnings

estimates on the economy.  In a letter to  *Business Week* in October 2001, Nacchio wrote:

554065.1

> This chatter about accounting issues is beside the point.  The misfortunes of our national and regional ec onomy, along with investor's flight from growth stocks to the value and dividend plays, may slow our emergence as an industry leader.  It will happen when the economy recovers and investors again turn to growth stocks.  We take some comfort in the well  -known line from the early days of the Clinton Administration, "It's the economy, stupid."

59.     As would later be revealed, Qwest's subsequent change in fortune was not due to the economy, but was predicated on unreasonable growth predictions sustained through fraudulent accounting practices.

60.     In September 2001, the Qwest Board of Directors praised Nacchio's performance, labeling him in a performance review that month as "perhaps the best creative mind in the industry."   The Board also approved a four year contract e xtension for Nacchio that amounted to a 25% salary increase above his base salary of $1.2 million, a boost of his maximum annual bonus to 250% of his salary, or $3.75 million, from a maximum of $2.4 million; and 7.25 million in stock options.

61.     While the Morgan Stanley reports of June, July and August 2001 raised the visibility of Qwest's accounting for swaps and IRU sales, and the revenues it derived from capacity swaps, these reports did not suggest that Qwest's accounting was illegal or improper.  After the reports were issued Qwest assured investors that its accounting for such transactions was sound.  As one analyst from U.S. Bancorp Piper Jaffrey stated following a Nacchio August 2001 speech at a Piper Jaffrey conference, "I walked away very comfortable  and talked to a lot of investors who walked away comfortable."   Deutsche Bank analyst Gary Jacobi wrote in August 2001:  "I really don't think they're doing anything illegal or unethical, I think people just want to understand what [Nacchio] is doing."

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 26 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 26 of 187

62.     In February 2002, a former employee of Global Crossing, Roy Olofson, publicly revealed a letter that he had written to Global Crossing's General Counsel in August 2001 about his fears that Global Crossing was engaged in sham capacity exchange transactions wit h other telecommunications carriers to boost revenue.  Among the telecommunications carriers that Olofson identified in these swap transactions was Qwest.

63.     The revelations by Olofson led to an SEC investigation of Qwest's accounting for its swap transaction s with Global Crossing.  On February 11, 2002, Qwest announced that the SEC had served it with a subpoena relating to its investigation of capacity swaps at Global Crossing.  On February 13, 2002, *The Wall Street Journal* published an article questioning Qwest's accounting for its capacity swaps and equipment sales, particularly sales to KMC and Calpoint.

64.     On March 11, 2002, Qwest disclosed that the SEC had begun an informal investigation into Qwest's accounting for capacity swaps and sales of equipment, and   in April 2002, Qwest disclosed the possibility that the SEC could force Qwest to restate its financials because of improper accounting for capacity swap deals and certain equipment sales.  Amid increasing controversy, Nacchio resigned from Qwest in June 20 02.

**B.     Qwest Restates its Financials for 2000, 2001, and First Quarter 2002**

65.     On July 28, 2002, Qwest announced that it planned to restate its financials for the years 2000 and 2001.  Fourteen months later, on October  16, 2003, Qwest filed with the SEC its Annual Report on Form 10 -K for Fiscal Year 2003.  In its 2003 Form 10 -K, Qwest restated its 2001 and 2000 consolidated financial statements (hereafter referred to as "October 2003 Restatement").

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 27 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 27 of 187

66.     On December 3, 2003, Qwest filed with the SEC its Quarterly Repor t on Form

10-Q for the fiscal quarter ending March  31, 2002 (the "December 2003 Restatement").  In this

filing, Qwest reported: "We have determined that, in certain cases, we misinterpreted or

misapplied GAAP in our 2001 and 2000 consolidated financial statements and, accordingly, we

have restated our consolidated statements for each of the years.   . . ."  The following Table

highlights the impact of Qwest's October 2003 and December 2003 Restatements:

| | Revenue | Pre-Tax Earnings (Loss) | Net Earnings (Loss) | Earnings (loss) per share |
|---|---|---|---|---|
| **Year ending December 31, 2000** (Dollars, in millions, except for loss per share) | | | | |
| Previously reported | 16,610 | 126 | (81) | (0.06) |
| Restated | 15,665 | (1,306) | (1,037) | (0.82) |
| Difference | (945) | (1,432) | (956) | (0.76) |
| **Year ending December 31, 2001** (Dollars, in millions, except for loss per share) | | | | |
| Previously reported | 19,695 | (3,958) | (4,023) | (2.42) |
| Restated | 18,152 | (6,455) | (5,603) | (3.37) |
| Difference | 1,543 | (2,497) | (1,580) | (0.95) |
| **Quarter ending March 31, 2002** (Dollars, in millions, except for los s per share) | | | | |
| Previously reported | 4,369 | (740) | (698) | (0.42) |
| Restated | 3,983 | (1,164) | (23,650) | (14.19) |
| Difference | 386 | 424 | 22,952 | 13.77 |
| **Total Restatement for 2000 and 2001, and First Quarter 2002** | 2,874 | (4,353) | (25,488) | (15.48) |

67.     Thus, while Qwest originally reported an $81 million net loss and revenues of
$16.6 billion for 2000, Qwest restated its results for 2000 to report a $1.037 billion net loss and
revenues of $15.7 billion.  For 2001, Qwest originally reported a $4 billion loss and revenues of
$19.7 billion but restated these results to report a $5.6 billion loss and revenues of $18.1 billion.
In other words, Qwest overstated its revenue by $1.543 billion in 2001, and by $945 million in
2000, a total of $2.488 billion in inflated revenue over a period of two years.  Combined with the
December 2003 restatement, which reduces the revenues reported for the quarter ending
March 31, 2002 by $386 million, Qwest's revenue for nine quarters was overstated by $2.874
billion.  Qwest's losses for the same period,  originally reported as $4.802 billion, were restated
by $25.488 billion.

68.     In the October 2003 and December 2003 Restatements, Qwest identified over two
dozen different examples of accounting errors in 2000 and 2001, all of which boosted Qwest's
revenues for those periods.  These accounting errors include improperly recognizing revenue
from (i) optical capacity asset transactions, (ii)  equipment sales, (iii) directory publishing and
(iv) contractual termination fees assessed to customers; products being given   away in connection
with wireless promotions; and sales of customer premise equipment based on the scheduled
completion date instead of actual completion date.  In addition, Qwest acknowledged that it also
improperly accounted for its losses and costs asso  ciated with the purchase accounting for the
Qwest-US West merger; impairment of assets and goodwill; valuation of investments, including
KPNQwest and Qwest Digital Media; network labor costs; and other errors.  Further, a
significant portion of Qwest's res tated losses, as reported in the December 2003 restatement, are

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 29 of
187
Case 1:06-cv-01539-REB    Document 171    Filed 08/07/2006    Page 29 of 187

attributable to asset impairment and loss of goodwill charges, which Qwest should have charged

over the course of 2000 and 2001.

### C.     **Andersen's Role in the Qwest Fraud**

69.     Andersen issued clean and unqualified audit opinion letters in connection with

Qwest's financial statements for 1999, 2000, and 2001, which were incorporated with

Andersen's approval in Qwest's public filings.  Andersen participated in Qwest audits from 1999

through 200l, and prepared, reviewed, approved, and directed the production of financial

statements, reports and releases issued or disclosed by Qwest throughout this period.

70.     Andersen audited Qwest's materially false and misleading financial statements

during the Relevant Period and issued materially false and misleading opinions on those

financial statements.  Andersen also consented to the use of its unqualified opinion on Qwest's

financial statements and reports filed with the SEC and otherwise disseminated to the investing

public during all relevant periods.  These financial statements were incorporated into and made a

part of the Company's public filings and offering memoranda with the knowledge and express

consent of Andersen.  Andersen reviewed, prepared, directed and control   led all public financial

disclosures, including public filings, statements to the press and investing public, earnings

releases, and press releases relating to financial issues of Qwest, made by the Company during

all relevant periods.  Andersen thus parti cipated in the scheme, plan and common course of

conduct alleged herein.

71.     Andersen's role in the fraud at Qwest is two -fold.  First, Andersen devised certain

of the accounting protocols by which Qwest recognized revenue up  -front from the sales of IRUs

and from capacity swaps.  Second, in furtherance of its profitable financial relationship with

Qwest, Andersen ignored Qwest's violations of established accounting principles.  Each of Andersen's audit letters for 1999, 2000, and 2001, which stated that Qwest's  financial statements for the respective fiscal period were in conformity with GAAP, were false.

## V.   QWEST'S UNLAWFUL MANIPULATION OF ITS FINANCIAL RESULTS THROUGH IMPROPER TRANSACTIONS AND ACCOUNTING

### A.   IRU Capacity Sale Transactions

72.   Qwest's financial results were inflated during the Relevant Period through the use of IRU capacity sale transactions.  In general, these contracts provided for the purchase by third parties of an irrevocable right to use telecommunications capacity on Qwest's fiber -optic and cable lines.  The contracts were often made at inflated prices which customers would agree to pay only because Qwest had agreed to buy services or capacity from the same customers at similarly inflated prices.  These were usually multi-year agreements in which Qwe st was obligated to keep capacity available for several years and would be paid over the terms of the contracts.  However, to accelerate revenue recognition, Qwest would recognize the full contract value at the beginning of the contract.  Moreover, because  Qwest had a finite amount of capacity, these sales did not represent revenues from ongoing business operations but rather more accurately represented the sale of an asset.

73.   In order to make Qwest look more successful than it was, and then to make the Company appear to be a more attractive merger partner for US West and to avoid breaking the "collar" in the US West merger pact, Qwest and the Individual Defendants issued false and misleading statements regarding, and improperly accounting for, several transac tions in 1999. Qwest has reported that, although it would not have to restate 1999 and 2000 pre  -merger results,

- 25 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 31 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 31 of 187

it recognized $1.32 billion of revenue in optical capacity asset transactions during this time based on the same improper method that it restat ed for post -merger results.

      **1.**      **STAR Telecommunications, Inc. Transaction**

      74.      On March 31, 1999, the last day of Qwest's first fiscal quarter, Qwest made the following statement in a press release:

> Qwest Communications International Inc, today announced that it has received an additional $15 million commitment for high-speed, broadband capacity from STAR Telecommunications.  The agreement builds upon the companies' original 20 -year, $70 million contract and extends the term of STAR's commitment to $85 million.  Additionally, Qwest will purchase international long distance services from STAR.

Press Release, *Qwest Awarded Additional $15 million Contract from STAR Telecommunications*, March 31, 1999.

      75.      The March 31, 1999, press release, which portrayed the $85 million tr ansaction as a straightforward "win" for Qwest, was false and misleading.  Rather, on March  24, 1999, STAR and Qwest modified the agreement to allow Qwest to purchase the STAR revenue through a "vendor financing" arrangement.  Under the new arrangement, Qw est swapped its capacity for the "international long distance services" it said it would "purchase" from STAR on a monthly basis.  Further, STAR could meet its obligations under the contract by either IRU's switched services or through dedicated private li ne services.  As STAR said in a footnote to a subsequent filing:

> On March 24, 1999, the agreement was amended to include the following terms: Qwest Communications International, Inc. ("Qwest") agreed to allow the conversion of a substantial portion of STAR's outstanding liability to a vendor financing arrangement. The terms of this arrangement allow STAR to provide long distance services to Qwest with the balance being offset against

> STAR's liability to Qwest on a monthly basis.  Additionally,
> STAR was given the option to meet its obligation through the
> purchase of a combination of IRU's switched services and
> dedicated private line services.  Any remaining balance
> outstanding to Qwest as of April 30, 2001 must be paid in full.
> The remaining balance due under this arrangement as of
> December 31, 1999 was approximately $45 million.

STAR Telecommunications, Inc. SEC Form 10 -K, filed 4/14/00.

### 2.   Electric Lightwave Inc. Transaction

76.     In June 1999, Qwest and Electric Lightwave, Inc. revised a $122 million deal

signed a year earlier for Electric Lightwave to lease network routes from Qwest.  Qwest cut by

$25 million the amount Electric Lightwave had agreed to pay Qwest in the original deal.  For its

part, Electric Lightwave agreed to buy a $9 million IRU, which it could  pay for over four years.

Qwest, however, recorded the full value of the $9   million IRU in the quarter ended June  30,

1999.  Electric Lightwave Inc. SEC Form 10 -Q, filed 8/3/99, Exhibit 10.21.1.

### 3.   CAIS Internet Inc. Transaction

77.     On September 30, 1999—the final day of Qwest's third fiscal quarter —Qwest

made the following statements in a press release:

> Qwest Communications International Inc. (Nasdaq: QWST), the
> broadband Internet communications company, and CAIS Internet
> (Nasdaq: CAIS), a pioneer in broadband ac cess solutions, today
> announced a strategic relationship worth approximately
> $69 million for the delivery of high-speed Internet access to new
> markets.  Qwest has been awarded a $54 million contract from
> CAIS for high-speed Internet capacity and broadband  Internet
> communications services.  The agreement also calls for Qwest to
> invest $15 million in CAIS Internet to accelerate the company's
> network and high-speed multi-user technology.
>
> CAIS will purchase $44 million of capacity on Qwest's fiber
> network, supe rceding previous leasing agreements.  The Qwest
> capacity will provide CAIS with significant network cost savings

- 27 -

and support the delivery of CAIS network services to 35 points of presence (POPs) by year-end 1999. CAIS has also committed to purchase $10 million of Qwest's communications services, which may include application hosting, e-commerce and web hosting.

78.     This press release was false and misleading because it did not mention that Qwest had agreed to make the $15 million "investment" in CAIS preferred stock in lieu of payment for the IRU, and failed to note that Qwest also agreed to let CAIS defer payment of an additional $14.5 million for several years. CAIS Internet, Inc. SEC Form 10-Q, filed 11/14/00.

### 4.      Novus Networks, Inc. Transaction

79.     Qwest also entered into a reciprocal transaction with Novo Networks, Inc. in the 3rd Quarter of 1999. On June 17, 2002, a former Qwest customer brought suit against the Company entitled *Novo Networks, Inc. v. Qwest Communications Corp.*, Case No. A452142, alleging that on September 30, 1999 (the last day of Qwest's third quarter), Qwest told Novo that if Novo did not buy from Qwest an IRU at the "inflated" price of $15 million, and a $10,000 per month maintenance contract, Qwest would "pull" all of its business from a Novo subsidiary. Complaint, *Novo Networks, Inc. v. Qwest Communications Corp.*, Case No. A452142; *see also* Deborah Solomon, *Novo Sues Qwest, Alleging Deal Required $15 Million Purchase*, *Wall Street Journal*, June 19, 2002. Novo's lawsuit alleges that a Qwest executive stated that Qwest "needed" the sale to "make its quarter." *Id.* at 124.

### 5.      ICG Communications Inc. Transaction

80.     In December 1999, Qwest sold approximately 18,000 miles of fiber optic network and additional broadband capacity to ICG Communications in an IRU deal worth $140 million, according to ICG's SEC filings. *See* Jed Graham, *Iffy Qwest Books Buoyed Stock, Cinching Its US West Takeover Capacity*, Investor's Business Daily, August 2, 2002. Then, the following

month (early January 2000), Qwest reciprocated by agreeing to buy an IRU from ICG for $126

million. ICG Communications Inc. SEC Form 10-K, filed March 30, 2000.

81.    These transactions had the effect of artificially inflating Qwest's earnings.  The

deals "show Qwest was 'in a sense buying revenue,' s aid Davenport & Co. analyst Drake

Johnstone."  *See* Graham, *supra*.  Moreover, Qwest's and the Individual Defendants'

misstatements and improper accounting for these deals permitted the Company to consummate

the US West merger on terms favorable to Qwest.  A  s Davenport & Co. analyst Johnstone

further stated:

> "If Qwest had reported revenues, earnings and cash flow as it
> should have, its growth may not have looked so enticing. There is a
> chance the US West shareholders would have rejected the merger."

*See* Salvi & Hudson, *Qwest's deals sealed merger*, The *Denver Post*, 8/28/02.

### 6.    UUNet Transaction

82.    In August, 2000 Qwest approached UUNet and structured a transaction pursuant

to which UUNet (part of MCI's Internet Wholesale Division) would pay $300 million for $30

million worth of Qwest equipment and seven to ten years of network service at a discounted rate.

Qwest recognized this revenue immediately. In fact, this deal was a net negative to Qwest

because it actually reduced the revenue stream compared to the amount US W  est had formerly

been receiving from UUNet on the contract that was superseded by this deal, and was done so

that Qwest could report favorable earnings in third quarter 2000.

83.    Moreover, Qwest's third quarter 2000 Form 10 -Q, filed in November 2000, stated

the following about Commercial Services revenues, and did not mention the IRUs:

> COMMERCIAL SERVICES.  Commercial services revenues are
> derived from Internet, data, voice and wireless products and

> services to both retail and wholesale business customers.  The
> increases in commercial services revenues for the three and nine
> months ended September  30, 2000 were primarily attributable to
> the Merger.  Also contributing to the increases, were growth in
> sales of data products and services.  We believe revenues from   data
> products and services will account for an increasingly larger
> portion of commercial services revenues in future periods.

84.     Qwest stated in its Third Quarter 2000 earnings release that it had $272 million in

"net realized gains on investments and asset s ales," but told analysts that the asset sales were

principally marketable securities.

85.     In the fourth quarter of 2000, Qwest recognized hundreds of millions of dollars

more in IRU transactions. One such deal was a contract for more than $250 million with Cab  le &

Wireless.  Qwest's 2000 Form 10 -K mentioned the transactions but did not quantify their amount

and represented they were not significant:

> The Company's revenues are generated from a variety of services
> and products. Commercial, consumer and small busi ness services
> revenues are derived from retail and wholesale services such as
> Internet and data products and services, including Web hosting and
> Internet access, frame relay and digital subscriber line ("DSL").
> Also included in this category are voice ser vices such as basic
> monthly fees for telephone service, wireless services, fees for
> calling services such as voice messaging and caller identification,
> special access and private line revenues from end -users buying
> local exchange capacity to support their  private networks and inter -
> and intraLATA (local access and transport area) long -distance
> services.  To a lesser extent, the Company sells capacity under
> indefeasible rights of use contracts.  *Revenues from these contracts*
> *are included in commercial services and were not significant in*
> *either fiscal 2000 or 1999.*  Directory services revenues are
> generated primarily from selling advertising in the Company's
> published directories.  Switched access services revenue is derived
> principally from charges to intere xchange carriers ("IXCs") for use
> of the Company's local network to connect customers to their
> long-distance networks.

86.     Qwest's 2000 Form 10 -K also represented:

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 36 of
187
Case 1:06-cv-01539-REB   Document 1-4   Filed 08/07/2006   Page 36 of 187

> Occasionally, the Company sells capacity on its network to other
> telecommunication providers.  S ales of capacity are accounted for
> as either sales-type leases, operating leases or service agreements
> depending upon the terms of the transaction.  Revenues related to
> sales of capacity that meet the criteria of a sales -type lease are
> recognized at the ti me of delivery of the capacity to the customer.
> If title is not transferred or if the other requirements for sales  -type
> lease accounting are not met, revenue is recognized ratably over
> the term of the agreement.

87.     The Defendants failed to disclose the recip rocal nature of these transactions, the

amount of them or that their value was inflated.

88.     In First Quarter 2001, Commercial Services revenues were reported to be $2.7

billion.  Qwest concealed that at least $425 million (more than 15% of Commercial Services

revenues) were from IRU sales.   In the First Quarter 2001 and Second Quarter 2001, Qwest

entered into two $100 million IRU swaps with Global Crossing, which did not have a legitimate

business purpose, but rather were entered into to inflate reported re   venues.  In fact, Qwest's

March 31, 2001 Form 10-Q, filed in May 2001, did not mention the IRU sales and stated only:

> Commercial services revenues are derived from Internet, data,
> voice and wireless products and services provided to both retail
> and wholesale business customers.  The increase in commercial
> services revenues for the three months ended March   31, 2001 was
> primarily attributable to growth in our data and Internet services.
> For the first quarter of 2001, data and Internet services represented
> more than 45% of commercial services revenue.  We believe
> revenues from data products and services will account for an
> increasingly larger portion of commercial services revenues in
> future periods.

Qwest's First Quarter results were also false and misleading du e to a reciprocal IRU transaction

with Sonus Networks.  As part of placing an order for Sonus equipment, Qwest required Sonus

to purchase an IRU from Qwest for more than $15 million.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 37 of
187
Case 1:06-cv-01539-REB      Document 1-4   Filed 08/07/2006      Page 37 of 187

89.    In August 2001, when Qwest filed its June 30, 2001 Form 10-Q, it began to

disclose the extent of the sales it had been recording from these transactions, but failed to

disclose that the transactions lacked business purpose:

> Commercial Services Revenues.  Commercial services revenues
> are derived from sales of IP, data, voice and  wireless products and
> services provided to both retail and wholesale business customers.
> The increases over the prior periods in commercial services
> revenues for the three and six months ended June  30, 2001 were
> 26.7% and 26.6%, respectively, primarily attributable to growth in
> our IP and data services (DIA, virtual private network, Internet dial
> access, optical private lines, ATM and frame relay).  During the
> three and six month periods ended June  30, 2001, we recognized
> $430 million and $857 million, respectively, in optical capacity
> sales under indefeasible right of use ("IRU") agreements versus
> $197 million and $416 million, respectively, for the comparable
> periods in 2000.

### 7.    <u>Enron IRU Transactions</u>

90.    Qwest also entered into a phony capacity swap with Enron  inflating its Third

Quarter 2001 results by at least $195.5 million, as *The New York Times* reported on March 29,

2002:

> Enron and the telecommunications giant Qwest
> Communications struck a deal last fall to swap fiber optic network
> capacity and services at exaggerated prices in an effort to improve
> each company's financial picture, executives close to the deal said
> this week.
>
> Details of the deal, which was not announced at the time
> but has been disclosed in recent filings in Enron's bankruptcy case,
> indicate that the two companies raced to complete the transaction
> as the third quarter was ending in September. Enron and Qwest
> valued the transaction at more than $500 million, but analysts said
> the timing and the valuation would be hard to justify because a g lut
> of fiber optic capacity had sent network prices plummeting.
>
> *   *   *
>
> But executives close to the Qwest -Enron deal, one of the

- 32 -

largest recorded, said the swap had other objectives. It helped
Qwest, the executives said, soften a deteriorating situa tion in profit
and revenue at the end of last year's third quarter.

The deal, they said, also allowed Enron, which was
tumbling toward a bankruptcy court filing, to avoid recording a
huge loss by selling an asset whose value had plummeted on the
open market.

" Qwest said we will overpay for the assets, and you will
overpay me on the contract," one former Enron executive said.
"They had a pinch in the third quarter and needed a deal."

\* \* \*

Then, on Sept. 30, a Sunday and the final day of the third
quarter, Qwest signed a deal to pay Enron $308 million for assets
that included so -called dark fiber along a route from Salt Lake City
to New Orleans. Dark fiber refers to idle network strands that
require additional investments in electronic equipment be fore they
can be put into service. In exchange, Enron agreed to pay Qwest
$195.5 million for "lit wavelength," or active fiber optic cable
services, over a 25 -year period: each company exchanged checks
for about $112 million around the close of the deal.

Qwest did not announce the Enron deal after it was made,
although the company had regularly issued news releases for
smaller deals, including a $20 million contract with Perot Systems
Inc. on Sept. 27.

91.     Thus, not until near the end of the Relevant Period di d Defendants begin to reveal

the magnitude of the IRU revenue being reported.  An article in  *The Wall Street Journal*  on

February 13, 2002 described Qwest's use of IRUs and termed Qwest the most aggressive of its

competitors in accounting for the transactio ns.  However, Defendants continued to conceal the

fact that Qwest's financial statements had been misstated due to these transactions since 1999.

92.     A complaint filed on February 26, 2002 by an employee of Global Crossing

alleged Qwest's misleading role in th ese reciprocal transactions:

On August 3, 2001, Global Crossing Ltd.'s CFO,

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 39 of
187
Case 1:06-cv-01539-REB   Document 1-4   Filed 08/07/2006   Page 39 of 187

Defendant Cohrs, circulated an e-mail to Defendant Casey and others commenting on a press story regarding Qwest Communications. In that e-mail Cohrs not only acknowledges the fact that Global Crossing Ltd.'s revenue recognition policies were suspect but he specifically indicated that he was concerned that related issues at Global Crossing Ltd.'s customer, Qwest Communications, was drawing attention to the issue. Cohrs' e-mail stated: "Qwest is booking sales type lease revenue as GAAP revenue and not breaking it out. At least we get credit for breaking it out. *The bad news is that this is raising visibility on the swaps issue.*"

\* \* \*

Plaintiff is informed and believes and thereupon alleges that Cohrs' fear of visibility of the "swap issue" reflects his concern that a possible investigation of Qwest's accounting practices would reveal, *inter alia*, that Qwest and Global Crossing Ltd. had swapped approximately $100 million of capacity in each of the first two quarters, some of which had not even been defined at the time of sale, that each company accounted for the transactions differently despite having the same firm of outside auditors (Andersen), and that further investigation could lead to the conclusion that these transactions were non-monetary exchanges of capacity that should not have been booked as revenue at all. In other words, Cohrs and by implication Global Crossing Ltd. feared that the public would be made aware that through this and related transactions, Global Crossing Ltd. was giving the impression that it was generating cash revenues when, in actuality, these transactions did not increase the cash position of Global Crossing Ltd. in any material sense. Furthermore, Global Crossing Ltd. was listing the payments to Qwest as a capital expenditure, which allowed Global Crossing Ltd, to report none of the expense (or at most a very small portion) in the current period.

93.   Failing to disclose the information about IRU revenue was highly significant to investors because capacity asset sales are non-recurring in nature. To the extent that this nonrecurring revenue component was hidden from investors, Qwest was able to overstate revenue growth percentages by combining these amounts with recurring revenues such as service revenues.  In Qwest's 2001 third quarter 10-Q filed in November 2001, the non-recurring nature

of these revenues finally became apparent as IRU revenue dropped from $430 million in Second

Quarter 2001 to $133 million in Third Quarter 2001.  This does not include revenue from the

$195.5 million reciprocal transaction with Enron, which Qwest concealed.

94.     Qwest and the Individual Defendants had actual knowledge that the Company's

recognition of revenue from the IRU tr ansactions was improper and likely to mislead investors.

On October 3, 2002, *The Wall Street Journal* reported that:

> As early as 2000, outside auditors at Qwest
> Communications International Inc. regarded the company's use of
> revenue-enhancing swap transactions as a potential risk for the
> company, warning that the Securities and Exchange Commission
> was already "vigorously" challenging some of its financial
> practices . . . .
>
> The conclusions were contained in an Oct. 4, 2000, presentation
> made to the company's  board-level audit committee and reviewed
> last night by The Wall Street Journal.
>
> *        *        *
>
> [T]he presentation by Andersen highlights that  *the transactions
> were viewed skeptically from their conception.*
>
> *        *        *
>
> In the presentation, Andersen said  that the SEC was already
> questioning the company's "up-front revenue recognition,"  which
> allowed the Denver firm to book decades' worth of sales in just
> one quarter. In addition, it said that the swaps "may not be viewed
> as a culmination of the earnings pr ocess," meaning that *the
> company may not be get revenue [sic] from the deals.*

*Arthur Andersen Warned Qwest On Risks of Swap Transactions*, *Wall Street Journal*, October 3,

2002.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 41 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 41 of 187

**B.**   **Use of Reciprocal Transactions with KMC to Manipulate Financial Results**

95.   Qwest also concealed its manipulative use of reciprocal transactions with KMC Telecom Holdings Inc. ("KMC") that boosted its reported revenues.  Qwest improperly recognized revenue from these transactions in violation of GAAP, and further concealed the impact these transactions had on its reported results.  In 2000 and 2001, Qwest sold $450 million in equipment to KMC and agreed to pay millions of dollars for Internet services on that equipment.  The transactions did not make sense from a business standpoint since  Qwest's business was to offer Internet services.  Thus, Qwest had no legitimate business reason to buy such services from another party.

96.   Qwest reported the sale of equipment to KMC immediately, but did not record the reciprocal obligation to buy Internet s ervices from KMC.

97.   In March 2000, Qwest and KMC entered into an agreement pursuant to which KMC would purchase $134 million in equipment from Qwest, and Qwest would buy services from KMC through 2004.  The Company's March 31, 2000 Form 10-Q, filed in May 2000, did not disclose this transaction. On the contrary, it concealed this transaction, which represented more than 11% of Communications Services revenue, in the description of the reasons for the increase in those revenues:

> During the three months ended M arch 31, 2000, as compared to the same period of the prior year, Communications Services revenue increased due to the growth in Internet, multimedia, data and voice services sold to business, government and wholesale customers. With the completion of the C ompany's network, Construction Services no longer generates revenue from network construction.

- 36 -

98.     In June 2000, Qwest and KMC entered a second transaction in which KMC would purchase $168 million in equipment from Qwest and install and maintain it from November 2000 through August 2004.  Yet another agreement was entered into in March 2001 pursuant to which KMC purchased an additional $65 million in equipment.  These transactions were not disclosed by Qwest until December 2001.

99.     In each of these transactions,  Qwest recorded equipment sales revenue immediately, but did not record or disclose the obligations to buy services from KMC in amounts equal to or exceeding the equipment sales.  These transactions caused Qwest improperly to inflate its revenues.

### C.     Warwick Valley Telephone Company Improper Revenue Recognition

100.    In July 1999, Qwest signed a five-year, $15 million contract with Warwick Valley Telephone Company for an OC-12 Circuit and OC-48 Local Loop for Internet access.  Defendants recognized all of the potential revenue under the contract in the period in which it was signed, instead of over the life of the contract, violating GAAP. Since Qwest had not provided the Internet access services (nor had it been paid) at the time the contract was signed, it was inappropriate to recognize the full contract revenue at that time.

### D.     Concealment of Qwest's Pension Credit

101.    In August 2001, Qwest amended its 2000 Form 10-K to include a disclosure that its 2000 results had benefited from a pension credit of $299 million, or $182  million after tax, in 2000, compared to a charge of $8 million in 1999.  The $299 million in credit to Qwest's 2000 results was significant and represented 16% of operating income for the year.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 43 of
187
Case 1:06-cv-01539-REB     Document 171     Filed 08/07/2006     Page 43 of 187

102.     Qwest management was involved in preparing Qwest's financial  statements and
knew of the impact of the $299 million pension credit on Qwest's 2000 financial results, but
chose to conceal it until August 2001.

E.     **Directory Services Manipulations**

103.     The Individual Defendants also caused Qwest to manipulate the results of the
Directory Services business.  For example, in late 2000 Nacchio and Woodruff approached the
head of Directory Services, Smith.   Qwest management had imposed a target of 10% revenue
growth and 15% -20% EBITDA growth in 2000.  In fact, such growth did not ex ist for 2000 in
Directory Services, as publication and shipment dates for the directories to be published had
already been set.  To achieve targeted revenue and earnings growth for US West Directory
Services, Nacchio, Woodruff and Smith caused Qwest to cha nge the scheduled ship date of a
directory to accelerate revenue recognition.  In 1999, Qwest changed its accounting for
directories to record all revenue for the directory in the quarter it was published rather than its
prior method of recording revenue o ver the life of the directory.  The Colorado Springs directory,
which was an annual directory with a January ship date, was changed to be shipped out in
December 2000.  Because Qwest would recognize revenue for a full year's directory in the
quarter it was shipped, Nacchio and Woodruff knew the Company could significantly increase
reported sales by moving the directory ship date from January 2001 to December 2000.

104.     Absent the Colorado Springs directory shipment date switch, Directory Services
revenue growth  would have been only 5% instead of the 10% Qwest reported.

105.     Nacchio directed another change to accelerate revenue on Directory Services,
which was to switch many of the directories to 13 -month directories.  Because Qwest would

- 38 -

recognize the full-term of the directory as revenue in the quarter it was shipped and because it billed most customers on a monthly basis, by switching from 12-month to 13-month terms, Qwest could inflate revenue by 8.3%. To conceal the switch, Qwest changed the date on the directories from the month and year issued to just the year. Qwest recognized the additional revenue in the current period even though there was no assurance that customers would pay for the extra month.

106. As a result of the manipulation, Qwest was able to report a favorable 10% increase in Directory Services revenues in the Fourth Quarter 2000. The directories affected by directory extensions included Denver (which is a directory worth about $72 million a year to Qwest), Portland and Seattle.

107. The 2000 Form 10-K failed to disclose the above manipulations as the reason for the increase in Directory Services revenue. It stated:

> Directory services revenues for 2000 increased by almost $100 million due principally to higher advertising rates, an increase in the number of directories published and an increase in the number of premium quality advertisements.

108. Thus, investors were not aware that Directory Services revenues had increased largely because Qwest management had changed the directory delivery dates and terms. The subsequent disclosures in Form 10-Qs were no more informative. The March 31, 2001 Form 10-Q stated:

> The decrease in directory services revenues for the three months ended March 31, 2001 was primarily attributable to a change in the mix of directories published in the three months ended March 31, 2001 versus the three months ended March 31, 2000, partially offset by increased advertising rates.

109.   Qwest did not disclose that the decrease was also the result of moving the date of

the Colorado Springs directory i nto 2000 from 2001.  Quest's June 30, 2001 Form 10-Q stated:

> Directory Services Revenues.  Directory services revenues are
> derived primarily from selling advertising in our published
> directories.  Directory services revenues increased 5.1% for the
> three mo nths ended June 30, 2001 and 1.8% for the six months
> ended June 30 primarily due to a change in the mix and *length of
> directories published* and increased advertising rates as compared
> to the same periods in the prior year.

110.   After the Relevant Period, and af ter announcing that the SEC was investigating

these issues, Defendants finally admitted the following  to investors in Qwest's 2001 10 -K, filed

with the SEC on April  1, 2002:

> Directory publishing revenues.
>
> *   *   *
>
> In 2000, the Company shortened the s ervice life of one of
> its directories to 11 months, resulting in the directory being
> published in both January and December of 2000.  This resulted in
> the Company recording an additional $28 million of revenue in
> 2000 relating to this directory.
>
> In 2001, the Company extended to 13 months or shortened
> to 11 months the service lives of certain of its directories, resulting
> in 2001 revenues being $42 million higher than if the service lives
> of the directories had not been extended or shortened.

111.   Thus, it was not until the Form 10 -Q for the Second Quarter 2001 —filed in

August 2001—that Qwest even hinted that it had changed the length of directories that affected

revenue growth.  Qwest did not disclose that it had lengthened the directory terms to accelerate

revenues and that it had moved the date of at least one directory to accelerate revenue growth.

112.   Ultimately, Qwest admitted that even its 1999 change in revenue recognition

method, to record all revenue in the quarter the directory was published, was improper.     Qwest

has restated its results to reduce previously reported Directory Services revenues by $78 million for 2001 and by $57 million for 2000.

**F.   Undisclosed Suspension of Depreciation on Certain Assets**

113.   From the acquisition of US West until Second Quarter 200 1, Qwest suspended recording the depreciation expense on 570,000 access lines worth $1.8 billion.  However, Qwest failed to disclose the amount of unrecorded depreciation until after the Second Quarter 2001 ended.  On July 24, 2001, Qwest revealed that a c harge of $222 million was recorded in the Second Quarter 2001 for the previously unrecorded depreciation expense, in connection with the termination of an agreement to sell these access lines to a third party.

**G.   Consumer and Small Business Services Manipulations**

114.   Qwest's consumer and small business services revenue was also inflated by Qwest's practice of recognizing revenue on orders for T -1 installation and Internet service. Through Qwest's Attila Information System ("Attila"), sales personnel would enter an  order for installation or service and the amount of the order would be recognized as revenue immediately. This was more than just premature revenue recognition because orders were routinely overstated in terms of what customers would actually buy from Qwe st. Some orders were for minute plans, or the amount of minutes per month a customer would be utilizing a line. Salespeople would enter orders (or "flash" them) into Attila and then Qwest would recognize the revenue. In fact, Qwest's "flash" sales were ove rstated by as much as 60% -70% due to overstated orders being flashed.  As a result of these practices, Qwest booked revenue that either had not been earned, because Qwest had not provided the product or services associated with the revenue, or was not collectible, because the revenue was for the sale of goods or services the customer had not

- 41 -

ordered.  This activity increased at quarter end to inflate Qwest's quarterly results for its

consumer and small business services.

115.    These flash sales occurred extensive ly during 1999, with some regions inflating

sales for some customers by as much as 75%.  When Qwest had acquired LCI International

("LCI") in 1998, it changed the requirement for orders to be included in revenue. Whereas LCI

had required invoicing prior to recognition, Qwest had no such requirements so that revenues

would be higher.  As a prominent technology industry magazine published in the San Francisco

Bay Area, the *Red Herring* noted on March 13, 2002:

> Employees say that in other parts of the business , Qwest
> created the appearance of growth by a revenue -boosting practice
> known as flashing. This refers to hooking the maximum projected
> revenue on a customer's account even if the realistically projected
> number is much lower. With major wholesale accounts,  the
> flashing practice could sometimes result in huge overstatements.
>
> A sales manager who oversaw a team of sales
> representatives says that in one recent instance, the manager was
> ordered by a regional vice president to flash a $30,000 sale for
> $275,000 instead. The practice was common in the region, the
> source says, claiming that similar flashing orders were being issued
> in Florida, Texas, and Washington state. Says the source, who left
> the company late last year, "The pressure was on because of
> unattainable forecasts by Nacchio."

**H.    Improper Revenue Recognition on Bill and Hold Transactions**

116.    During Second Quarter 2001, Qwest recognized revenue of $36 million related to

certain equipment to be installed under a contract with the Arizona School Facilities Board . The

equipment had not been shipped, nor had Qwest been paid for the equipment at the time it

recorded revenue from the transaction. This revenue was incorrectly recorded as a "bill and

hold" transaction because there was no binding obligation to pay in 2 001. This recognition violated GAAP and SEC rules as alleged herein. [1]

### I.      Genuity Contract Income Overstatement

117.     In September 2000, Qwest secured a contract with Genuity for $260 million for five years of network services.  The contract called for Qwest to ship   equipment required under the contract and receive a $100 million payment.  The equipment was not something Qwest had, so it had to purchase $40 million worth of equipment from Lucent and Cisco.  Because this portion of the contract was essentially an equi pment sale, Qwest should have recorded revenues of $100 million and costs of sales of $40 million, with a profit contribution of $60 million. However, in order to inflate reported EBITDA earnings, Qwest deferred $20 million in costs as an asset and record ed a profit contribution of $80 million.

---

[1] "Bill and Hold" refers to transaction where a product is recorded as revenue prior to shipment to a customer.  Because these types of transactions are so ripe for abuse the SEC has very specific rules for revenue recognition for  Bill and Hold.  According to SEC Staff Accounting Bulletin ("SAB") No. 101 *Revenue Recognition in Accounting Statements* and AAER No. 108, the following conditions must exist for revenue recognition:

The risks of ownership must have passed to the buyer;
The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;
The buyer, not the seller, must request that the transaction be on a bill and hold basis. The buyer must have a substantial business purpose for or dering the goods on a bill and hold basis;
There must be a fixed schedule for delivery of the goods.  The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);
The seller must not have retained any specific performance obligations such that the earning process is not complete;
The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and
The equipment [product] must be complete and ready for shipment.

Case 1:06-cv-17880-REB-MEH    Document 45-2    Filed 04/24/07    USDC Colorado    Page 49 of
187
Case 1:06-cv-01539-REB    Document 174    Filed 08/07/2006    Page 49 of 187

**J.      Pension Assumptions**

118.    Qwest's undisclosed alteration of pension assumptions, as disclosed in the

June 20, 2001 Morgan Stanley report, materially increased Qwest's earnings.  This type of

change would not have occurred  absent senior management's approval.  Defendants knew about

this change and about the fact that it was not disclosed.

**VI.    QWEST'S ADDITIONAL FINANCIAL STATEMENT IMPROPRIETIES**

119.    GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practices at a

particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(l )) states that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to   be

misleading and inaccurate.  Regulation S-X requires that interim financial statements must also

comply with GAAP, with the exception that interim financial statements need not include

disclosures that would be duplicative of disclosures accompanying ann ual financial statements.

17 C.F.R. § 210.10-01(a).

120.    Defendants unlawfully manipulated Qwest's financial results in violation of SEC

rules, GAAP and numerous other accounting rules. In order to overstate its earnings in 1999,

2000 and 2001, Qwest violated GAAP and SEC rules:

        a.      by improperly recognizing revenue on reciprocal transactions involving

IRUs and on the sale of equipment to KMC,

        b.      by failing to properly report the value of its KPNQwest investment to

reflect the non -temporary impairment of its investme nt,

        c.      by overstating revenue from order "flashing,"

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 50 of
187
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 50 of 187

       d.     by improperly accelerating the recognition of revenue on the Warwick

deal,

       e.     by failing to record $1 billion in impairment to Property, Plant and

Equipment ("PP&E"), and

       f.     by failing to accrue $700 million in liabilities for contracts and other

expenses and through other manipulations.

Further, Qwest recorded $2 billion in purchase price adjustments on the value of its KPNQwest

investment.  These adjustments should have been recorded as asset impairment write -downs.

      121.    Qwest reported the following financial results during the Relevant Period:

|  | 3/31/99 | 6/20/99 | 9/30/99 | 12/31/99 |
|---|---|---|---|---|
| Revenues | $878.4M | $873.7M | $1.02B | $1.16B |
| EBITDA | $155.4M | $186.9M | $190.5M | $226.4M |

|  | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 3/31/01 | 6/30/01 |
|---|---|---|---|---|---|---|
| Revenues | $1.22B | $1.28B | $4.77B | $5.02B | $5.50B | $5.22B |
| Gross Profit |  |  | $3.06B | $3.24B | $3.15B | $3.37B |
| EBITDA | $236M | $256M | $1.86B | $1.99B | $2.0B | $2.03B |

Qwest included these results in press releases and SEC filings.

      122.    These financial results and the statements about the m were false and misleading,

as such financial information was not prepared in conformity with GAAP, nor was the financial

information a fair presentation of the Company's operations due to the Company's improper

accounting for its investment in KPNQwest,  and other assets and liabilities, in violation of

GAAP and SEC rules.  Qwest has now restated its post June   30, 2000 financial statements to

- 45 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 51 of
187
Case 1:06-cv-01539-REB   Document 1-4   Filed 08/07/2006   Page 51 of 187

reduce previously reported income by $2.5 billion in 2001 and $1.4 billion in 2000.  Although it

technically did not have to restate pre -merger financials, Qwest has also acknowledged $1.32

billion in IRU deals in 1999 and 2000 pre-merger for which it used the same, improper

accounting method.

      A.    **KPNQwest Investment**

123.    Qwest's investment in KPNQwest had declined 40% from sum mer 2000 to fall

2000, and another 50% between Fourth Quarter 2000 and First Quarter 2001.  The investment

was not properly accounted for as Qwest failed to record any impairment until the summer of

2001 when it made a $3 billion adjustment to the "original" value as of June 30, 2000 and

recorded an additional $3 billion impairment charge.

124.    GAAP, as set forth in Accounting Princ iples Board Opinion ("APB") No. 18,

requires that companies recognize an impairment loss when a decline in value of an equity

investment is other than temporary.  APB No.  18, 16(b), states in pertinent part:

> A series of operating losses of an investee or other factors may
> indicate that a decrease in value of the investment has occurred
> which is other than temporary and which should be  recognized
> even though the decrease in value is in excess of what would
> otherwise be recognized by application of the equity method.

125.    GAAP, as set forth in APB No.  16, "Business Combinations," requires companies

to allocate the purchase price of an acquisi tion based on fair values of the assets acquired, as of

the acquisition date.  As of June  30, 2000, the acquisition date, Qwest's most valuable tangible

asset was its investment in KPNQwest, a European provider of communications services, which

had a market value of $7.9 billion.  Because Qwest's investment in KPNQwest carried certain

trading restrictions, Qwest reduced the market value to reflect its fair value.    As a result, Qwest

- 46 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 52 of
187
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 52 of 187

initially reported its investment in KPNQwest at $7.4 billion in its Form 10-Q for June 30, 2000.

Qwest also reported its investment in KPNQwest at  $7.4 billion or more as of June 30, 2000 (the

acquisition date) in its September  30, 2000, December 13, 2000, and March 31, 2001 financial

statements.

126.     By the time Qwest reported its  Third Quarter 2000 and Fourth Quarter 2000

results, however, its investment in KPNQwest had deteriorated significantly since the merger

date.  By the time it reported its First Quarter 2001 results, Qwest's investment in KPNQwest

had deteriorated dramatica lly as compared to the value at June  30, 2000–the merger date.   On

June 30, 2000, KPNQwest stock traded at $39.63 per share.   By October 2000 it was trading at

well below $30.  By March 31, 2001 (the last day of Qwest's First Quarter 2001), KPNQwest

had dropped to $10.30.  By April 20, 2001 (just prior to Qwest reporting its First Quarter 2001

results), the value of KPNQwest had dropped to $9.50 per share, a decline of 76% from the

merger date.   Thus, Defendants increasingly knew that the impairment was not  temporary and

certainly realized this fact before Qwest issued its First Quarter 2001 results.    Defendants also

knew that KPNQwest was not as strong financially as the public perception.    It was not until

February 12, 2002, that KPNQwest acknowledged that  more than half its 2001 revenues were

generated through IRU sales.

127.     Pursuant to GAAP, as set forth in APB No.  18, the Company was required to

recognize a loss to reflect the non -temporary impairment of the investment.   Contrary to GAAP,

the Individual Defendants caused Qwest to ignore such losses, as to do so would have reduced

the Company's earnings during the relevant period.

128.   Qwest ultimately admitted in a June 20, 2001 Form 8-K responding to the Morgan Stanley report that:

> At the time of the Merger, the  Company originally estimated the fair value of its investment in KPNQwest to be approximately $7.9 billion.  Based upon an independent third party appraisal that has recently been completed, the estimated fair value of the Company's investment in KPNQwest  was approximately $4.8 billion on June 30, 2000 (the Merger date).

> * * *

> The current market value of the Company's investment in KPNQwest is approximately $1.6 billion.

129.   Thus, during Second Quarter 2001, in order to avoid fully recording this loss  in value in June 2001, Qwest claimed that the fair value of its in vestment in KPNQwest as of June 30, 2000 was only $4.8 billion.  By doing so, Qwest was able to avoid recording a $2.6 billion loss (the difference between the $7.4 billi on actual fair value as of June 30, 2000 and Qwest's subsequent claimed fair value of $4.8 billion) in 2000 and First Quarter 2001.

130.   In its SEC filings, Qwest claimed that the June  30, 2000 market value of its stock in KPNQwest was $7.9 billion.  As of June 30, 2000, Qwest claimed the fair value of its investment in KPNQwest was not less than $7.4 billion.   Its later claim that the June  30, 2000 fair value was only $4.8 billion is based on subsequent developments, which is not permitted b y GAAP. APB No.  16, 88A, 94.

131.   Qwest, in S econd Quarter 2001, recorded a write -down of its investment in KPNQwest of $3.05 billion.  The total amount of impairment (exceeding $6 billion) of Qwest's investment in KPNQwest was not reflected until Defendants had finished selling their personally-held over shares.   Additional write-downs were recorded in Fourth Quarter of 2001.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 54 of
187
Case 1:06-cv-01539-REB     Document 1-1     Filed 08/07/2006     Page 54 of 187

**B.**   **Qwest Improperly Avoided Recording Charges of $2.1 Billion from Losses on its Property and Equipment and Accrued Liability**

132.   Just as it improperly accounted for its investment in KPNQwest, Qwest also improperly retroactively reduced its purchase price allocation for property and equipment by $1 billion and accrued $700 million in previously unrecorded liabilities. Qwest did not disclose this adjustment to investors until after the Morgan Stanley report criticizing Qwest's purchase price allocation was issued in June 2001.

133.   Qwest attributed the delay in finalizing the purchase price allocation for Property, Plant and Equipment to "limited interaction between Qwest and US West prior t o the closing of the merger" and "limited information available to US West and the short timeframe" between the merger and the filing deadline. This explanation is inadequate because Qwest, as the surviving corporate entity, knew what assets it owned and what they were worth.

134.   According to Qwest's June 20, 2001 Form 8-K, impairments to Qwest's property and equipment were based on declining replacement costs of network equipment. However, the decline in these replacement costs did not occur until after June 30, 2000.

135.   Qwest failed to record any impairment to property and equipment as it should have during the Relevant Period. Then, on June 30, 2001, Qwest reallocated its purchase price to reduce the value of property and equipment. Pursuant to GAAP, as set f orth in SFAS No. 121, Qwest was required to identify and record impairment whenever conditions indicated impairment existed. The assets in question were Qwest assets and thus Qwest was aware of the problems with these assets.

136.    Qwest also failed to record some $700 million in provisions for contracts and other liabilities.  Pursuant to GAAP, as set forth in SFAS No. 5, a loss should be recorded for a contingency when the loss is probable and can be reasonably estimated.

137.    Qwest has admitted the liability existed on June 30, 2000.  This liability existed on not only June 30, 2000, but also on September 30, 2000, December 31, 2000 and March 31, 2001.  Nonetheless, Qwest did not record it until June 30, 2001.

138.    The amount of the unrecorded liabilities and unrecorded impairment ($1.7 billion), if properly recorded, would have wiped out Qwest's earnings in any of the quarters during the relevant period.  If Qwest had recorded even a portion of the charges, it would have significantly affected its results, but—in violation of GAAP—Qwest failed to do so.

## VII.    QWEST RESTATES ITS FINANCIAL STATEMENTS

139.    On July 28, 2002, Qwest announced that it was restating its earnings for 1999, 2000 and 2001. Qwest SEC Form 8-K, filed 7/29/02. In a press release the same day, Qwest explained:

> the company has determined that it has in some cases applied its accounting policies incorrectly with respect to certain optical capacity asset sale transactions [(IRU deals)] in 1999, 2000 and 2001.

Press Release, *Qwest Communications Provides Current Status Of Ongoing Analysis Of Its Accounting Policies And Practices* (7/28/02).  In an interview also that same day, CEO Notebaert stated that "an internal review had identified 220 transactions involving the sale of communications capacity that might have [been] incorrectly accounted for by its executives and approved by its then auditor, Arthur Andersen." Simon Romero,  *Qwest Says It Incorrectly Accounted or $1.1 Billion*, N.Y. Times, 7/29/02.

140.    During a conference call, various Qwest executives told investment ana lysts and the media that:

a.    "Qwest disclosed it improperly accounted for $1.16 billion in sales of fiberoptic strands on its network in 1999, 2000 and 2001."

b.    "Qwest intends to restate revenue and costs from contracts to sell equipment to upstart telecommunic ations companies and, in turn, buy telecom services from those companies.  The deals involved $283 million in revenue and $162 million in cash flow."

c.    "Qwest estimates it overstated its costs in 2000 by $15 million and understated its costs in 2001 by $113  million because of improper accounting for costs associated with services it bought from other telecom companies."

d.    "Qwest still is looking into accounting methods for changes in the publication schedules of its QwestDex directory business."

Kris Hudson, *Qwest Revising '99 - '01 Results. Move May Bolster Shareholder Suits*, Denver Post, 7/29/02.

141.    Qwest later detailed the restatement on September  22, 2002, announcing that it would restate $950 million in revenue booked from swaps of capacity on its fiber -optic network from after the Qwest/US West merger, and most likely would restate up to an additional $1.32 billion in revenue from before the merger.  Press Release,  *Qwest Communications Updates Status of Analysis of Optical Capacity Asset Transaction Accounting Policies and Procedures* (9/22/02); Qwest SEC Form 8 -K, filed 9/23/02.

142.    On October 16, 2003, prompted by the 18 -month federal probe into Qwest's accounting practices, the Company eventually issued an amended SEC Form 10 -K that contained

restated consolidated financial statements for the years ending 2000 and 2001. In the amended Form 10-K, Qwest shuffled or erased nearly $2.5 billion of revenue for 2000 and 2001, conceding that it had improperly accounted for multiple transactions in these years.

143.   According to the financial statements, the restatements were made after numerous errors were identified because the Company violated GAAP. Most of these material adjustments involve Qwest either improperly recognizing revenue or reducing its expenses for a period.   In every instance, the end result was the understatement of Qwest's overall net losses. This restatement concerned numerous accounting practices challenged by Plaintiff herein.

### A.   IRU Sales Manipulations

144.   In its restatement, Qwest admitted to manipulating t he revenue recognized from the sale of capacity under IRU contracts by both incorrectly accounting for the transfers of optical capacity for cash and by incorrectly accounting for transfers involving the simultaneous exchange of optical capacity with other  telecommunications service providers. The amount of these combined IRU manipulations reduced revenue for 2000 and 2001 by $467 million and $988 million, respectively.

145.   Transfers of Optical Capacity for Cash : In 1999, 2000 and 2001, Qwest entered into several IRU transactions for cash. The terms of these IRUs were typically for a period of 20 years. Nonetheless, Qwest recognized the total amount of cash received as revenue up front. Pursuant to GAAP, as set forth in SFAS No.  13 "Accounting for Leases," Qwest was required to defer the revenues associated with these transactions and recognize them ratably over the terms of the respective contracts.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 58 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 58 of 187

146.     Qwest further violated GAAP by recognizing a portion of the revenue generated
from these IRU sales in the wrong period.  Under GAAP, Qwest could not recognize any income
associated with these IRU contracts until the assets were actually physically transferred to the
other party.  *See* FASB Statement of Concepts No.  5, 83-84.  Qwest violated this concept by
recognizing revenue from the sale of these leases in periods prior to the transfer of the assets.

147.     Due to the above GAAP violations, in its restatements, Qwest cut its previously
reported revenue for the periods ending 2000 and 2001 by $150 million and $339 million,
respectively.

148.     Contemporaneous Transfers of Optical Capacity :  As discussed above, in 1999,
2000 and 2001, Qwest entered into several IRU arrangements with other service providers to
exchange or "swap" optical capacity assets.  Under GAAP, as provided for in APB Opinion
No. 29, "Accounting for Nonmonetary Transactions" ("APB No.  29") and related interpretative
guidance, Qwest was required to treat these simultaneous transfers as exchanges of similar
productive assets based upon the carrying value of the e xchanged assets.  Instead, Qwest
improperly treated these transactions as two separate agreements and recognized the "earnings"
associated with these transactions as revenue, thus wrongly inflating Qwest's revenue for these
periods.

149.     In its restatement, Qwest slashed its previously reported revenue for the periods
ending 2000 and 2001 by $317 million and $649 million, respectively.

## B.     **Equipment Sales**

150.     Qwest overstated certain equipment sales in 2000 and 2001.  In its restatement,
Qwest's corrections of these mis statements resulted in an aggregate decrease to its revenue for

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 59 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 59 of 187

these two years of $111 million and $202 million and an increase in its reported pre-tax loss of $83 million and $58 million, respectively. These amounts concern sales involving Genuity, Arizona, KMC and Calpoint, discussed in more detail below.

151.  *Genuity* – As discussed herein, Qwest improperly accounted for its income under its contract with Genuity. In 2000, Qwest entered into a contract with Genuity whereby Qwest agreed (a) to sell Genuity $100 million of equipment and (b) to provide Genuity with $160 million of services over a period of 5 years. Despite the arrangement involving a single agreement, Qwest treated the equipment sale and the service sale as separate arrangements. Accordingly, Qwest recorded the $100 million equipment sale as revenue in 2000. As for the service agreement, Qwest recorded income related to this contract in the amount of $11 million and $31 million for 2000 and 2001, respectively. Nonetheless, the proper treatment of this arrangement under GAAP was to treat both parts of the agreement as a single transaction, which would require Qwest to recognize the full amount of the revenue for this contract ratably over the course of five years.

152.  In addition to improperly treating the agreements as separate arrangements, Qwest recognized income associated with this agreement prior to Genuity's acceptance of the agreement. This last fact was admitted by Qwest in its Amended 10-K. Genuity did not accept the agreement until the Third Quarter of 2001; nevertheless, Qwest began recognizing income from this arrangement in 2000.

153.  For 2000, Qwest was forced to reverse all of the entries associated with this transaction, including reducing its revenue by $111 million. For 2001, Qwest first had to reverse the entries, reducing its revenue by $31 million. Then Qwest had to recognize $1 million of

revenue for the amount of revenue it did earn in 2001, as well as to take a $3 million depreciation expense related to the equipment purchased  for this arrangement.

154.   *Arizona* – In the Second Quarter of 2001, Qwest received a purchase order from the Arizona School Facilities Board for the design and implementation of a statewide school network in the amount of $100 million.  Originally, Qwest began recording revenue on this purchase order (including $36 million in the Second Quarter of 2001) before any payment was received or even before the school board had agreed to a binding payment, an improper recognition of revenue under "Bill and Hold" Accoun ting.  Eventually, in the Fourth Quarter 2001, Qwest reversed these entries and began to recognize revenue and cost of sales on this project based upon the percentage of completion method.  Unfortunately, Qwest's calculations under this method were based o n an "assumption" that the total amount of revenue recognized during the life of the contract would be substantially greater than the $100 million contract price.  Based upon this over inflation of its revenue, as well as other additional errors associated   with this project, in its restatements Qwest recognized a net restatement. adjustment, reducing its revenue by $24 million for 2001.  A number of now-former Qwest employees are facing criminal charges as to this transaction.

155.   *KMC and Calpoint* – As discuss ed above, Qwest would enter into reciprocal transactions with KMC, whereby Qwest would buy services from KMC and KMC would buy equipment from Qwest.  Thereafter, Qwest treated the reciprocal transactions as two separate agreements and immediately recognized revenue associated with the equipment sales which is a violation of GAAP, as alleged herein. In its restatement, Qwest admitted that these agreements could not be separated because "they were entered into in contemplation of each other."  In its

restatement, Qwest reduced its revenue for 2001 by $148 million to reverse several of the arrangements it entered into with KMC in the first two quarters of 2001.

156.    In the Third Quarter 2001, Qwest entered into a similar swap type arrangement with Calpoint, whereby Qwest agreed to buy services from Calpoint over a five year term and in exchange Calpoint would buy equipment from Qwest.  Per this agreement, Qwest calculated the difference between the proceeds it received minus the cost of the equipment and recognized it ratably over the terms of the agreement and posted it as a reduction to cost of sales.

157.    With both the KMC and Calpoint transaction, Qwest also agreed to aid the two in obtaining financing by agreeing to pay 75% of the monthly service fee for debt instrumen ts associated with KMC and Calpoint.  Qwest was required to pay this fee even if KMC and Calpoint did not provide Qwest with any services during the period. In light of this atypical agreement, per GAAP, Qwest should have deferred the difference between th e proceeds it received minus the cost of the equipment until such a time as the commitment to pay this service fee was equal to or less than, the total amount deferred.  In fact, Qwest admitted in its 10   -K that its accounting for the KMC and Calpoint trans actions were "not in compliance with GAAP."  As a result, Qwest reversed $12 million of amortization of the deferred gross profit for the year.

### C.    Directory Publishing Services Revenues and Costs

158.    In addition to the directory services manipulations discussed h erein, Qwest also decided to change the method it used for accounting for its directory service revenue in order to overstate its revenue for the periods.  The proper revenue recognition method is the "deferral and amortization method"  which requires the c ompany to recognize revenue and expense over the life of the directories, in this case one year.  Qwest used this method until 1999, when it decided

to change to the "point of publication method."  Under this new method, Qwest would recognize

the revenue and expense at the time the directory was published.  The point of publication

method is not an acceptable method under GAAP, as acknowledged by Qwest in its restatement.

*See* SAB No. 101.  As a result, Qwest reduced its revenue for 2000 and 2001 by $57 mil lion and

$78 million.

159.    Additionally, in light of the fact that Qwest erroneously changed its accounting

method in 1999, it affected its revenue in 1999.  Rather than restate its 1999 financial statements,

Qwest opted to restate its beginning retained earnin gs balance as of January 1, 2000 by $353

million to account for this misstatement.

### D.    KPNQwest Valuation

160.    As discussed more fully above, Qwest improperly failed to timely write down the

carrying value of its investment in KPNQwest to its fair market value as i s required under

GAAP, as set forth in APB No.  18.  This provision requires a company to recognize a loss to

reflect the non -temporary impairment of the investment.  By the end of 2001, Qwest eventually

wrote down its investment in KPNQwest to $1.3 billion .  However, in its restatement, Qwest

acknowledged that the true value of the investment at the end of 2001 was $1.15 billion and,

accordingly, wrote down the investment another $156 million.

### E.    Investment in Qwest Digital Media

161.    Qwest failed to account proper ly for a loss on its investment in Qwest Digital

Media, the business venture it entered into with Anschutz in 1999, as alleged herein under the

heading "Scienter."  Qwest accounted for its investment under the equity method, which requires

a company to ori ginally record the investment at its initial cost.  Thereafter the company will

adjust the value of the investment to reflect the company's share of the investee's income or loss for the period, as well as to recognize any non-temporary impairment in the value of the investment.  Similar to its treatment of its KPNQwest investment, Qwest failed to record timely an additional $27 million loss in 2000 when it occurred, waiting until 2001 to record the loss.  In its restatement, Qwest moved the $27 million loss from its 2001 income statement to its 2000 income statement.

###### F.   Other Accounting Improprieties

162.   Additionally, Qwest acknowledged in its restatement that during its internal investigation it discovered "other" improprieties which caused an overstatement in its revenue for both years.  Although it did not specifically identify what these "other" errors were or why the adjustment was necessary, Qwest reduced its previously reported revenue for 2000 and 2001 by $65 million and $113 million, respectively.

###### G.   Qwest's Financial Statements Violated Fundamental Concepts of GAAP

163.   Due to these accounting improprieties, Qwest presented its financial results and statements in a manner which violated GAAP, including violations of the following fundamental accounting principles:

a.   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, 10);

b.   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, 34);

c.      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources   (FASB Statement of Concepts No.  1,  40);

d.      The principle that financial reporting should provide  information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted.     To the extent that management offers securities of the enterprise to the public, it vo  luntarily accepts wider responsibilities for accountability to prospective investors and to the public in general  (FASB Statement of Concepts No. 1, 50);

e.      The principle that financial reporting should provide information about an enterprise's financial performance during a period.   Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.     Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance  , those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No.  1, 42);

f.      The principle that financial reporting should be reliable in that it represents what it purports to represent.    That information should be reliable as well as relevant is a notion that is central to accounting  (FASB Statement of Concepts No.  2, 58-59);

g.      The principle of completeness, which means that nothing is left out of the information that may be necessary to in sure that it validly represents underlying events and conditions (FASB Statement of Concepts No.  2, 79); and

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 65 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 65 of 187

h.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business si tuations are adequately considered.   The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent    (FASB Statement of Concepts No.  2, 95, 97).

164.    Further, the Defendants concealed adverse informat ion during the Relevant Period, which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, investors and securities analysts expect companies to disclose. Corporate officials and their legal and financi al advisors know that they must disclose this information and know that this is the type of information that investors and analysts rely on.

**H.      Qwest Admits Publishing Materially Incorrect Financial Results**

165.    As a result of Qwest's accounting practices as alleg ed herein, Qwest restated its 2000 and 2001 financial statements.  The number of and size of the accounting restatements suggests that the restatements were not the product of mathematical error, but rather were the product of purposeful misstatements of f act, misapplication of accounting principles, and/or fraud.  At a minimum Qwest has acknowledged that the financial results it originally published during the Relevant Period and its public statements regarding those results were materially incorrect.

166.    GAAP requires a restatement to occur when the originally issued financial statements were based on fraudulent accounting practices.  [2]  As set forth in APB No.  20, the type of restatement announced by Qwest was for "a correction of an error in previously issued

---

[2] In general, restatements of past financial statements is disfavored because it dilutes investor confidence in the financial statements, and it makes it difficult to compare financial statements ; therefore, GAAP provides that financial statements should only be restated in limited circumstances.  *See* APB Opinion No. 20, 14.

financial statements." *See* APB No. 20, 7-13.  APB Opinion No. 20 defines errors as "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepare d." *See* APB Opinion No. 20 13.

167.    Due to the accounting improprieties set forth herein, it appears likely that Qwest engaged in mistakes in the application of accounting principles and "misuse of facts" at the time its financial results were published, in either case in violation of GAAP.

## VIII.   THE UNITED STATES CONGRESS INVESTIGATES QWEST

168.    As alleged herein, on  September 24, 2002, the House of Representatives Energy and Commerce Committee commenced the Hearings on Sham Transactions.  During these hearings, the Committee took sworn testimony from a number of individuals involved in the telecommunications industry.  On September  14, 2002, the Committee interviewed Defendant Szeliga and took sworn  testimony from her on September  24, 2002.  On October  1, 2002, the Committee took sworn testimony from Defendant Nacchio.

169.    During the Hearings on Sham Transactions, Subcommittee Chairman Rep. James C. Greenwood (R. -Pa.) asked, "[w]ere these capacity swap transactions undertaken to respond to do new business opportunities or wer  e they merely designed to provide the appearance of expanding business and growing revenues[?]"  Greenwood then answered his own question, explaining that "[e]vidence uncovered by this committee's investigation suggest that the latter is true."

170.    As part of i ts interview with D efendant Szeliga on September  14, 2002, the Committee staffers asked Szeliga to show the purpose of sales and purchases of fiber optic

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 67 of
187
Case 1:06-cv-01539-REB     Document 171     Filed 08/07/2006     Page 67 of 187

capacity Qwest made with Global Crossing.   According to Ken Johnson, spokesman for the

Committee, "[t]he more the committee probes, the more it appears those deals were questionable,

made simply to inflate revenues."

171.   Testimony taken by the Committee, and documents obtained and released by it,

confirm that Qwest improperly recognized the revenue up -front for many transactions.

Testimony and documentary evidence also show that Qwest entered into improper "side deals"

that changed the terms of the agreements after they were concluded in order to permit Qwest

fraudulently to inflate revenue from the deals.   An internal Qwest e-mail, for example, detailed

the Company's understanding that it could only properly recognize revenue up -front if the

particular fiber sold was specifically identified at the outset.   By contrast, an agreement

providing for portability—*i.e.*, the purchaser's right to later determine or switch what fiber was

sold—would disallow up-front revenue recognition.   As explained by Matthew Scott, Qwest's

Director of Finance for Worldwide Strategic Transactions, in a September  26, 2001 e-mail to

Susan Chase, Qwest's VP of International Wholesale Markets:

> The issue is the "ultimate culmination of the earnings process," or
> lack thereof. If [Qwest] offer[s] portability [its] Auditors view that
> as a service, not an asset sale. . . . Because the customer h as a
> "defacto" right to swap out capacity that was not originally
> contemplated, the earning process has not been completed until
> such time as we have provided the ultimate capacity they need.

172.   Thus, in situations where the customer desired portability, Qwes t hid the

provision for such in a side -deal and improperly recognized revenue from the deal as though it

were one not providing for portability.   These side deals were sometimes oral and at variance

with the original contracts concerning the deals:

> Officials from [Global Crossing, Flag Telecom Holdings Ltd. and

> Cable & Wireless PLC] testified that Qwest gave them the right to use their capacity as a kind of "gift certificate" to buy Qwest services, via side agreements made orally and in e-mails. That ran contrary to the firms' written contracts, which said that the three companies were buying specific assets – a key technicality for Qwest to recognize the full value of the contracts in one quarter.

Dennis K. Berman, *Companies Testify About Side Deals Made With Qwest*, The Asian Wall Street Journal, 09/26/02. Szeliga's testimony indicated that these side deals may also have violated some of Qwest's internal policies:

> "We had a number of policies and procedures that would not allow these side agreements to be ma de," Qwest executive vice president Robin Szeliga, former chief financial officer, said under oath.

Anne C. Mulkern, *E-mail Suggests Stretched Ethics Qwest-Global Crossing Deal Scrutinized as House Hearings Open*, Denver Post Washington Bureau, 09/25/02.

173. Additional evidence uncovered by the Committee left no doubt that Qwest undertook use of the side deals to falsify reported revenues, and that their impact on Qwest's bottom line was substantial. Ken Johnson, spokesman for the Committee, stated "[d]ocuments and interviews indicate that Qwest struck undisclosed side deals with other telecommunications companies that significantly altered the net financial result for Qwest." Elizabeth Douglass, Panel Told of 'Sham' Global, Qwest Deals, 9/19/02. The Committee released an e-mail between Robin Wright, a senior vice president at Global Crossing, and Qwest managers where Wright said, "'[y]ou both know the issue, we are taking capacity in order to help with revenue recognition issues.'" James Granelli, *E-Mails Confirm Ruse by Global*, L.A. Times, 9/20/02. One of the Qwest executives who received this e-mail replied four minutes later: "'I agree with your comments.'" Anne C. Mulkern, *Qwest Deal Was Disputed*, Denver Post. 9/26/02.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 69 of
187
Case 1:06-cv-01539-REB   Document 174   Filed 08/07/2006   Page 69 of 187

174.     The Committee's investigation reve aled several specific transactions wherein Qwest used portability side deals to inflate revenues improperly:

**A.**     <u>**Cable & Wireless**</u>

175.     On September 24, 2002, the Committee received a declaration from Nicholas Jeffery ("Jeffery"), an employee of Cable & Wireless, a "global provider of telecommunications services headquartered in the United Kingdom."   Declaration of Nicholas Jeffrey executed 9/24/02.  In his declaration, Jeffery states that his company "entered into an agreement to purchase [fiber optic] capacity from [Qwest] effective as of March 21, 2000, as amended June 30, 2000, September 29, 2000 and December 28, 2000." *Id.*  After the origination of the contract on March 21, 2000, each of these amendments took place on the last business day of the quarter in which they were executed.  In each case, the agreements or amendments were entered into before the final terms of the transactions had been determined, or were modified by subsequent "side letters" but the revenue associated with the agreements was nevertheles s in the period in which the agreement or amendment was signed.

176.     For example, Jeffery declared that on December 29, 2000, Mohebbi "confirmed the understanding of the parties that Cable & Wireless could obtain a `full and fair trade of the capacity' in the Agreement if it wished to upgrade [to different capacity]."  Jeffery further states that he corresponded with Casey, who also confirmed the ability to upgrade. According to Jeffery, the upgrade capability was important because "it allowed Cable & Wireless t o apply the purchased capacity to other routes if demand increased or parts of the Cable & Wireless network buildout were delayed."  These upgrade capabilities were not set forth in the original agreement, but rather were outlined in "side letters."

- 64 -

177.    E-mails between and among Qwest and Cable & Wireless employees that were

released by the Committee support Jeffrey's statements.  E -mail exchange between various

authors and recipients (12/00) (noting that "Qwest understands your concerns regarding the

language in the side letter 'as agreed on by the parties'"); E -mail to Jeffrey from Mohebbi

(12/29/00) (stating the same, and noting that "Qwest guarantees that should Cable & Wireless

request such a trade prior to 31  December 2001, then Qwest shall provide such ca pacity"); Letter

from Casey to Alan Oue (12/29/00) (stating that "C&W may exchange some or all of the

Original Capacity," and offering other services).  Ultimately, according to Jeffery, Cable &

Wireless was able to extract the portability out of Qwest, no twithstanding the prohibition against

it.

## B.    **FLAG Telecom**

178.    The Committee also revealed that on June  27, 2001, Qwest entered into an IRU

swap with FLAG Telecom of England ("FLAG").   At the time, FLAG was looking for access in

Japan, and Qwest could offer them t he cable—but not the exact cable they wanted because it was

not yet available. E -mail to Casey & Julie Hawkins from Susan Chase (6/4/01).  Instead, "[f]or

Qwest to start recognizing revenue on the 20 million dollar IRU,  we are planning to sell Flag [ 10

strands on another US -Japan cable].  Flag will then port over to [the new cable] within 2 or three

months once [the new cable is available]."  The deal could be done because "Flag is willing to

trust us."  The deal was one half of a swap, valued at $20 million for each company.  E-mail

exchange between various authors and recipients (5/7/01).

179.    By November 2001, FLAG wanted to take advantage of the side deal it negotiated

with Qwest, and "upgrade" its fiber location to the new fiber line.   E-mail exchange between

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 71 of
187
Case 1:06-cv-01539-REB    Document 17    Filed 08/07/2006    Page 71 of 187

various authors and recipients (11-12/01).  The problem was that, according to Steven Q.

Hansen, Qwest's Vice President and CFO – Wholesale Markets, Qwest had over-promised, and

could not sell IRUs on the new "J-US" line.  Rather, Qwest would have to ch ange the terms of

the deal from a sale to a lease, and, again, according to Hansen, "would have to adjust revenue

by $18 [million]."

180.   Qwest employees also recognized this "[c]oncern" because it was raised by an

"Audit Letter from Arthur Andersen."   E-mail to Kimberly Smiley from Shawna Lee (12/11/01).

Qwest employees discussed the audit letter in e -mails, noting that there is "[p]ossible exposure

on both parties based on 'verbal/oral' agreements."   Qwest's Director for International

Wholesale Markets, Shawn a Lee asked other Qwest employees for information regarding "[h]ow

should FLAG handle responding to the request to list the verbal/oral agreements between the

companies?"

181.   Andersen had asked FLAG for "a complete listing of all agreements between [it]

and Qwest, including executed contracts, side agreements and oral commitments, executed

during the first three quarters of 2001."   Letter to Ken Floyd from Mark Schumacher (11/14/01)

and handwritten letter to Arthur Andersen from P. Dost (12/21/01).  On December 21, 2001,

FLAG wrote back to Andersen that "[f]or the contract dated 27 June 2001, there is a verbal

agreement that Qwest will convert the capacity purchased into 16 STML's on the Japan -US

cable system when available."

C.   **Global Crossing**

182.   The Committee's investigation further revealed that on March 27, 2001, Qwest

and Global Crossing entered into a side deal relating to Global's "purchase" of "certain capacity

in North America pursuant to a Wave IRU agreement" and other purchases by Global.
Agreement between  Global Crossing North American Networks, Inc. and Qwest (3/27/01).  The
side agreement stated that it was "the intention of the parties" to allow Global to exchange the
capacity under a new IRU for other capacity "between the same or alternative sites in E  urope or
the USA."

183.   And on June 22, 2001, Qwest and Global Crossing entered into a side deal
relating to a multi-part swap deal for capacity in Europe and the United States.  E -mail exchange
between various authors and recipients with attached side letter t  o Qwest from Global Crossing
(6/01).  As part of the side deal, after 30 days notice, Global Crossing was allowed to "sell back
the whole or part of the Capacity in exchange for [Global's] purchase of an IRU in any other
bandwidth capacity between the same  or alternative sites in Europe or the USA."  This side deal
rendered the non -portability provisions of the original deal useless.

184.   An additional group of e -mails obtained by the Committee revealed that Qwest
upper management understood the highly improper  nature of their use of the IRU deals.  The
emails, released by the Committee on September  30, 2002, illustrate that Qwest's second
highest-ranking executive, Mohebbi, "encouraged employees to put through a questionable sale
of fiberoptic capacity in 2000 and offered to 'take the fall' if the company was caught in an
audit."  Anne C. Mulkern, *Qwest Exec Advocated Dicey Sale*, Denver Post, 10/1/02.  "The e -
mails released Monday are a conversation between Mohebbi and David Boast, Qwest's
executive vice presiden t of planning, engineering, network and operations in 2000, and several
other employees."

Mohebbi suggests "what if we mis -route the IRU and then
route it as it is suppose to?"

> Boast responds by telling Mohebbi "then all we have to do is get audited, get caught, and get screwed!"

> Mohebbi responds, "I know it is risky.  I will take the fall for it!"

185.    The Committee also uncovered the fact that Defendant Szeliga, after learning of the side deals, apparently told Qwest's Audit Committee that "it was her view   that the Corporation did not need to take any action with respect to accounting or financial reporting for those transactions."  Memorandum from the Audit Committee (10/29/01).  Her opinion was seconded at the meeting by Andersen's representative, Mark Iwa  n, and was supported, according to the committee notes, by Defendants Nacchio and Tempest, as they were "comfortable with Ms. Szeliga's assessment."  The Audit Committee, in turn, was "comfortable with the recommendations and positions taken by management, " but "requested that management perform a thorough review of its relevant policies and procedures and report back to the [Audit] Committee."

186.    Another e -mail recognized the culture at Qwest, acknowledging that under Defendant Nacchio's leadership, "there [w ere] well known consequences for not making the numbers but no clear consequences for cutting corners."  E -mail from Peter Hellman, incoming chairman of Qwest's audit committee, to Tom Stephens, departing audit chairman (10/25/01).

187.    According to Defendant S zeliga's testimony to the Committee, Qwest penalized those who questioned the Company's handling of swaps.  For example, after Morgan Stanley analyst Simon Flannery publicly questioned in August 2001 why Qwest was increasingly reliant on capacity swaps, Ms . Szeliga wrote an internal note saying to "[q]uietly close Morgan Stanley out of company."  Defendant Szeliga then listed banking, stock options and investment banking

- 68 -

opportunities as businesses in which Qwest should shun Morgan Stanley.  When asked abou t this

at a Committee hearing, Defendant Szeliga acknowledged that her note was written in retaliation

for Morgan Stanley's criticism.  *Id.* at 29-31.

188.    Defendant Nacchio's testimony at the Committee's hearing on October  1, 2002,

established that Defendant An schutz helped run Qwest's operations during the relevant period.

Kris Hudson, *Concluded Qwest Hearing Just The Start*, Denver Pos *t*, 1013/02.  According to

Defendant Nacchio's testimony, Defendant Anschutz spoke with Nacchio "almost daily during

his time at Qwest."  Kris Hudson,  *Nacchio Recalls Directors' Hostility*, Denver Post, 10/2/02.

> "I always went to Phil Anschutz when I needed counsel," Nacchio
> said.  "Many times, I would get calls from Phil just to find out
> what was going on. Phil was very involved.  F or board matters, I
> went to Phil, and Phil managed the relationship with the board."

*Id.*  Nacchio added "that Anschutz ran Qwest's board despite the title of co  -chairman he shared

with Nacchio."  Kris Hudson, *Concluded Qwest hearing just the start*, Denver Post, 10/3/02.

## IX.    THE SEC INVESTIGATES QWEST

189.    Defendants' conduct during the Relevant Period prompted at least two formal

investigations by the SEC in 2001 and 2002.  On March  11, 2002, Qwest disclosed that the SEC

had opened an inquiry into its accounting pra ctices.  In its press release, Qwest identified the

investigation as concerning three areas of Qwest's accounting policies, practices and procedures

in 2000 and 2001:  "(1) sales of optical capacity assets (often referred to as Indefeasible Rights

of Use o r "IRUs"), particularly sales to customers from whom the company agreed to purchase

optical capacity; (2) the sale of equipment by Qwest to customers from which Qwest bought

Internet services or to which Qwest contributed equity financing, including equipm ent sales to

KMC and Calpoint; and (3) Qwest Dex, particularly changes in the production schedules and

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 75 of
187
Case 1:06-cv-01539-REB    Document 1-7    Filed 08/07/2006    Page 75 of 187

lives of some directories."  Qwest stated that it "continues to believe[] that its accounting

policies, practices and procedures for all periods, includi ng 2000 and 2001, comply with all

applicable requirements."

190.    Less than a month later, Qwest announced that it was going to take what others

referred to as a "massive charge" for goodwill and other issues.  As  *the Wall Street Journal*

reported on April  2, 2002:

> Qwest Communications International Inc. said it expects to
> take a charge of $20 billion to $30 billion in the second quarter to
> reflect a decline in the value of assets it has acquired.
>
> In announcing the massive charge, Qwest joined several
> other comp anies, including WorldCom Inc. and AOL Time Warner
> Inc., that have been caught in a similar downward spiral of
> plunging assets amid the telecom meltdown.
>
> *   *   *
>
> The company also said the SEC has recommended action
> against it, which could include a  fine, because it only used pro
> forma figures in its fourth -quarter 2000 earnings release.  The SEC
> requires companies to include net income figures that conform to
> generally accepted accounting principles in earnings
> announcements so investors can judge tr ue results.  The company
> said it believes an SEC action would be without merit.
>
> *   *   *

191.    On April 5, 2002, *The Wall Street Journal* published another story about the SEC

inquiry, reporting that the SEC had escalated its informal investigations into a f ormal inquiry.

That article quoted Defendant Nacchio has defending the use of capacity sales as "smart business

moves."

192.    In February 2003, the SEC filed civil charges against eight former and then -

current employees of Qwest, alleging that the employees fra udulently inflated Qwest's revenue

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 76 of
Case 1:06-cv-01539-REB      Document 1-7      Filed 08/07/2006      Page 76 of 187
187

by approximately $144 million in 2000 and 2001.  In a complaint filed in the District of

Colorado, the SEC alleged that members of Qwest's Global Business Unit artificially accelerated

revenue recognition on sales of tele communications equipment to the Arizona School Facilities

Board and telecommunications carrier Genuity, Inc.  The complaint charged the employees with

preparing false agreements and internal memoranda to aid the improper revenue recognition

practices.  Without improperly recognized revenue, Qwest would have failed to meet its Second

Quarter 2001 projections.

193.    In March 2004, the SEC filed civil fraud charges against Nacchio, Szeliga,

Woodruff, Casey, and others for orchestrating a financial fraud between 1998  and 2002.

Subsequently, the SEC and Szeliga settled.  Terms were not disclosed.  In September 2004 the

SEC and Casey also settled civil fraud charges.  Casey agreed to pay a $2.1 million fine.

194.    Other former Qwest employees have also settled civil fraud ch arges with the SEC.

For example, former Qwest senior vice president Augustine  M. Cruciotti has settled charges that

he authorized improper verbal side agreements with respect to certain IRU transactions.

Cruciotti agreed to pay $204,967 into an SEC settl ement fund.  Roger  B. Hoaglund, a former

Senior Vice President of Pricing and Offer Management at Qwest, and William  L. Eveleth, a

former Senior Vice President of Finance, agreed to pay $328,650 and $118,389 respectively to

settle civil fraud charges the S EC brought against them.

## X.    THE DEPARTMENT OF JUSTICE INVESTIGATES QWEST

195.    On July 28, 2002, *The Wall Street Journal* reported that "[t]he Justice Department

has launched a criminal investigation into Qwest Communications International Inc."  Deborah

Solomon & S usan Pulliam, *Qwest Faces Criminal Probe By Department of Justice*, Wall St. J.,

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 77 of
187
Case 1:06-cv-01539-REB   Document 1-4   Filed 08/07/2006   Page 77 of 187

7/5/02.  Qwest acknowledged the existence of the criminal investigation a few days later.  Press

Release, Qwest Communications Notified Of Criminal Investigation By The U.S. At torney's

Office In Denver, 7/10/02.  Shortly thereafter, Qwest detailed that the scope of the United States

Attorney's office investigation was the same as the previously -announced SEC investigation.

Press Release, Qwest Updates Status Of U.S. Attorney's   Office Investigation, 8/14/02.

196.    In February 2003, the Department of Justice filed criminal conspiracy and

securities fraud charges against four former Qwest employees:  John Walker, Byron Treadway,

Grant Graham, and Thomas Hall.  On May 28, 2004, Graham pled guilty to felony accessory

after the fact wire fraud and has agreed to cooperate with prosecutors in further proceedings

against others.  On September  17, 2004, Hall pled guilty to a misdemeanor count of falsifying

documents.  Both John Walker and Bryon  Treadway were acquitted after trial on April  16, 2004.

197.    In 2004, Marc Weisberg, a former Qwest EVP, was indicted by the Department of

Justice on wire fraud and money laundering charges.  On December  28, 2005, six days before his

scheduled trial, Weisberg pled guilty to one count of wire fraud and agreed to pay a $250,000

fine.

198.    In June 2004, the Department of Justice indicted Robin Szeliga for insider trading.

She subsequently entered into a plea agreement and agreed to cooperate with prosecutors.

199.    In December 2005, after a three -year investigation, the Department of Justice

indicted Nacchio on 42 counts of criminal insider trading charges.  Nacchio is charged with

selling more than $100 million of his Qwest stock in 2001 after he knew that the company would

not meets its financial forecasts.

## XI.   THE FALSE AND MISLEADING STATEMENTS ISSUED BY DEFENDANTS PRIOR TO AND DURING THE RELEVANT PERIOD

200.   On March 31, 1999—the last day of Qwest's first fiscal quarter —Qwest made the following statement in a press release:

> Qwest Communications International Inc. today announced that it has received an additional $15 million commitment for high-speed, broadband capacity from STAR Telecommunications.  The agreement builds upon the companies' original 20-year, $70 million contract and extends the term of STAR's commitment to $85 million.  Additionally, Qwest will purchase international long distance services from STAR.

201.   This press release was false and misleading.  On March 24, 1999, STAR and Qwest modified the agreement to allow Qwest  to basically purchase the STAR revenue through a "vendor financing" arrangement.  Under the new arrangement, Qwest merely swapped its capacity for the "international long distance services" it said it would "purchase" from STAR on a monthly basis.  Further, STAR could meet its obligations under the contract by either switched services indefeasible rights of use or through dedicated private line services.  As STAR said in a footnote to a subsequent filing:

> On March 24, 1999, the agreement was amended to inc lude the following terms:  Qwest Communications International, Inc. ("Qwest") agreed to allow the conversion of a substantial portion of STAR's outstanding liability to a vendor financing arrangement. The terms of this arrangement allow STAR to provide lo ng distance services to Qwest with the balance being offset against STAR's liability to Qwest on a monthly basis.  Additionally, STAR was given the option to meet its obligation through the purchase of a combination of IRU's switched services and dedicated private line services.  Any remaining balance outstanding to Qwest as of April  30, 2001 must be paid in full. The remaining balance due under this arrangement as of December 31, 1999 was approximately $45 million.

STAR Telecommunications, Inc. SEC Form 1 0-K, filed Apr. 14, 2000.

554065.1

202.    On April 21, 1999, Qwest reported its First Quarter 1999 results in a release

which stated in part:

> Qwest Communications International Inc. today reported strong first quarter 1999 results reflecting the company's continued rapid growth, momentum and success in winning large, high-profile business accounts.  Qwest exceeded the consensus of analysts' earnings estimates.

> *    *    *

> On a reported basis, communications services revenue for the quarter grew 1,600 percent from $42.6 million to $737.2 million, while total revenue grew fivefold over the first quarter of 1998 from $177.1 million to $878.4 million.  Total EBITDA grew 33-fold for the quarter from $4.5 million to $155.4 million compared to the same period last year.

> For the three months ending March 31, 1999, pro forma communications services revenue grew to $737.2 million, a 36 percent increase over the same period in 1998.  Total revenue was $878.4 million, a 30 percent increase over pro forma revenue for the same period in the previous year.  As a result of new service offerings and aggressive customer acquisition efforts, Internet and data communications services continued to post impressive gains and grew by more than 100 percent over 1998.  Total EBITDA grew to $155.4 million while communications services EBITDA increased to $100.7 million, representing growth of 95 percent and 98 percent respectively over the same period in 1998.  The company reported earnings of $4.8 million, or $0.01 per share, compared to a pro for ma loss of (20.5) million or ($0.06) loss per share for the comparable period.

> Commenting on the quarter, Qwest Chairman and CEO Joseph P. Nacchio said, "We're extremely pleased with the strong first quarter operational results and the progress across all  aspects of our business.  Our leading-edge technology and services are in high demand and during the quarter we took critical steps in providing end-to-end networking solutions to our customers."

> On a sequential basis, Qwest reported double-digit growth in communications services revenue while communications EBITDA was up more than 30 percent from the fourth quarter of 1998.

> "Our quarterly results reflect Qwest's continued momentum and execution while investing for future growth," said Robert S. Woodruff, Qwest executive vice president and chief financial officer.  "Our strong revenue growth along with the continued improved gross margins and selling, general and administrative cost efficiencies, further strengthen our financial position."

203.     On May 13, 1999, Qwest filed its Form 10-Q with the SEC including therein its results for the First Quarter 1999.  These results were false and misleading because of,  *inter alia*, the consumer and small business services manipulations that Defendants used to improperly inflate Qwest's revenues, as alleged above, the STAR transaction, as well as the improper IRU sales which totaled $1.32 billion pre-merger.

204.     These statements about Qwest's historic financial data in its First Quarter 1999 Form 10-Q and the June 14, 1999 announcement, however, were false and misleading when made, due to Qwest's falsification of its financial statements by improper IRU swap deals and its inflation of its consumer and small business services revenues through its practice of overstating customer orders by as much as 60%-70%, as alleged herein.  The statements also were misleading because of the improper revenue recognition carried out by Defendants regarding a contract with Warwick Valley Telephone Company, as alleged above.  Moreover, these statements about Qwest's anticipated future financial performance were false and misleading when made, both because they were based on Qwest's false and misleading reported historic financial data for 1999 (as alleged directly above), and because Qwest and the relevant Individual Defendants knew at the time they made these statements that Qwest's future financial performance would not be as good as represented because of the past and planned accounting manipulations alleged throughout this Complaint.

205.    On June 14, 1999, Qwest announced in a press release an offer to acquire US West and Frontier.

206.    On June 21, 1999, Qwest filed with the SEC a Registration Statement and Prospectus for 897,907,706 shares of Qwest Common Stock to be issued to US West shareholders to effectuate the merger of Qwest and US West.  Qwest filed amendments to the Registration Statement with the SEC on August  13, 1999 and September 17, 1999, and the Registration Statement was declared effective by the SEC on September  17, 1999.  Qwest and Defendants Nacchio, Anschutz, Woodruff, and Slater, among other Qwest directors, authored the Registration Statement, the amendments thereto, and the Prospectus, and collectively were responsible for the accuracy of the offering documents.  Defendants Nacchio, Ans chutz, Woodruff and Slater signed the September  17, 1999 Amendment to the Registration Statement.

207.    The Registration Statement and Prospectus contained representations of Qwest's financial data, stating:

QWEST COMMUNICATIONS INTERNATIONAL AND
SUBSIDIARIES SELECTED FINANCIAL DATA
(IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

|  | Six Months Ended June 30, | |
| --- | --- | --- |
| STATEMENT OF OPERATIONS: | 1998 | 1999 |
| Total revenue | $571 | $1752 |
| Total operating expense | 1,395 | 1,599 |
| Earning (loss) from operations | (824) | 153 |
| Earning (loss) before income taxes | (843) | 72 |
| Net earnings (loss) | ($816) | $23 |
| Net earnings (loss) per share  – basic | ($1.82) | $0.03 |
| Net earnings (loss) per share  – diluted | ($1.82) | $0.03 |

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 82 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 82 of 187

|  | Six Months Ended June 30, | |
| --- | --- | --- |
| OTHER FINANCIAL DATA: | 1998 | 1999 |
| EBITDA | $29 | $342 |
| * * * | * * * | * * * |
| Capital expenditures | $413 | $764 |

208.     The Registration Statement incorporated by reference,  *inter alia*, the Company's

current reports on Form 8 -K filed on June 21, 1999 and July 20, 1999. The Company's June 21,

1999 Form 8-K affirmed certain analysts' predictions that Qwest's offer to merge with US West

(and Frontier) was worth $98 per share:

> As you may know, some analysts estimate that our offer is worth
> $98.00 for each US WEST share, based upon the expected
> synergies of a combined Qwes t/US WEST/Frontier, our
> anticipated growth rate and the multiples accorded similarly
> situated companies. We attach a recent DLJ research analysts'
> report which supports that conclusion.

209.     On July 18, 1999, Qwest entered into an Agreement and Plan of Merger w herein

US West would merge with and into Qwest.  Qwest's acquisition of US West was to be a stock

exchange transaction, with US West shareholders to receive an amount of Qwest stock equal to

$69 per share.  Throughout the merger process, however, a competi ng bid for US West from

Global Crossing forced Defendants to increase their offer for US West.  By July  18, 1999, when

the boards of the two companies reached a final deal, Qwest had been forced to guarantee that

US West shareholders would receive a high s tock swap price, or it would pay extra cash at the

time of the merger.  Indeed, if Qwest shares fell below $38.70 per share before the merger

closed, US West could demand a cash payment.  If Qwest shares fell below $22.00, US West

could kill the deal.

- 77 -

210.    A July 18, 1999 Qwest press release laid out the details:

> Under terms of the merger agreement, Qwest will issue shares of its common stock having a value of $69.00 for each share of US WEST common stock, subject to a "collar" on Qwest's average stock price be tween $28.26 and $39.90 per share.  The number of Qwest shares to be issued for each US WEST share will be determined by dividing $69.00 by the average of the daily volume weighted average prices of Qwest common stock for 15 randomly selected trading days  over a 30-day measurement period ending three days before the closing of the transaction, provided that Qwest will not issue more than 2.44161 shares for each US WEST share or less than 1.72932 shares for each US WEST share.

> The obligation if necessary, u nder the "collar" may be satisfied in whole or in part with cash if Qwest's average stock price is below $38.70 per share.  In determining the cash amount for the collar, Qwest and US WEST will consider Qwest's desire to reduce dilution it its shareowners,  US WEST's potential desire to provide a cash element to its shareowners and both companies' desire to maintain the company's strong financial condition.  If the companies decide to provide cash as part of the collar consideration, the minimum exchange rat io would be 1.783.

> US WEST may terminate the merger agreement if the closing price of Qwest's shares is below $22.00 for 20 consecutive trading days before the closing, or if the average Qwest share price during the measurement period is less than $22.00.

211.    On July 20, 1999, Qwest filed a Form 8-K incorporating as an exhibit a July 18,

1999 Qwest press release that represented some of the financial benefits of the merger as

follows:

> Financial Benefits of the Transaction

> Qwest and US WEST expect the combined  company to have a compounded average annual revenue growth rate of approximately 15-17 percent, and a targeted compounded annual EBITDA growth rate of 20 percent, in each case for the period 2000 through 2005.

> The combined company expects to realize reve nue synergy of $12 billion over a five-and-one-half-year period after closing. In

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 84 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 84 of 187

addition, the combined company expects to achieve cost savings of
$4.4 billion, and capital-expenditure synergies in excess of $2
billion over the period.

212.     These statements about Qwest's historic financial data in 1999—incorporated by

reference into the Registration Statement and Prospectus effective September    17, 1999—

however, were false and misleading when made, due to Qwest's inflation of its consumer and

small business services revenues through its practice of overstating customer orders by as much

as 60%-70%, as alleged herein.  The statements are also false and misleading due to Qwest's

falsification of its 1999 financial results from IRU sales.  In addition, the statement s were

misleading because of the improper revenue recognition carried out by Defendants regarding a

contract with Warwick Valley Telephone Company, as alleged above.  Moreover, these

statements about Qwest's anticipated future financial performance —also incorporated by

reference into the Registration Statement and Prospectus effective September    17, 1999—were

false and misleading when made, both because they were based on Qwest's false and misleading

reported historic financial data for 1999, and because Qw est and the relevant Individual

Defendants knew at the time they made these statements that Qwest's future financial

performance would not be as good as represented because of the past and planned accounting

manipulations alleged throughout this Complaint.

213.     On July 27, 1999, Qwest reported its Second Quarter 1999 results in a release

entitled, "Strong Revenue and EBITDA Achieved During The Company's Most Active Strategic

Quarter," which stated in part:

> Qwest Communications International Inc., the broadband
> Internet communications company, today reported record financial
> results for the second quarter of 1999, its most active strategic
> quarter to date.  For the ninth consecutive quarter Qwest exceeded

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 85 of
187
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 85 of 187

the consensus of analysts' earnings estimates.

On a reported basis, communications services revenue for
the quarter more than tripled from $239.8 million to $790.4
million, while total revenue grew 122 percent over the second
quarter of 1998 from $393.7 million to $873.7 million.  Total
earnings before interest, taxes, depreciation and amortization
(EBITDA) for the second quarter was $186.9 million, up 675
percent over the same quarter of a year ago.  Earnings per share
(EPS) on a diluted basis were $0.02, compared to a loss of ($1.67)
per share in the previous y ear.

On a pro forma basis, communications services revenue
grew to $790.4 million, a 46 percent increase over the same period
in 1998.  Total revenue was $873.7 million, a 26 percent increase
over the previous year.  Internet and data communications servi ces
revenue continues to expand as a percentage of the company's total
revenue mix and continued to grow in excess of 100 percent.  Total
EBITDA grew to $186.9 million, up more than 200 percent, while
communications services EBITDA increased to $134.2 million,
five times the same period in 1998.  The company reported net
earnings of $18.5 million, or $0.02 per diluted share, compared to
a pro forma net loss of $27.0 million (excluding one -time merger
related charges), or ($0.04) loss per diluted share for t he
comparable period.

*   *   *

"The financial results for the quarter reflect strong, year
over year and sequential gains across the business in a very
competitive marketplace," said Robert S. Woodruff, Qwest
executive vice president and chief financ ial officer.  "In addition to
our strong operational results, during the quarter we also
strengthened our balance sheet with the equity investment by
BellSouth."

214.   On August 11, 1999, Qwest filed a Form 10-Q with the SEC, including therein its

financial results for the 2ndQ 99.  These results along with the statements made in Qwest's

July 29, 1999 release were false and misleading when made due to Qwest's inflation of its

consumer and small business services revenue through its practice of overstating custome r orders

by as much as 60 to 70%, as alleged herein, and Qwest's falsification of its 1999 financial results

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 86 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 86 of 187

from IRU sales.  These statements also were misleading because of the improper revenue

recognition carried out by Defendants regarding a contract w ith Warwick Valley Telephone

Company.

215.    On September 30, 1999—the final day of Qwest's third fiscal quarter —Qwest

made the following statements in a press release:

> Qwest Communications International Inc. (Nasdaq:
> QWST), the broadband Internet communications  company, and
> CAIS Internet (Nasdaq: CAIS), a pioneer in broadband access
> solutions, today announced a strategic relationship worth
> approximately $69 million for the delivery of high-speed Internet
> access to new markets.  Qwest has been awarded a $54 milli on
> contract from CAIS for high -speed Internet capacity and
> broadband Internet communications services.  The agreement also
> calls for Qwest to invest $15 million in CAIS Internet to accelerate
> the company's network and high -speed multi-user technology.
>
> CAIS will purchase $44 million of capacity on Qwest's
> fiber network, superceding previous leasing agreements.  The
> Qwest capacity will provide CAIS with significant network cost
> savings and support the delivery of CAIS network services to
> 35 points of presenc e (POPs) by year-end 1999. CAIS has also
> committed to purchase $10 million of Qwest's communications
> services, which may include application hosting, e -commerce and
> web hosting.

216.    This press release was false and misleading because it did not mention that Qw est

had agreed to make the $15 million "investment" in CAIS preferred stock in lieu of payment for

the IRU, and failed to note that Qwest also agreed to let CAIS defer payment of an additional

$14.5 million for years to come.  CAIS Internet, Inc. SEC Form   10-Q, filed 11/14/00.

217.    On October 27, 1999 Qwest reported its Third Quarter 1999 results in a release

that stated in part:

> Qwest Communications International Inc. (Nasdaq:
> QWST), the broadband Internet communications company, today

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 87 of
187
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 87 of 187

announced that for the f irst time the company has recorded revenue
for a quarter in excess of one billion dollars.  For the tenth
consecutive quarter the company met or exceeded the consensus of
analysts' estimates.

The $1.02 billion in total revenue for the quarter reflects a
26 percent increase over the same period in 1998, while
communications services revenue grew 69 percent.  The strong
revenue results were achieved during the quarter despite the
expected decline in construction services revenue as a result of the
mid-year completion of 18,500 miles of the company's U.S.
network.  Construction services accounted for less than two
percent of total revenue for the quarter and was combined with
communications services.

Total EBITDA was up 62 percent to $190.5 million
compared to the third quarter of 1998, while communications
services EBITDA increased more than 250 percent.  Excluding
one-time costs of $25.0 million directly related to the pending
merger with US WEST, Qwest reported net earnings of $19.8
million, or $0.03 per diluted share, compared to a pro forma net
loss of ($0.02) per share during the same period in 1998. Including
the merger-related costs, Qwest reported a net loss of $1.8 million,
or ($0.00) per share, compared to a net loss of ($0.01) per share a
year ago.

Commenting on the quarter, Qwest Chairman and CEO
Joseph P. Nacchio said, "Reaching a billion dollars in revenue for
the quarter is a major achievement – and a significant milestone for
the company.  We've said from the beginning that we are creating
a growth company and our results clearly show the steps we've
taken – building a next-generation network, acquiring strategic
assets and capabilities, creating alliances to build advanced
applications on our network, and rapidly growing our Internet and
data business segment.  We continue to see the payoff and the
potential inn what we've created."

*   *   *

"The results for the third quarter demonstrate Qwest's
ability to drive strong revenue and EBITDA growth while making
the necessary investments for th e future," said Robert  S. Woodruff,
Qwest's executive vice president and CFO.  "With 18,500 miles of
the U.S. network now complete, we are committing more resources
to the expansion of the Qwest Internet and data services portfolio,

- 82 -

> CyberCenter operations, trans-Atlantic service platform and local broadband access services so that we may continue to capitalize on our first-to-market advantage."

The Third Quarter 1999 results were false and misleading because Qwest inflated its business services revenue thro ugh its practice of overstating orders by as much as 60% -70%, as alleged herein and Qwest's falsification of its financial results from IRU sales.

218.    On November 2, 1999, Qwest announced the results of the merger vote, stating that "more than 97 percent of Qw est shareowners approved the merger" with US West.

219.    On February 2, 2000, Qwest reported "Record Revenue and EBITDA" for the Fourth Quarter 1999 and 1999, in a release which stated in part:

> Qwest Communications International Inc. (NYSE: Q), the broadband Internet communications company, today announced record revenue and earnings before interest, taxes, depreciation and amortization (EBITDA) for the fourth quarter and year -end 1999. For the eleventh consecutive quarter Qwest has met or exceeded the consensu s of analysts' estimates.

> The $1.16 billion in total reported revenue for the quarter reflects a 34 percent increase from the $865.1 million recorded in the same period in 1998, while communications services revenue grew 73 percent. On a sequential basis , Qwest reported a 14 percent increase from $1.02 billion in the third quarter of 1999 to $1.16 billion as a result of continued growth in Internet, multimedia and data services. Full year reported revenue increased 75 percent from $2.24 billion to $3.93 billion. Full year 1999 pro forma revenue increased 29 percent from $3.03 billion to $3.90 billion.

> Total reported EBITDA for the fourth quarter was up 53 percent to $226.4 million compared to $148.3 million in the fourth quarter of 1998, while communications services EBITDA increased more than 197 percent.

> *    *    *

> "We are extremely pleased to continue our strong financial performance in our core businesses, while our management team

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 89 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 89 of 187

focuses on growing revenues globally through strategic initiative s, including the merger with US WEST," said Joseph P. Nacchio, Qwest chairman and CEO. "In 1999 we made the necessary investments and commitments to continue to deliver to customers leading-edge broadband Internet communications solutions that will solidly position us as the new Internet communications company of the next decade."

Robert S. Woodruff, Qwest executive vice president and chief financial officer, said, "The financial results for the year reflect Qwest's strong revenue growth and continued mar gin improvement as a result of our ability to manage expenses. We expect to continue to see strong revenue and EBITDA growth in 2000 led by the demand for Qwest's Internet -based applications and services. In 2000, we anticipate revenue will continue to g row in the range of 30 - 35 percent, with EBITDA growth of approximately 40 - 50 percent."

220. Qwest's Fourth Quarter 1999 results and Defendant Nacchio's and Woodruff's statements were false and misleading, however, because they knew of the massive amount of improperly recognized revenue being accounted for at Qwest, including the IRU sales, as alleged herein.

221. On April 19, 2000, Qwest reported its First Quarter 2000 results in a release that stated in part:

Results Fueled by More Than 200% Growth in Internet a nd Data
Revenues That Now Comprise Over 30% of Total Revenue

First quarter financial results compared to previous year:

? Internet and data revenues continued strong growth of more than 200 percent and comprise more than 30 percent of total revenue

? Services revenue increased 65 percent

? Total revenue grew 39 percent to $1.22 billion

? Total EBITDA increased 52% to $236.0 million

- 84 -

? Services EBITDA margins improved from 13.7 percent to 19.4 percent

First quarter operational highlights:

? Qwest has grown from the 25th to the third largest carrier of Internet traffic in only 14 months

? Qwest and KPNQwest struck deals with IBM to support expansion of CyberCenters (SM) in North America and Europe, with combined revenue to Qwest and KPNQwest of $4.5 billion expected over t he life of the contracts

? Qwest/US WEST merger gained approvals from the FCC, Colorado and Iowa; new senior management team selected; Qwest announced plan to sell its long distance business in the US WEST territory to Touch America

\*   \*   \*

"We continue to drive strong demand for our industry - leading portfolio of Internet and data services in the business marketplace," said Joseph P. Nacchio, Qwest's chairman and CEO. "We are riveted on delivering next -generation broadband Internet applications and services.  Importantly, during the quarter we strengthened our services portfolio through the deal with IBM to deliver a broader range of hosting and e -commerce solutions to our customers."

\*   \*   \*

Robert S. Woodruff, Qwest executive vice president an d CFO, said, "We are extremely pleased with the strong financial results for the quarter, and expect continued strong revenue and EBITDA growth led by the demand for Qwest's Internet -based broadband applications and services."

\*   \*   \*

Woodruff conti nued, "Our capital spending program for 2000 is expected to be approximately $3.3 billion.  This increase over our previously announced $2.5 to $2.7 billion plan reflects time to market and growth opportunities for acceleration of our CyberCenter expansion and build-out of local broadband services."

554065.1

222.     The Company's Current Report on Form 8 -K filed on April 19, 2000 represented

that:

> [Qwest] remains comfortable with the consensus of
> analysts' estimates for 2000 revenues of approximately $5.1 billion
> and EBITDA (earnings before interest, taxes, depreciation and
> amortization) of approximately $1.1 billion.

223.     Subsequent to the release of its First Quarter 2000 results, Qwest held a

conference call for analysts, money and portfolio managers, institutional investors  and large

Qwest shareholders to discuss Qwest's First Quarter 2000 results, its business and its prospects.

During the call—and in follow up conversations with analysts —Nacchio, Wilks and Woodruff

stated:

> Qwest's success came from its wide range of product  s and
> services.
>
> The strong lstQ 00 results were due to strong demand for Internet
> and data services which would represent 35% -40% of revenues by
> 4thQ 2000.
>
> Qwest was reporting and would continue to report, favorable
> results due to its strong and deep manag ement team.
>
> Subsequent to the conference call, analysts issued reports on Qwest
> repeating Nacchio, Wilks and Woodruff s statements, including
> those made during the conference call.  The reports rated Qwest as
> follows:

| **Firm** | **Analyst** | **Rating** |
|---|---|---|
| Credit Suisse First Boston | Reingold | Strong Buy |
| Janney Montgomery Scott | Kovacs | Buy |
| Warburg Dillon Read | Meltzer | Buy |
| Prudential Securities | Greenwood | Accumulate |
| CIBC World Markets | Horan | Buy |

- 86 -

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 92 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 92 of 187

| Firm | Analyst | Rating |
|------|---------|--------|
| J.P. Morgan | Barden | Market Performer |
| Smith Barney | Grubman | 1H (Buy) |

These analysts wrote the following about Qwest:

Smith Barney:  Qwest continues to blow the door off in terms of evolving from what was simply a construction project three years ago to becoming a full service integrated provider especially in the commercial marketplace of value-added solutions.  Furthermore, given our overall view of the industry, we believe that Qwest is going to be in an extremely good position to be one of the major beneficiaries of all the trends that we believe will occur over the next several years.  We would be buyers at current levels.

Janney Montgomery Scott:  For Communications services (100% of Qwest's current business), revenues increased 71% year -over-year and more than 5% sequentially.  This was driven mostly by rapidly growing Internet and  data sales, up more than 200% and contributing more than 30% of total revenues.  On an annualized basis, Qwest's Internet and data sales are running well ahead of plan, which projects $1 billion or revenues in 2000.

Credit Suisse First Boston:  We re -iterate our Strong Buy opinion and our 12 to 18 month price target of $68, which we calculate based on the average of a 10 -year DCF model and an EBITDA multiple analysis in which we apply a 0.95x EBITDA multiple: growth ratio to our 5 -year pro forma EBITDA gro wth rate of 16.7% and to our '01 EBITDA estimate of $8.5B.

Prudential Securities:  *Growth has been driven by continued strong growth in data and Internet services.  *Qwest continues to execute on its business plan and is successfully driving traffic and revenue onto its network by providing a wide range of value added products and services.

CIBC World Markets Corp.:  We believe Qwest looks set to have a very strong year, driven by dramatic growth in current businesses and several likely new business ventures.  The company has already had tremendous success, moving up to become the 3rd largest Internet backbone in the US.  The company is also de -emphasizing (correctly, we believe) the consumer LD business, where it saw an 8.5% decline in revenues -per-minute in 1Q00.

- 87 -

> Overall, the company believes it is on track for 30-35% revenue growth in 2000, with 40-50% EBITDA growth and an end of year EBITDA margin of about 25%. We would not be surprised to see higher growth rates given performance this quarter.

224.    In fact, Qwest's First Quarter 2000 results were materially misstated, in violation of GAAP, due to Qwest's improper revenue recognition due to its inflation of consumer and small business services revenue through its practice of overstating customer orders by as much as 60-70%, as alleged herein, and falsification of its financial results from IRU sales. Further, during the First Quarter 2000, Qwest engaged in the fraudulent KMC transaction, as alleged above.

225.    By June 27, 2000, Qwest's stock was trading above $50 per share, minimizing the number of shares it would issue to acquire US West and ensuring that Qwest would not have to make any cash payments to US West shareholders.

226.    On June 30, 2000, Qwest announced it had completed the merger with US West. The release stated:

> During the past three years Qwest has become one of the fastest growing Internet communications companies in the world, solidifying Qwest's position as the third-largest carrier of Internet traffic. The new Qwest will have the scale, scope and growth characteristics to deliver more value for shareowners and to continue to lead the industry in the delivery of innovative applications and services," said Joseph P. Nacchio, who will continue to be Qwest's chairman and CEO.
>
> *   *   *
>
> Each US West share will be exchanged for 1.72932 shares of Qwest common stock. Qwest will issue approximately 882 million shares in exchange for US West shares currently outstanding, or approximately 53 percent of the combined company's shares.

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 94 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 94 of 187

Defendants were able to complete the merger, and with no extra cost to Qwest, because Qwest
stock price had remained above the "collar" US West shareholders had demanded.  The merger
closed however, without Defendants disclosing their fraudulent manipulation of Qwest's
financials.

227.   On July 2, 2000, the *Denver Rocky Mountain News* published an interview with
Mohebbi in which Mohebbi stated:

> Q: What's your take on reports Qwest might become a takeover
> target?
>
> A: We've got a great company called the new Qwest.  We
> wouldn't comment on all of this speculation.  We have tremendous
> potential and we're just going to execute.  We're going to execute
> and grow it and just let the future potentials speak for themselves
> as they come along.

228.   On July 19, 2000, Qwest reported its Second Quarter 200 0 results in a release that
stated in part:

> Qwest second quarter financial results compared to previous year:
>
> ?   Internet and data services posted growth of more than 150
>      percent for the quarter and now comprise more than 33 percent
>      of total revenue
>
> ?   Total revenue increased 47 percent to $1.28 billion
>
> ?   Services EBITDA increased 91 percent to $256.0 million
>
> ?   Services EBITDA margin increased to 20 percent from 17
>      percent
>
> ?   Sequential revenue and EBITDA increased 5.4 percent and 8.5
>      percent, respectively
>
> US West second quarter financial results compared to previous
> year:
>
> ?   Posted strong revenue growth of 6.9 percent

- 89 -

    ?    Data revenues increased 38 percent

    ?    EBITDA increased more than 11 percent to $1.56 billion

    ?    Normalized diluted earnings per share increased 8.8 percent t o $0.87

    ?    DSL subscriber base grew more than 280 percent to 175,000

*   *   *

"Our merger creates a broadband Internet communications company better able to provide customers end -to-end global applications and services," said Joseph P. Nacchio, Qwest chairman and CEO. "We are pleased with the quarterly results of both companies and we are well positioned to achieve our goals and continue to build shareholder value."

*   *   *

Robert S. Woodruff, Qwest executive vice president and CFO said, "We are extremely pleased with the strong financial results for the quarter. Internet and data services continued to drive revenue growth. Margin improvement continued despite the work related to divesting our in -region long distance business in anticipation of the merger and our continued investment in future growth opportunities."

229.   These representations about Qwest's financial condition however were false and misleading when made, due to:

    a.   Qwest's failure to disclose, and improper accounting for, the $168 millio n reciprocal transaction with KMC, as alleged herein;

    b.   Qwest's inflation of its consumer and small business services revenues through its practice of overstating customer orders by as much as 60% -70%, as alleged in above; and

    c.   Qwest's failure to disclose its other financial manipulations for which it has now restated its 2000 results, as alleged herein.

- 90 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 96 of
187
Case 1:06-cv-01539-REB   Document 17-4   Filed 08/07/2006   Page 96 of 187

230.    On October 24, 2000, prior to the market's opening, Qwest reported its Third

Quarter 2000 results in a release entitled "Qwest Communications Reports Strong Third Quarter

2000 Financial Results While Successfully Integrating $77 Billion Company," which stated:

> Third quarter highlights compared to previous year:
>
> Total revenue grew on a normalized pro forma basis 12.4 percent
> to $4.77 billion, on track to meet or exceed 2000 revenue targets
>
> Commercial services revenue grew by 24.3 percent, driven
> primarily by Internet and data services
>
> *   *   *
>
> EBITDA grew by 14.3 percent, reflecting strong revenue growth
> and continued cost efficiencies, driving margins from 38.5 percent
> to 39.1 percent
>
> Earnings Per Share (EPS) increased to 14 cents per share versus 12
> cents a share a year ago, representing a 16.7 percent increase
>
> *   *   *
>
> Results exceeded the consensus of analysts' expectations
> for revenues, earnings before interest, taxes, depreciation and
> amortization (EBITDA) and earnings per share for the quarter.
> This is the fourteenth consecutive quarter that the company has
> met or exceeded analyst expectations.
>
> "Our results for the quarter reflect Qwest's continued
> execution and ability to exploit revenue opportunities in key
> sectors of our industry," said Joseph P. Nacchio, Qwest's chairman
> and CEO. "I'm proud of the Qwest team for producing these
> results while in the middle of a complex merger."
>
> *   *   *
>
> "We are very pleased with these strong financial results for
> the quarter. Internet and data services continued to drive revenue
> growth," said Robert S. Woodruff, Qwest executive vice president
> and CFO. "We are well positioned to attain our long term revenue,
> EBITDA and EPS targets."

- 91 -

Excluding non-recurring items, the company's third quarter net earnings grew by 18.5 percent to $231 million. EPS was $0.14 per diluted share, an increase of 16.7 percent from third quarter of 1999. Included in the non-recurring items are merger-related and other one-time pre-tax charges totaling $1.03 billion and other non-operating income of $272 million from net realized gains on investments and asset sales. Including the non-recurring items, the company reported a loss of $0.15 per share for the third quarter 2000.

*   *   *

Qwest added an additional 38,000 subscribers during the quarter and now was 213,000 DSL subscribers – an increase of more than 166 percent over the same period in 1999 – and is on track for its target of 250,000 subscribers by year-end 2000.

231.    Subsequent to the release, Qwest hosted a conference call for analysts and Qwest investors in which Nacchio and Woodruff made statements about Qwest's results, its business and its prospects, and in which Nacchio and Woodruff also answered questions. During the call, and in follow up conversations, Defendants stated:

Qwest had a "very strong demand [for] new Internet broadband products."

Qwest expected a strong 2000; Qwest was on track to report EPS of $0.56-$0.59 and EBITDA per share of $5.02 in 2001.

The integration with US West and the strong financial results were partly due to better than anticipated synergies.

The wireless business was growing fast, with 691,000 subscribers and Qwest was on track to have 800,000 subscribers by year-end, which was indicative of its success in this business.

Qwest had a better management team and better strategy than its competitors which would help it overcome the problems of other telecom companies.

Qwest was positioned to be the revenue and earnings growth leader among the regional bell operating companies.

232.    On October 30, 2000, Defendant Nacchio was interviewed by Neil Cavuto of Fox

News Network. During the interview, Nacchio was quoted as stating:

> Cavuto:  What do you thi nk of this trend, though, where
> you break a company up, or you spin -off sections and they become
> publicly traded?
>
> Nacchio:  Well, you know, I think you can only do so much
> with financial engineering.
>
> Cavuto: Yes.
>
> Nacchio:  I mean, you know, the premise  is, if the investors
> only knew how much we were really worth, they would value it
> more.  Well, listen, the investors I know, know a lot about our
> company. So they generally know everything to begin with.  I
> think that's – my personal opinion, it's a bit ov erplayed, you know,
> tracking stocks, financial engineering.  At the end of the day, you
> have to create economic value and you have to run it well.
>
> Cavuto: Wall Street sees that you have a great growth rate
> going. But the fear is always, can you maintain t hat?  And now
> Wall Street is looking forward and worried about, for your whole
> industry, that growth rate factor.  It what was one of things that
> weighed on NorTel  . . . and some of these others, JDS Uniphase
> . . . briefly.
>
> Nacchio:  Sure.  Well, you know , you got to look at relative
> valuations, you got to look at track records.  And again, in our
> case, 14 quarters of meeting or beating expectations, going from
> nowhere to a large company, we lay out our plans clearly, we hold
> these sessions, we execute on  them, and I think you build
> credibility over time.

233.    On October 31, 2000, Qwest hosted an all day analyst meeting at the Waldorf

Astoria in New York.  During the meeting, Qwest management represented:

> KPNQwest was succeeding in Europe as it was taking market
> share from existing players that were having financial problems.
>
> Qwest was still on track to report favorable and growing revenues
> and earnings in 2000 and 2001 and Qwest was on track to report
> 2001 EPS of $0.55+.

- 93 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 99 of
187
Case 1:06-cv-01539-REB   Document 171   Filed 08/07/2006   Page 99 of 187

Qwest was stronger than its competitors d ue to its advantages of an extensive low-cost network, a strong IP/data platform and a comprehensive product suite.

Even as other telecom companies had problems and reported disappointing results, Qwest would report continued growth and would survive the downturn.

Qwest had strengthened its management team, which would help it have success and be more profitable in the near term.

Qwest had announced several significant long -term contracts which would add hundreds of millions of dollars to 2001 revenues.

234. Qwest's stock stabilized in the mid -$40 range on these positive statements. Defendant Nacchio took advantage, selling 725,000 shares of his Qwest stock between October 30, 2000 and November 17, 2000.

In fact, each of the statements made between October 24, 20 00 and October 31, 2000 were false or misleading when issued. The true, but concealed facts were:

a. Qwest's revenues were not increasing as much as represented, as Qwest was engaging in accounting manipulations to inflate revenues, including selling hundreds of millions of dollars worth of IRUs at inflated prices which Qwest did not disclose;

b. Defendants concealed that Qwest revenues had been inflated by the inclusion of at least $232 million in the sale of IRUs in the Third Quarter 2000. These sales were not a source of ongoing revenue as there was a finite amount of optical capacity Qwest could sell:

c. Qwest's 2000 results included $299 million (pre-tax) from the reversal of a pension charge which was non -recurring income which was not disclosed;

d.      Qwest was boo king network capacity sales up front, rather than over the term of the deals, and not disclosing that these were non -recurring one-time events, such that reported recurring revenue growth was misleading;

e.      Qwest was deferring costs associated with contracts,    including with a Genuity contract, to inflate its reported EBITDA;

f.      Qwest had suspended depreciation on certain assets such that net earnings were inflated;

g.      Qwest was including in its count of wireless subscribers thousands of "disconnect 30's," or people  who had requested discontinuation of service but were convinced to stay enrolled by promises of a free 30 minutes every month;

h.      Qwest's financial statements were materially overstated in violation of GAAP, due to improper revenue recognition and the failure  to value properly KPNQwest and PP&E, as alleged herein, as well as other items it has subsequently restated as alleged herein;

i.      Qwest was suffering the same problems as other telecommunications companies, including excess capacity, decelerating demand for  services, assets that were not worth nearly as much as represented and declining prices; problems Qwest was concealing through the artifices alleged herein; and

j.      As a result of the foregoing, Defendants actually knew that Qwest was not on track to report EP S of $0.55-$0.61 in 2001.

235.    On December 20, 2000, Qwest's stock fell 14% on concerns that the Company would be hurt by regulatory delays in its attempt to sell long -distance service and by service -quality issues. *Bloomberg News* reported:

Qwest appears to b e suffering from the same investor concern th[at] sent shares of San Antonio -based SBC Communications Inc. down 13 percent yesterday, said Jim Linnehan, an analyst at Thomas Weisel Partners.

SBC, the No. 2 U.S. local telephone company, said 2001 sales and profit would fall short of forecasts. It blamed delays in gaining permission to sell long-distance and costs to improve networks and offer new services in the region served by its Ameritech unit. BellSouth Corp., another large local phone company, halved its profit forecast last month.

Amitech slowed spending on network upgrades in its five - state region while it was in the process of being acquired, Linnehan said. SBC bought Ameritech in October 1999 for $80.6 billion.

236.    Qwest reacted immediately, puttin g out a press release and holding a conference call on December 21, 2000. The press release stated:

"Qwest believes it is not having the same problems announced by several competitors because Qwest has newer assets, a lower cost position and a product lin e targeted to capitalize on the high-growth sectors of the industry," Nacchio declared. Qwest also provides local and advanced communications services in 14 Western states, which include half of the fastest -growing business markets in the United States.

Nacchio said he is making a strong, specific statement today about Qwest's prospects because of recent market turmoil and extraordinary speculation about the likely results of major companies in the sector. Nacchio noted several companies have reduced guidance for 2000 and 2001.

"Demand for our products and services remains robust and we continue to see our market share and revenues grow in key segments of the market, such as DSL, wireless, Web hosting and broadband Internet services. We are reconfirming the targets we set on Sept. 7, 2000 for this year and 2001 based on the continued strength of our business and our success in executing our strategic merger plan," Nacchio said.

237.    On December 21, 2000, *Bloomberg News* reported that Qwest expected to match or beat analysts' estimates for the fourth quarter:

554065.1

The Denver-based company said it isn't having the problems of other telecommunications companies because it has newer equipment, lower costs and is concentrating on high -growth areas such as wireless commu nications and broadband Internet service.  SBC Communications Inc. and AT&T Corp. are among the other phone companies who have cut their profit and sales forecasts.

* * *

"While (AT&T's) growth is anemic, maybe 1 or 2 percent, we're still confident in our forecasts for the rest of the year and next year,"  Qwest Chief Executive Joseph Nacchio said on a conference call.  "The industry oligarchy is breaking down."

238.    This effort was successful and by December  29, 2000, Qwest's stock had recovered to $40  per share.  This was just in time for Nacchio to sell 619,467 of his Qwest stock on January 2, 2001 and January 3, 2001.  In fact, Qwest was suffering the same problems as other telecommunications companies, including excess capacity, declining demand and overvalued assets.

239.    On January 16, 2001, at the same time that certain of the Individual Defendants were selling their personally-held Qwest shares,  Qwest issued a release announcing a buyback of stock:

Qwest Communications International Inc. announced that  Qwest will purchase today approximately 22.22 million Qwest shares from BellSouth Corporation at a price of $45 per share, or $1 billion, in cash.  After the sale to Qwest, BellSouth will own approximately 51.78 million Qwest shares, or approximately 3.1 percent of the Qwest shares then outstanding.

BellSouth has also agreed to purchase $250 million in services from Qwest over five years.  BellSouth will pay for the services in Qwest stock over a four -year period.

Qwest and BellSouth will continue their  business relationship, which was developed to help both companies more effectively provide large business customers in the Southeast with

- 97 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 103 of
Case 1:06-cv-01539-REB   Document 1-7   Filed 08/07/2006   Page 103 of 187
187

complete communications solutions.  To date, the relationship has
yielded more than 200 customer contracts totaling mo re than
$300 million in revenue to Qwest in a broad range of industries.

Qwest said that it agreed to purchase the approximately
22.22 million Qwest shares because it believes that the Qwest
stock is a good value at $45 per share.  Qwest also said that th e
repurchased shares would be available to satisfy Qwest's
obligations under employee benefit and option programs.

240.   On January 24, 2001, Qwest announced its Fourth Quarter 2000 and 2000 results

in a release entitled "Qwest Communications Reports Strong Four th Quarter and Full-Year 2000

Results Driven by Growth in Internet, Data and Wireless Revenues," which stated:

Fourth Quarter Results Compared to Previous Year:

?   EBITDA grew nearly 20 percent to $2 billion

?   EBITDA margins increased 330 basis points

?   Revenue grew 10% to more than $5 billion

\*   \*   \*

"Results for the quarter demonstrate Qwest's strong
position in the industry and our ability to execute the business
plan," said Joseph P. Nacchio, Qwest chairman and CEO.  "With
the initial integration of t he merger successfully completed, we are
on track to meet our expected growth rates."

\*   \*   \*

"We are extremely pleased with our strong operating and
financial results for the fourth quarter and full -year 2000," said
Robert S. Woodruff, Qwest execut ive vice president and CFO.
"We achieved significant revenue and EBITDA growth while
integrating a large acquisition and investing for growth.  We
remain confident that we will achieve our financial commitments
for 2001 of $21.3 to $21.7 billion in revenue and $8.5 to $8.7
billion in EBITDA."

Qwest ended 2000 with more than 255,000 DSL customers,
more than double the previous year and exceeding the company's

> year-end target of 250,000.  Qwest expects to double the number
> of DSL customers to 500,000 by the  end of 2001.  Qwest leads the
> industry with 846 DSL customers per central office with DSL -
> equipped facilities.

This press release was filed with the SEC as a Current Report on Form 8 -K on January 25, 2001.

241.   Subsequent to the release of its Fourth Quarter 2 000 results, Qwest held a

conference call for analysts, money and portfolio managers, institutional investors and large

Qwest shareholders to discuss Qwest's Fourth Quarter 2000 results, its business and its

prospects.  During the call —and in follow up con versations with analysts—Nacchio and Szeliga

stated:

> [Qwest] expected that revenue would grow between 11.5% and
> 12.5% for the 1st quarter of 2001 over the 1st quarter of 2000.
> [Qwest] expected higher growth rates in the subsequent quarters.
>
> [Qwest] was co mfortable with its previously announced guidance
> for 2001, for revenues of $21.3 billion to $21.7 billion (a 12.5% to
> 14.5% increase over 2000) and EBITDA (earnings before interest,
> taxes, depreciation and amortization) of $8.5 billion to $8.7 billion
> (a 14.9% to 17.6% increase over 2000).
>
> [Qwest] was on track to meet previously announced targets of 15%
> to 17% CAGR (compounded annual growth rate) for revenue and
> almost 20% CAGR for EBITDA from 2000 to 2005.
>
> [Qwest] expects to double its targets for DSL and   wireless
> customers by the end of 2001 to 500,000 and 1.6 million
> customers, respectively.
>
> Qwest expected SG&A as a percentage of revenue to continue to
> improve modestly through 2001 as a result of workforce reductions
> and other synergies and scale and effi ciency improvements,
> partially offset by increased investments in wireless, DSL and sales
> activities.
>
> Qwest's favorable margins were the result of good expense control
> and improving employee productivity.
>
> SG&A expenses as a percentage of revenues were only   22% due to

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 105 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 105 of 187

successful expense controls implemented by Qwest management.

Qwest had much more capacity than Nortel.

Qwest had reached 800,000 in wireless subscribers in 2000 and
planned to double this number by the end of 2001.

Qwest would not spend as much  in 2001 on capital expenditures as
previously forecast – not because it was reducing growth but rather
because it was receiving favorable pricing on equipment.

Qwest was reporting, and would continue to report favorable
results due to its strong and deep  management team.

Directory Services revenues had increased 10% year over year.

Qwest would be making a 271 application to the FCC for entry
into the long distance market, and although competitors had done
this already it would not be a disadvantage to Qwes t because its
multi-state support systems were consistent as compared to
competitors' systems.

Qwest was able to beat estimates notwithstanding a slowing
economy in part because it was taking market share from
competitors.

Qwest would continue to report fa vorable results despite a slowing
economy due to its mix of data and voice revenues, due to its entry
into long distance and due to the fact it could beat any competitor
in offering bundled services in terms and pricing and products.

242.     Each of the statements  made between December  20, 2000 and January 25, 2001

were false or misleading when issued. The true but concealed facts were:

a.       Qwest's revenues were not increasing as much as represented, as Qwest

was engaging in accounting manipulations to inflate revenues , including selling hundreds of

millions of dollars worth of IRUs at inflated prices which Qwest did not disclose;

b.       Defendants concealed that Qwest revenues had been inflated by the

inclusion of at least $232 million in the sale of IRUs in Third Quarter 2000 and hundreds of

- 100 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 106 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 106 of 187

millions of dollars more in Fourth Quarter 2000, including a deal with Cable & Wireless.  These

sales were not a source of ongoing revenue as there was a finite amount of optical capacity

Qwest could sell;

      c.     Qwest's Directory Services reven ues had increased in Fourth Quarter

2000 by 10% only through manipulations of the directories, dates and terms.   The Colorado

Springs directory, which was due to be sent out in January 2001, and recognized as revenue in

First Quarter 2001, had been shipped out in December 2000 to record revenue in Fourth Quarter

2000.  This manipulation alone represented 5% of the growth Qwest reported for Directory

Services revenue in Fourth Quarter 2000;

      d.     Qwest's 2000 results included $299 million (pre-tax) from the revers al of

a pension charge which was non -recurring income which was not disclosed;

      e.     Qwest was booking network capacity sales up front, rather than over the

term of the deals, and not disclosing that these were non  -recurring one time events, such that

reported r ecurring revenue growth was misleading;

      f.     Defendants actually knew that Qwest was not a good value at $45 per

share due to the many undisclosed problems Qwest was concealing through its manipulation.

For this reason Defendants continued to sell their person  al Qwest holdings even while causing

the Company to pay an inflated priced for Bell South's shares of Qwest.   One reason they agreed

to the high price was to convince Bell South to enter a five  -year $250 million contract with

Qwest which Defendants could r ecognize as revenue immediately, thus inflating Qwest's own

results;

- 101 -

g.      Qwest was deferring costs associated with contracts, including with

Genuity, to inflate its reported EBITDA;

h.      Qwest had suspended depreciation on certain assets such that net earnings

were inflated;

i.      Qwest was suffering the same problems as other telecommunications

companies, including excess capacity, decelerating demand for services, assets which were not

worth nearly as much as represented and declining prices, which problems Qwest was co  ncealing

through the artifices alleged herein;

j.      Qwest was including in its count of wireless subscribers thousands of

"disconnect 30's," or people who had requested discontinuation of service but were convinced to

stay enrolled by promises of a free 30 minu tes every month;

k.      Qwest's financial statements were materially overstated in violation of

GAAP, due to improper revenue recognition and the failure to properly value KPNQwest and

PP&E, as alleged herein; and

l.      As a result of the foregoing, Defendants actually  knew that Qwest was not

on track to report EPS of $0.53 -50.71 in 2001.

243.    On February 16, 2001, Qwest announced via a press release:

> Qwest Communications International Inc. is continuing to succeed
> in a marketplace that is undergoing significant structural c hange
> while shareowners and customers are placing dramatically
> different demands on chief executive officers, Qwest Chairman
> and CEO Joseph P. Nacchio told an audience at the University of
> Pennsylvania's Wharton School.
>
> Nacchio said the telecommunications  industry is
> undergoing structural change as older companies reposition
> themselves for the future.  Speaking Thursday evening at a

Wharton media and technology conference, Nacchio said Qwest
had grown quickly in less than four years through seven mergers o r
acquisitions.  He said that had been a smart way for Qwest to grow
as it was maturing as a company.

On Jan. 24, Qwest announced fourth quarter 2000 results
saying it had met or exceeded the consensus of analyst's estimates
for the 15th consecutive quart er since becoming a public company
in 1997.  The company also reconfirmed on Jan. 24 its 2001 targets
for revenue and earnings before interest, taxes, depreciation and
amortization (EBITDA).

244.   On February 16, 2001, Nacchio had announced "a planned and struct ured daily

stock sales program" with respect to the sale of his personally held Qwest shares.  The release

had stated:

Nacchio intends to sell 11,500 shares daily beginning February 20,
2001 until June 30, 2003, or 6.1 million shares in total.  The daily
sales price will not affect the number of shares sold on that day.

This program lasted only eight days, however.  Shortly thereafter, Nacchio returned to his

practice of selling large numbers of shares which he did through late April 2001.  Thereafter,

once Qwest's share price dropped below $20, he did not sell any shares.

245.   On February 26, 2001, Nacchio held an investor conference in Washington, D.C.

During the conference, Nacchio stated:

. . . He was comfortable with previously announced guidance for
2001 for revenues of $21.3 billion to $21.7 billion (a 12.5% to
14.5% increase over pro forma revenues for 2000) and EBITDA
(earnings before interest, taxes, depreciation and amortization) of
$8.5 billion to $8.7 billion (a 14.9% to 17.6% increase over pro
forma EBITDA for 2000).

He expected that total revenues would grow between 11.5% and
12.5% for the 1st quarter of 2001 over pro forma revenues for the
1st quarter of 2000.  He expected higher growth rates in
subsequent quarters.

He expected Qwest's Business Mar kets unit revenues to grow by

- 103 -

554065.1

> 25-30% in 2001 over pro forma revenues for 2000, and that 45%
> of new sales in that unit would come from national or large
> accounts.

These representations were filed with the SEC as a Current Report on Form 8 -K on February 27,

2001.

246.    On March 15, 2001, Qwest filed a Current Report on Form 8 -K, which reprinted

comments made by Qwest officer Afshin Mohebbi at a March  13, 2001 conference hosted by

Merrill Lynch, that:

> Based on his review of Qwest results for January and February
> 2001, he was comfortable with previously announced guidance for
> 2001 for revenues of $21.3 billion to $21.7 billion (a 12.5% to
> 14.5% increase over pro forma revenues for 2000) and EBITDA
> (earnings before interest, taxes, depreciation and amortization) of
> $8.5 billion to $8.7 billion (a 14.9% to 17.6% increase over pro
> forma EBITDA for 2000).
>
> Based on those results, he was comfortable with previously
> announced guidance that total revenues would grow between
> 11.5% and 12.5% for the 1st quarter of 2001 over pro  forma
> revenues for the 1st quarter of 2000.

247.    Despite these statements, Qwest's stock declined in early 2001 from the $45

range in January 2001 to the $35 range in early March 2001 as market observers were concerned

about the prospects in the telecommunicati ons industry.  Defendants wished to sell more of their

shares and, thus, assured analysts that 2001 earnings would be favorable.

248.    The Company's Current Report on Form 8 -K filed on March 22, 2001 described

that Nacchio, speaking with a group of investors, as  stating, among other things, that:

> Based on the results for January and February, which showed
> strong growth in Qwest's Business Markets, Wholesale Markets,
> DSL and certain other businesses, he is comfortable with
> previously announced guidance of (1)  revenue growth of between
> 11.5% and 12.5% for the 1st quarter of 2001 over pro forma

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 110 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 110 of 187

revenues for the 1st quarter of 2000, (2)  revenues of $21.3 billion to $21.7 billion (a 12.5% to 14.5% increase over pro forma revenues for 2000) and EBITDA (earnings before i nterest, taxes, depreciation and amortization) of $8.5 billion to $8.7 billion (a 14.9% to 17.6% increase over pro forma EBITDA for 2000), in each case for 2001, and (3)  compounded annual growth rates for revenue of 15% to 17% and EBITDA of 20% over the pe riod 2000 to 2005.

249.    On March 22, 2001, Nacchio and Szeliga appeared at a UBS Warburg hosted

senior management meeting.  UBS Warburg subsequently issued a report on the meeting by

analyst Linda Meltzer which was based on Nacchio's and Szeliga's comments.  Th e report, dated

March 23, 2001, forecast 2001 and 2002 EPS of $0.59 and $0.75, respectively, and the following

2001 quarterly data:

|      | 1Q     | 2Q     | 3Q     | 4Q     |
|------|--------|--------|--------|--------|
| 2001 | $0.11  | $0.13  | $0.16  | $0.19  |

It also stated:

> At an UBS-Warburg sponsored investor group meeting with senior Q management, CEO Joe Nacchio provided strong confirmation that the company is on track to meet accelerated growth targets for I QO1 and 2001, and addressed a number of issues that have been overhanging the stock.  Clearly Q's substantive management line-up exemplifies the deep bench strength with the execution capability leveraging rich IP/data mix, which differentiates Q strategy from ILECs and long distance companies.  We look for Q to deliver accelerated growth, justifying premium valuation.  We reiterate our Buy rating and [are] fine-tuning our price target to $68 from $78 assuming multiple revaluation, 100% above yesterday's close.

> *   *   *

> On Thursday, we had an opportunity to host an investor group with the Q senior management, headlined by CE O Joe Nacchio; Afshin Mohebbi, President Worldwide Operations; Steve

Jacobsen EVP, Business Markets who is on track for targeted 28% revenue growth in his large base of customers; Lew Wilkes, EVP, Internet Strategy & Development and very much on board desp ite speculation of his imminent departure; Robin Szeliga Interim CFO owing to Woodruff's (former CFO) departure and was able to address the speculation of accounting irregularities (there are no investigations by the SEC as released by Q in an 8K on Thursd ay) and conservative policies on reserves and clarified reclassified goodwill on the balance sheet for KPNQwest interest; Jim Smith EVP, Small Business & Consumers Markets and reiterated strong growth momentum in DSL, wireless and bundling benefits; Richard Weston, SVP Internet Solutions discussed demand for outsourced offerings and new services such as IP VPN capabilities; and Mike Perusse SVP Worldwide Engineering & Technology.

MANAGEMENT BENCH STRENGTH WITH A GROWING EXECUTION TRACK RECORD BENEFITING FROM Q'S DIFFERENTIATED POSITION.  Led by Nacchio, the substantial management lineup exemplifies Q's deep bench strength, and serves to highlight the company's differentiation from both ILECs and long distance companies as a uniquely positioned customer -focused company with local distribution assets, low cost advanced network capabilities, and complex Web hosting solutions via the CyberCenters.  Q is experiencing momentum across the board and doesn't expect to be impacted by the slowing economy, with any pote ntial impact, particularly if the downturn were to become severe, likely to be felt first in the US West core telecom business.  However, Q Classic likely to be better positioned given its IP -based product portfolio (e.g., VPN's) which can enhance producti vity benefits for mid-large enterprises.

\*   \*   \*

Q RECONFIRMED 1Q01 AND 2001 OUTLOOK AGAIN.  We note that it is with some irony that Q, which is among the few, if only company, in our universe that executed its plan in 2000 by meeting/exceeding expectations is undergoing severe scrutiny and speculation that it will be reducing its guidance for the upcoming quarter.  As he has done many times over the past several weeks, CEO Joe Nacchio reiterated the company's 1Q01 guidance and 2001 guidance and issued an 8K (again). Based on results for January and February, which shows strong growth for Qwest's Business Markets, Wholesale Markets, DSL and other businesses, Nacchio expressed comfort with previous

554065.1

guidance of; [sic] (1) Revenue growth of 11.5% -12.5% for the lQ01 over pro forma l Q00 (we are at 11.5% and see details below), accelerating over the 4Q00 growth of 9.9% and again among the few, if any of our companies, able to accelerate growth in 1Q0l ; (2) 2001 outlook reconfirmed revenues of $21.3B -$21.7B for 12.5% -14.5% rise over 2001 (we're at the lower end of revenues and EBITDA of $8.5B -$8.7B for 14.9% -17.6%); and (3) CAGR growth rates for 15% -17% revenue growth and 20% EBITDA growth for 2000 -05.  On this latter point we assume mid teens EBITDA growth  rather than 20% not because we don't believe the target to be achievable but rather based on our belief that Q is a growth company with multiple growth initiatives it can target and better use excess EBITDA, that is over 15% to reinvest in top-line growth.  What's so shabby about sustainable mid-teens growth?

*    *    *

Qwest continues to spend heavily on its growth initiatives; 2000 capital expenditures of $9.0 billion represented 47% of revenues.  We expect capital expenditures of $9.5 billion in 200 1 (see Table 6), representing approximately 44% of revenues, with 2001 representing a peak year in capital expenditures which is front-end loaded for 271 initiatives before we expect it to begin to decelerate in 2002.

250.    On these positive statements, Qwest's  shares spiked 10% to $37.

251.    On April 24, 2001, Qwest reported its financial results for the First Quarter 2001.

The press release issued in connection with the announcement stated:

Qwest Communications Reports Strong First Quarter 2001 Results Driven by Growth in Commercial, Internet and Data Revenues

Quarterly Revenue Grew Nearly 12 Percent Over Pro Forma 2000; EBITDA Growth of Nearly 16 Percent; Met or Exceeded Consensus of Analysts' Estimates for Revenue, EBITDA and EPS

First Quarter Results Compared to P ro Forma First Quarter 2000:

Total revenue grew nearly 12 percent to $5.05 billion

Internet and data services revenue grew 44 percent and represents approximately 25 percent of total revenue and more than 45

percent of commercial revenue

Commercial revenue increased more than 26 percent

Total EBITDA grew nearly 16 percent to $2 billion

EBITDA margins increased 130 basis points from 38.2 percent to 39.5 percent

Operational Results:

DSL customers grew 125 percent over first quarter 2000 to more than 306,000

Wireless customers grew to approximately 908,000

Activated 15th U.S. CyberCenter (SM) in Dallas for hosting and managed applications

Achieved best service performance results in five to seven years

Since the acquisition of US WEST, revenue pre employee increased from $249,000 to $310,000, a 24 percent improvement in productivity

Achieved significant milestones for accelerated re -entry into the long-distance business in 14 Western states.

*   *   *

   "We are extremely pleased with the results the Qwest tea m achieved during the quarter.  With our unique blend of assets, Qwest is well positioned for future growth across all segments of the communications marketplace," said Joseph P. Nacchio, Qwest's chairman and CEO.  "We believe the industry will continue to provide solid growth opportunities in 2001, especially for our broadband Internet and data services.  Qwest is well positioned to take advantage of that growth at the local, national and global level."

*   *   *

   "We are very pleased with our strong o perating and financial results for the quarter.  This solid performance positions us well to achieve our growth rates for 2001," said Robin R. Szeliga, Qwest executive vice president and CFO.  "We achieved

- 108 -

> strong revenue and EBITDA growth for the quarter a s our focus on
> execution and investment for growth continued to produce results.
> For the second quarter of 2001 we expect revenue to increase
> between 12 percent and 13 percent compared to pro forma second
> quarter 2000."

252.    In fact, as was subsequently reveal ed in the October 2003 restatement, Qwest lost

substantial sums in the First Quarter of 2001, contrary to the rosy financial picture painted in its

April 24, 2001 press release.

253.    On April 25, 2001, Qwest filed a Current Report on Form 8 -K, which

incorporated the Company's press release and also reprinted representations from an April   24,

2001 conference call, wherein Quest stated, among other things:

> It expected that revenue would grow between 12% and 13% for the
> 2nd quarter of 2001 over the 2nd quarter of 2 000.  It expected
> higher growth rates in the subsequent quarters of 2001.

> It expected that revenue and EBITDA (earnings before interest,
> taxes, depreciation and amortization) for 2001 would be within the
> previously announced ranges. Its previous guidance w as for
> revenues of $21.3 billion to $21.7 billion (a 12.5% to 14.5%
> increase over 2000) and EBITDA of $8.5 billion to $8.7 billion (a
> 14.9% to 17.6% increase over 2000).

> It ended the 1st quarter of 2001 with 908,000 wireless customers
> compared with 805,000 customers at the end of 2000. . . . As
> previously announced, Qwest is targeting 1.6 million wireless
> customers at the end of 2001.

> It was on track to meet previously announced targets of 15% to
> 17% CAGR (compounded annual growth rate) for revenue and
> approximately 20% CAGR for EBITDA from 2000 to 2005.

> It had diluted EPS (earnings per share) of $0.13 and cash EPS of
> $0.30 for the 1st quarter of 2001.

254.    Subsequent to the release of its First Quarter 2001 results, Qwest held a

conference call for analysts, mon ey and portfolio managers, institutional investors and large

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 115 of
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 115 of 187
187

Qwest shareholders to discuss Qwest's First Quarter 2001 results, its business, and its prospects.

During the call —and in follow up conversations with analysts —Nacchio and Szeliga stated:

> Qwest's favorable margins were the result of good expense control and improving employee productivity.
>
> SG&A expenses as a percentage of revenues were only 22% due to successful expense controls implemented by Qwest management.
>
> Qwest had much more capacity than Nortel.
>
> Qwest would not spend as much in 2001 on capital expenditures as previously forecast – not because it was reducing growth but rather because it was receiving favorable pricing on equipment.
>
> Other telecommunications companies were reporting disappoi nting results and laying it on the economy, but Qwest was a market share taker in most of its product lines and would thus continue to hit its numbers or its earnings forecasts despite economic problems in the industry.
>
> Qwest was reporting, and would conti nue to report, favorable results due to its strong and deep management team.
>
> Qwest would be making a 271 application to the FCC for entry into the long distance market, and although competitors had done this already it would not be a disadvantage to Qwest  because its multi-state support systems were consistent as compared to competitors' systems.
>
> Qwest was able to beat estimates notwithstanding a slowing economy in part because it was taking market share from competitors.
>
> Qwest would continue to report favo rable results despite a slowing economy due to its mix of data and voice revenues, due to its entry into long distance and due to the fact it could beat any competitor in offering bundled services in terms and pricing and products.

255. Subsequent to the confer ence call, analysts issued reports on Qwest repeating

Nacchio and Szeliga's statements, including those made during the conference call.  The reports

rated Qwest and forecast 2001 and 2002 earnings as follows:

| Firm | Analyst | Rating | 2001 EPS | 2002 EPS |
|---|---|---|---|---|
| Credit Suisse First Boston | Reingold | Strong Buy | $0.60 | |
| Janney Montgomery Scott | Kovacs | Buy | -- | -- |
| ABN AMRO | Roe | Buy | $0.59 | $0.80 |
| Prudential Securities | Greenwood | Strong Buy | $0.51 | |
| US Bancorp Piper | Robinson | Strong Buy | $0.56 | |
| CIBC World Markets | Horan | Hold | $0.59 | $0.74 |
| UBS Warburg | Meltzer | Buy | $0.59 | $0.79 |
| Lehman Brothers | Bath | Strong Buy | $0.52 | $0.63 |
| Dresdner Kleinwort Wasserstein | Klein | Buy | $0.60 | $0.89 |
| ING Barings | Miller | Buy | $0.60 | $0.78 |
| Salomon Smith Barney | Grubman | 1M (Buy) | $0.58 | $0.70 |
| Bear Stearns | Deatherage | Neutral | $0.53 | $0.70 |
| J.P. Morgan | Crossman | Buy | $0.55 | $0.76 |
| Frost Securities | Giansiracusa | Buy | $0.56 | |
| Arnhold & S. Bleichroeder | Wilkes | Attractive | $0.60 | $0.85 |

256.     Subsequent to these statements, Qwest's stock price increased, trading as high as $41.83 on April 30, 2001.  In fact, Qwest's First Quarter 2001 results and its statements between February 13, 2001 and April 24, 2001 were materially false and misleading due to the Company's improper accounting in violation of GAAP, as alleged herein, and due to the following undisclosed facts:

a.     Qwest's First Quarter 2001 earnings were better than expectations primarily due to its change in the discount rate to calculate its pension obligations, increasing Qwest's First Quarter 2001 results by at least $0.03;

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 117 of
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 117 of 187
187

        b.      Qwest's First Quarter 2001 earnings were better than expectations due to Defendants' failure to properly write down the value of its holdings in KPNQwest, which was materially overstated as a result;

        c.      Qwest's First Quarter 2001 earnings were increased by $0.01 -$0.02 due to its aggressive use of capitalization to classify tens of millions of dollars of interest and software development costs as assets rather than expenses, which would contribute to decreased earnings in future quarters;

        d.      Qwest's 2000 income had been inflated by the inclusion of a pension credit of $299 million;

        e.      Qwest's revenues and income were inflated by the manipulation of the terms and shipment dates of directories;

        f.      There was no way Qwest's future earnings would be nearly as strong as represented due in part to the accounting manipulations Defendants engaged in which would adversely affect future results, as expenses were being deferred to future quarters and years;

        g.      Qwest was inflating revenue by recording $420 million in IRU deals as part of Commercial Services revenue and not disclosing the amount of this transaction to the public;

        h.      Qwest inflated its revenue by its reciprocal IRU transaction with Sonus Networks - a deal where Qwest conditioned its purchase of Sonus equipment on an agreement by Sonus to purchase an IRU from Qwest for more than $15 million;

        i.      Qwest was deferring costs associated with contracts, including with Genuity, to inflate its reported EBITDA;

       j.     Qwest had suspended depreciation on certain assets such that net earnings were inflated;

       k.     Qwest was suffering the same problems as other telecommunications companies, including excess capacity, decelerating demand for services, assets which were not worth nearly as much as represented and declining prices, which problems Qwest was concealing through the artifices alleged herein;

       l.     Qwest's SG&A expenses were only 22% of sales, not due to tight expense controls as represented, but due to improper classification of SG&A expenses as cost of sales;

       m.     Qwest's financial statements were false and misleading and pres ented in violation of GAAP due to improper revenue recognition and failure to properly report the value of assets, as alleged herein; and

       n.     Defendants knew that, due to the foregoing, Qwest was not on track to report strong results or EPS of $0.55+ in 2001.

257.     In May 2001, Defendant Anschutz entered into two "forward sales contracts" for which he received $179 million in exchange for promising to deliver some 4.6 million of his Qwest shares.

258.     During May 2001–July 2001, Qwest management continued to have frequent conversations with analysts, each time reiterating that the Company was on track for strong earnings in 2001.  On May 4, 2001, Lehman Brothers issued a report on Qwest based on and in reliance upon analyst Bath's meetings with Qwest management.  The report  forecast 2001 and 2002 earnings of $0.52 and $0.63 per share, respectively, and stated:

      *     Meetings with management strengthen accelerating
          revenue growth conviction.  Top line accelerates from 12% in

1Q01 to 15% in 4Q01 driven by mix shift of the growth d rivers
and not a material acceleration in sequential dollar revenue growth.
Excluding wireless, the sequential '01 ramps in dollar growth are
very similar to those in 4Q00, which Q beat in 1Q01.

\*   \*   \*

Q stands alone in the mega -cap group as the o nly carrier to
be growing revenues at such a rapid clip while simultaneously
being able to significantly improve EBITDA margins. For the
remainder of 01 we expect that EBITDA margins will increase
approximately 20-30 bps sequentially each quarter, improving 100
bps from 38.9% in 2000 to 39.9% for the full year 2001.

Margin improvements should be driven by a $300-400M
reduction in expenses due to US West merger synergies (primarily
headcount reductions), partially offset by higher spending on key
initiatives such as DSL, LD entry, wireless, and out -of-region
DLEC.

In 02, we forecast another 60 bps improvement in the
EBITDA margin as an additional $700-800M in costs are stripped
away and upwards of $1B in revenue synergies from out -of-region
DLEC/CLEC, in-region LD entry, and in-region data/IP areas are
realized. We forecast that EBITDA will grow 16.6% in both 01
and 02.

259.   On May 8, 2001, UBS Warburg issued a report on Qwest based on and in reliance

upon analyst Meltzer's conversations with Qwest management.  T he report forecast 2001 and

2002 EPS and $0.53 and $0.76, respectively, and stated:

After further discussions with the company and reviewing
our model, we are fine -tuning our EPS and cash EPS estimates for
2001 and 2002 to more fully reflect the impact as sociated with Q's
repurchase of $1B worth of shares from BellSouth (BLS -$42.14-
Hold) and has no operational impact. BLS still holds about 51.8M
of Q shares.  We are adjusting our 2001 EPS estimate from $0.59
to $0.53 and our cash EPS estimate from $1.25 to  $1.19.  We are
lowering our 2002 EPS estimate from $0.79 to $0.76 and our cash
EPS estimate from $1.48 to $1.42.  We reiterate our Buy rating and
$68 12-month price target, targeting multiple expansion owing to
Q's higher growth profile.

- 114 -

260.     On June 5, 2001, Qwest filed a Form 8-K with the SEC ahead of its participation

at investor conferences, reiterating its guidance for the year with 2001 revenues of $21.3 -$21.7

billion and EBITDA of $8.5-$8.7 billion, and a second reduction in its capital expenditure

budget to $8.8-$9 billion for 2001, to as low as $8 billion in 2002.  Management highlighted the

fact that these capital expenditure ("capex") cuts would not prevent it from reaching its financial

targets.  The Company mentioned a series of reasons for the redu ctions:

> Better communications equipment pricing, as the suppliers chase
> fewer dollars following the aggregate capex cut in the ILEC,
> CLEC, IXC and ISP spaces.
>
> Improved inventory management.
>
> Business process improvements such as more cost effectively
> designing transmission and hosting capacity.
>
> Early completion of the 25 DLEC metro facilities, seven months
> ahead of schedule and below budget.
>
> Bulk of the 271 investment taking place this year.
>
> Additional merger synergies for network equipment and
> distribution operations.
>
> It is comfortable with previously announced guidance of
> (1) revenue growth of between 12% and 13% for the 2nd quarter of
> 2001 over pro forma normalized revenues for the 2nd quarter of
> 2000, (2) 2001 revenues of $21.3 billion to $21.7 billion (a 12.5%
> to 14.5% increase over pro forma normalized revenues for 2000),
> and (3) 2001 EBITDA (earnings before interest, taxes, depreciation
> and amortization) of $8.5 billion to $8.7 billion (a 15% to 18%
> increase over pro forma normalized EBITDA for 2000).

261.     On June 19, 2001, Qwest issued a release and hosted a conference call to reiterate

it was comfortable with earnings estimates:

> Qwest Communications International Inc., the broadband Internet
> communications company, said today that the company continues
> to see strong demand for services and that it is comfortable with its

previously announced financial guidance. The company expects
that revenue will increase approximately 12-13 percent over the
second quarter of 2000, while revenue for 2001 will be
approximately $21.3-$21.7 billion and EBITDA (earnings before
revenue, interest, taxes, depreciation and amortization) for the year
will be approximately $8.5-$8.7 billion.

*   *   *

"Despite some softening in the general economy, we
believe that demand for com munications services is stronger than
what others have reported," said Joseph  P. Nacchio, Qwest
chairman and CEO.  "Qwest is unique, as it competes as both a
local exchange company and a long-distance carrier. This gives us
diverse product lines to meet ou r growth targets in this economy."

262.    On the June 19, 2001 conference call, Nacchio stated:

"It's a little bit frustrating that every time a new carrier has
trouble, we get whacked.  . . . I don't get it.  . . . There's a slowdown
in the economy versus a year  ago. . . . But it is not a cliff.  We have
not seen demand go off the table. The lights, to quote other people,
have not gone out."

"There has been an over -aggressive pessimism in our
industry. . . . I continue to be amazed that people don't get the fact
that there are radical differences between our product lines as
compared to some of the startups who came into the business with
imperfect business models and who are now failing."

263.    On June 20, 2001, Morgan Stanley Dean Witter issued a report on Qwest by

Simon Flannery, Jeffrey Camp and Trevor Harris entitled "Qwest: Listening to the 10 -K."  The

report downgraded Qwest to Neutral, reduced EPS estimates for 2002 and 2003, and stated:

We are downgrading Qwest from Outperform to Neutral,
and are also lowering  our long-term growth forecasts for the
company.  These actions arise from a deteriorating economic and
industry environment and from greater uncertainty stemming from
accounting decisions made since the Qwest merger with US West.

*   *   *

We have recently conducted an extensive review of

- 116 -

Qwest's financial statements.  This report was prepared with the assistance of Trevor Harris, professor of accounting at Columbia University, and currently head of Morgan Stanley's valuation and accounting research group, and his team.  Our analysis leads us to the conclusion that the company has taken a number of financial actions that could have an important bearing on the sustainability of future earnings growth and capital needs.

\*   \*   \*

Exhibit 3
**Summary of Key Issues at Qwest**

| Issue | Comments |
| --- | --- |
| Write-downs in Adjustments of the Purchase Price Allocation | As part of its merger with US West,  we believe Qwest wrote off approximately $2.1 billion (pre-tax) of (old) Qwest tangible net assets.  This write-off would have been separate from the $1.75 bn in merger - related and other charges reported in Q's 12/31/00 earnings and a further $209 million charge reported in 1Q01.  Although we do not have full details, we estimate that $1.0 bn of the incremental write -off was for PP&E (including about half for LIC assets), and $1.1 bn for provisions concerning such items as contracts and other legal liabilities.  For an adjustment in the purchase price under US GAAP, these obligations and asset impairments for old Qwest had to  exist at the date of the merger, yet it appears to us the adjustments were only made after this date and remain largely undisclosed.  In the purchase price allocation adjustments made between 6/30/00 and 9/30/00, there is also an additional $1.6 bn increase in deferred taxes from the write -up of separable intangible assets, as required by U.S. GAAP. |
| KPNQwest Write- Down | We expect Qwest will need to take a  substantial write down to the value of its 44.5% investment in KPNQwest.   The investment is currently carried on the books at approximately $7.4 bn, the value at the date of the merger, although at current market prices for KPNQwest the value in the market is closer to $2 bn.  While the market is clearly cognizant of this possibility, the potential write do wn is sizable.  The KPNQwest assets were written up as part of the "reverse merger" accounting, so any write-down taken before June  30, 2001 could require a further adjustment to the purchase price allocation.  This would in turn raise a new question about  whether goodwill will need to be adjusted for impairment under the new FASB rules that we expect will become effective on July 1, 2001. |
| Pension Assumptions | Qwest (via US West) increased the discount rate on pension liabilities to 8% from 6.75% and the re turn on plan assets to 9.4% from 8.8% for its |

- 117 -

Exhibit 3
**Summary of Key Issues at Qwest**

| Issue | Comments |
|---|---|
| | fiscal year end 2000.  This had the effect of raising the pension benefit recorded in operating income.  While these return assumptions are within the range of those used by other Bell companies, the accounting changes that help income are unlikely to be sustainable, especially as actual returns on pension assets have turned negative, and as Qwest had increased pension benefits payable in 2002 and 2003. |
| Capitalized Software | Accounting rules require software cos ts to be capitalized .  The level of costs capitalized at Qwest is high relative to its competitors.    In 1999 cumulative capitalized software for US West appears to have been $800 mn, and we understand the 1999 amount for (old) Qwest was approx. $170 mn (net).  Only 114 mn of the capitalized software was written off as a result of the merger, and at 12/31/00 we estimate Qwest's gross capitalized software to be approximately $1,640 mn.  This suggests approximately $780 million in incremental capitalized software costs, which would seem a higher multiple of sales that [sic] in its competitors. Qwest is expected to capitalize an additional $600 mn in 2001.  Over - capitalization leads to higher current earnings, when the cash is being spent, but depresses future  earnings. |

264.    Qwest, particularly Nacchio, reacted strongly to this report, beginning a campaign

to prevent a decline in Qwest's stock price immediately.  Qwest issued the following press

release on June 20, 2001 to rebut the Morgan Stanley report:

> Qwest Com munications International, Inc. today again confirmed its financial guidance for 2001 and the period 2000 to 2005 in light of an inaccurate and misleading report issued by Morgan Stanley. During the five-year period, Qwest expects to grow revenue at least 15% and EBITDA (earnings before interest, taxes, depreciation and amortization) approximately 20%, each on an annually compounded basis.  Qwest also confirmed that it does not expect its capital expenditures to exceed $9.2 billion in 2001.  It is also looking at ways to further reduce capital expenditures to between $8.8 billion and $9.0 billion for 2001, and to as low as $8.0 billion for 2002.

> Qwest said that a Morgan Stanley report issued earlier today does not present any information or analysis that h as any

554065.1

bearing whatsoever on the sustainability of its future earnings growth or capital needs. The Morgan Stanley report addresses several technical issues relating to the manner in which Qwest has accounted for its acquisition of US West on June 30, 2000. The report does not disclose any accounting treatment that Qwest has not previously disclosed in its public filings nor does it suggest that any accounting treatment by the company is improper. Qwest believes that Morgan Stanley's analysis, from an accounting point of view, is incorrect and its conclusions about Qwest's business and prospects are wrong.

Qwest said that its disclosure of the merger with US West and the purchase accounting is fully adequate. . . .

*   *   *

"Qwest has already fully disclosed all the issues raised by Morgan Stanley," said Robin Szeliga, Executive Vice President and Chief Financial Officer. "Their report is just an academic commentary on the merits of purchase accounting and an attempt to educate investors on the application of Generally Accepted Accounting Principles (GAAP). As applied to Qwest, Morgan Stanley's accounting analysis is incorrect. Their business conclusions are wrong. Nothing they say in their report has anything to do with our prospects for future performance. Nothing they say, except by unsupportable innuendo, casts any doubt on any of our accounting practices. We will respond to their report in detail in a filing we will make with the Securities and Exchange Commission later today."

265. This press release was incorporated as an exhibit to a June 21, 2001 Current

Report on Form 8-K that Qwest filed with the SEC.

266. Qwest also held a conference call in which Nacchio and Szeliga stated:

Nacchio:     Number one, there are no accounting issues or improprieties in Qwest's financial reporting. Let me repeat that, there are no accounting issues or improprieties in our reporting. The only open issue that we have with anyone is an earlier reported set of inquiries from the SEC over the treatment of certain wireless subscribers which I believe was the fourth quarter of last year. There was nothing else

- 119 -

than that matter.  Two, innuendoes on our integrity are not going to be tolerated, irrespective of who makes them, including what I used to believe was a reputable branded firm like Morgan Stanley.  And let me be, and I will be specific in a minute.  Thirdly and very important, as a fiduciary of your investment money, the unsupportable assertions made in this report about our ability to generate future growth in revenues , cash flow and earnings are inaccurate and unsupportable.  There is nothing about any judgments on purchased accounting that will affect our ability to go forward with anything we have said up to and including anything we said yesterday.  So, it is unfort unate that we have to reiterate guidance today in light of [unintelligible] that they believed that we had issues with how much capital we have to spend and that we have an unsustainable future earnings growth and capital requirements that is hogwash, I do n't know where it comes from and I don't know where it was supported.

*   *   *

Szeliga:        I again want to reiterate that I am surprised and perplexed that they would use this sort of information to be the primary thesis for a downgrade.  In my opinion,  if you are going to do recommendations to your investor base, you would look at the fundamental drivers of a business to see if you are on a healthy track to meeting a five year view.  Those I will enumerate for you.  I will give you a few.  These would be  the kinds of things I would have expected in a note from them, such as re-entry into 271, we are about that in a healthy fashion.  CLEC, DLEC out of region build out, we have just talked openly, publicly about the fact that we are on a, the fact that we a re on a fast track there.  The health of the economy inside of our 14 state region.  We talked very openly in our first quarter earnings release and again yesterday about the fact that we continue to see a healthy economy and continue to thrive inside of o ur local business and finally, our bundling initiative which we are

- 120 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 126 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 126 of 187

talking about in the context of being able to drive
more revenue out of every customer house and
every business and we are successfully doing that.
We have healthy sales channels and finally, the
ability of our global sales force to sell into the top
end of the market.  Those are the sorts of things I
think we need to be focused on, those are the
business issues I would have expected in a report as
opposed to some obscure accounting purcha  se
accounting issues and others.

267.    Analysts such as Salomon Smith Barney, Lehman, CS First Boston, and Deutsche

Banc Alex Brown who were loyal to Qwest repeated these and other statements from the

conference call to the market over the next several days.

| Firm | Analyst | Rating | Forecasted 3Q01 EPS | 2001 EPS | 2002 EPS |
|---|---|---|---|---|---|
| Salomon Smith Barney | Grubman | 1M (Buy) | | $0.58 | $0.70 |
| Lehman | Bath | Strong Buy | | $0.52 | $0.64 |
| CS First Boston | Reingold | Strong Buy | | $0.57 | |
| Deutsche Banc Alex. Brown | Jacobi/ Melloul | Buy | | $0.41 | $0.64 |

268.    Nacchio was successful in convincing the market that Qwest's growth rate was

still intact and that there was no financial reporting or disclosure issues at Qwest and the stock

stabilized in the $30 range by the end of June 2001.

269.    On July 20, 2001, Qwest admitted that its classification of costs had been

incorrect such that cost of sales had been overstated and SG&A expenses had been understated.

This was the real reason SG&A expenses had been only 22% of revenues in the First Quarter

2001 (better than estimates  of 25%) and not due to Qwest's successful expense controls.  In fact,

once the results were restated, First Quarter 2001 SG&A expenses were actually 24.9% of

revenues.

- 121 -

270.    On July 24, 2001, Qwest reported its Second Quarter 2001 results in a release
which stated in part: Second quarter results compared with pro forma second quarter 2000:

Total revenue grew 12.2 percent to $5.22 billion

Pro forma normalized net income was $128 million, or $0.08 per
diluted share

Internet and data services revenue grew about 41 p ercent and
represents more than 27 percent of total revenue.

*   *   *

Operations results:

-        DSL customers grew 105 percent to 360,000
customers over second quarter 2000

"We are pleased with our overall results achieved during
the quarter.  The Qwest  team demonstrated its ability to continue
strong revenue and EBITDA growth by leveraging our unique and
diverse market position in challenging economic conditions," said
Joseph P. Nacchio, Qwest chairman and CEO.  "We are
encouraged by strong growth in ou r commercial unit and by recent
operational improvements, driven by new business leadership.
These factors are key to our growth through the remainder of the
year."

Reported in accordance with generally accepted accounting
principles (GAAP), Qwest's reve nue increased 51.4 percent;
EBITDA grew 30.1 percent over reported second quarter 2000
results; and Qwest recorded a net loss of ($3.31) billion of ($1.99)
per share of the second quarter 2001.  The GAAP  -based results
include $3.72 billion in pre-tax one-time charges.  The one -time
items include $3.11 billion in non-cash investment write -downs
principally comprised of the company's holdings in KPNQwest;
$415 million in merger-related charges; a non -cash charge of $222
million for additional depreciation on access lines previously held
for sale; and $27 million on other one -time gains (net).

Wireless services revenues grew 20 percent sequentially or
51 percent year-over-year to more than $181 million in the second
quarter of 2001.  Qwest wireless customers t otaled over one
million at the end of the quarter.

- 122 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 128 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 128 of 187

Qwest filed this release as a Current Report on Form 8 -K filed on July 26, 2001.

271.   On this disclosure, Qwest's shares dropped to below $27, on volume of 7.2

million shares.  However, Qwest's stock continued  to trade at artificially inflated levels because

the Defendants continued to conceal the Company's true financial condition and poor prospects.

Moreover, the Company continued to make positive but false statements about its business and

prospects.  For ex ample, Defendants continued to conceal Qwest's IRU transactions, including

with Global Crossing, as alleged above, the impact of reciprocal equipment sales to KMC, as

alleged above, which included a $100 million swap transaction in the Second Quarter 2001,  and

that Qwest's revenue and income were inflated by the manipulation of the terms and shipment

dates of directories.  Defendants also concealed three major transactions with KMC in March

2000, June 2000 and March 2001, in which Qwest had recognized hundr eds of millions in

reciprocal revenue.

272.   On August 3, 2001, *TheStreet.com* published a story including an interview with

Mohebbi, which stated in part:

> The bears are speculating that Qwest's recent financial results got
> an unnatural boost from these deals.  T hese critics point out that
> such transactions are accounted for in a manner that, while entirely
> legal, particularly helps Qwest's bottom line.
>
> In an interview Thursday, Qwest's president, Afshin Mohebbi, and
> its finance chief, Robin Szeliga, dismissed suc h allegations and
> stood by their accounting practices.  Mohebbi says "Qwest
> categorically denies" the charge that it has been using such deals to
> meet earnings estimates.

273.   On August 7, 2001, Nacchio appeared at a U.S. Bancorp Piper Jaffray conference

in Boston.

274.    On August 8, 2001, U.S. Bancorp Piper Jaffray issued a report on Qwest which

was based on and repeated Nacchio's comments made at the conference. The report rated Qwest

a "Strong Buy," had a price target of $60 and forecast the following earnings:

| GAAP EPS | 2001E | 2002E |
|---|---|---|
| Mar | $0.13A | |
| Jun | $0.08A | |
| Sep | $0.06E | |
| Dec | $0.07E | |
| FY | $0.34E | $1.47E |

| Net Rev (Mil) | 2001E | 2002E |
|---|---|---|
| Mar | $ 5,051A | |
| Jun | $ 5,222A | |
| Sep | $ 5,458E | |
| Dec | $ 5,770E | |
| FY | $21,501E | $24,540 |

The report also stated:

> **Qwest Chairman And CEO, Joe Nacchio Provided Additional Detail Regarding The Company's Financials** while making the Keynote address at the U.S. Bancorp Piper Jaffray Technology and Communications Conference.  Mr.  Nacchio disclosed incremental granularity on revenue quality, the outlook for  2001 and 2002, and future cash needs.

> **There Is Significant Concern In The Market With Regard To The Achievability Of Qwest's Growth Targets**.  These growth targets are highly dependent upon a [sic] economic recovery in the first half of 2002. Revenue growt h of 14%-15% and EBITDA

- 124 -

growth of 17% is achievable due to the high growth nature of several of Qwest's business lines.

We expect Wholesale revenues as a percentage of total revenues will increase from 5% to 2000 to 8% in 2001. While there is significant concern related to the quality of this revenue stream, we believe wholesale revenue is not equivalent to a capacity swap if a significant customer is gained and a significant infrastructure position is gained as a result of separately negotiated transactio n that coincidently occur with the same customer. In essence, we believe the revenue is real and the asset obtained is real.

275.   On August 13, 2001 Qwest filed a Current Report on Form 8 -K which incorporated as an exhibit Defendant Nacchio's presentation at a n August 7, 2001 conference hosted by U.S. Bancorp Piper Jaffray, wherein Nacchio stated:

- he expected $8.5 to $8.6 billion in EBITDA in 2001

- cash EPS for 2001 expected to be $1.10 to $1.20 for 2001

- 2002 revenue expected to be $21.5 billion

276.   On August 24, 2001, Prudential Securities issued a report on Qwest by Greenwood based on Greenwood's conversations with Qwest management on that day. The report rated Qwest a Buy and "Low" risk, forecast Third Quarter 2001 EPS of $0.10, and 2001 and 2002 EPS of $0.41 and $0.61, respectively, and stated:

Based on our own analysis and a conversation with management earlier today, we believe Qwest's business remains healthy and that the current market valuation is very low. We believe its value is approaching its ILEC floor and that it is now undervalued. Qwest is trading at its lowest level since the end of 1998, and we think current selling is not by the fundamentals.

*   *   *

Regardless of accounting treatment and offsetting transaction, we believe these sa les are attractive. IRU sales represent up -front cash, usually at good margins. Per Qwest, these sales generate mid-30%-low-40% EBITDA margins. Since they

- 125 -

are not recurring, they lack some of the predictability of other sources of revenue, but we do bel ieve this means these are bad businesses.

                    *   *   *

    We continue to believe Qwest will be a share gainer in important growth areas like data and the enterprise market.  Our confidence comes from our view that Qwest will be a net share gainer for at least the next few years.  The company currently estimates that it has only 5.0% share in the enterprise market.  Qwest believes it can achieve its growth targets if it can increase this share to 7.8%.  Our own research suggests that Qwest is currently making strong inroads in this market and we believe its market share target should be very achievable.

    We continue to be comfortable with our 2002 revenue growth target of 14.8%.  We believe the primary risks to Qwest's expectations and our model come primarily  from the economy and long distance entry.

    277.    In August 2001, Qwest was required by the SEC to amend its 2000 Form 10 -K to include a disclosure that its 2000 results had benefited from a pension credit of $299 million, or $182 million after tax, in 2000 compared to a charge of $8 million in 1999.  The $299 million in credits to Qwest's 2000 results were highly significant and represented some 16% of operating income for the year.

    278.    On September  10, 2001, Qwest issued a press release and hosted a conference call with media, analysts and investors and lowered its guidance for 2001 and 2002, including that:

    It currently expected use of working capital in the range of $1.2  - $1.5 billion in 2002.

    It currently expected it would issue an additional $500  - $750 million in debt securities before turning free cash flow positive in the second quarter of 2002, and that total debt levels would be approximately equal for 2001 and 2002.

    It currently expected optical capacity sales to generate less revenue for the second half of  2001 than previously announced.

                        - 126 -

Of the workforce reductions it announced, it currently expected
approximately 20% would come from attrition.  It currently
expected the remainder of the reductions to come from continued
streamlining of its operations.  Bec ause approximately 30% of its
workforce was located in Colorado, it currently expected a similar
percentage of the reductions would come from Colorado and the
surrounding area.

279.    On this news, Qwest's stock dropped to below $20 per share, a 65% decline from

the relevant period high of $57.00.  However, even this news did not apprise the market of just

how poorly Qwest was doing in terms of generating recurring revenue or its falsification of its

financial results.  In early October 2001, Qwest came under fire  when analysts learned the

Company was planning to recognize some $300 million up front from a multi -year deal with

Calpoint.  By this point, analysts were much more aware of the manipulations Qwest had

engaged in and objected to the immediate revenue reco gnition.  Facing this strong criticism,

Qwest backed off and stated it would recognize the revenue ratably over the terms of the

contract.

280.    On the morning of October  31, 2001, Qwest reported surprisingly poor Third

Quarter 2001 results in a release which st ated:

Qwest Communications International Inc., the broadband
communications company, today announced its financial results
including revenue and earnings before interest, taxes, depreciation
and amortization (EBITDA) for the third quarter of 2001.  Third
quarter reported revenue of $4.77 billion equaled third quarter
revenue a year ago while pro forma normalized EBITDA
decreased 5.3 percent from $1.86 billion in the third quarter a year
ago to $1.77 billion in the third quarter 2001.

In addition, Qwest rep orted a net loss of ($142) million, or
($0.09) per share in the third quarter of 2001 compared to a
reported net loss of ($248) million or ($0.15) per share in the third
quarter a year ago.  On a pro forma normalized basis, the company
recorded an ($0.08)  loss per share for the third quarter compared to

- 127 -

earnings of $0.14 per diluted share a year ago.  The decrease
reflects the impact of lower EBITDA and the related commutative
adjustment to the annual effective tax rate as well as increases in
both interest expense and depreciation driven by Qwest's capital
plan.

281.    The release also included a description of a swap of fiber routes which was a

disclosure Qwest had failed to make about similar transactions occurring earlier in the relevant

period:

In a transaction with a significant business customer, Qwest
purchased approximately $300 million of assets – including the
5,500 miles of domestic fiber routes, co-location space and
power – to diversify and extend its network and provide backup
facilities.  This customer also has agreed to purchase high-speed,
optical network capacity from Qwest, with approximately $86
million of revenue recognized in the third quarter and additional
future contracted revenue.

282.    This loss and the fact that revenues were flat caused the Company's stock to

decline to as low as $7.49.  However, even these announcements did not inform the market of

Qwest's improper reporting during 2000 and 2001.  Over the next few months, more information

came out although Qwest continued to conceal the extent of its IRU transactions and liquidity

concerns.

283.    In fact, Qwest's Third Quarter 2001 results and its statements between August 7,

2001 and October 30, 2001 were materially false and misleading due to the Company's improper

accounting in violation of GAAP, as alleged in herein, and due to the following undisclosed

facts:

a.      Qwest's revenues and income were inflated by the manipulation of the

terms and shipment dates of directories;

- 128 -

b.       Qwest's Third Quarter 2001 results included a $300 million phony swap transaction with Enron which Qwest had entered into in late September 2001 to make its results appear more favorable, as alleged above;

c.       There was no way Qwest's future earnings would be nearly as strong as represented due in part to the accounting manipulations De fendants engaged in which would adversely affect future results, as expenses were being deferred to future quarters and years;

d.       Qwest was inflating revenue by recording $664 million in IRU deals as part of Commercial Services revenue and not disclosing the  amount of this transaction to the public;

e.       Qwest was suffering the same problems as other telecommunications companies, including excess capacity, decelerating demand for services, assets which were not worth nearly as much as represented and declining pric es, which problems Qwest was concealing through the artifices alleged herein; and

f.       Qwest's financial statements were false and misleading and presented in violation of GAAP due to improper recognition and failure to report properly the value of assets, as alleged herein.

284.     On November 8, 2001, Qwest announced that it had signed a three -year, multi-million dollar Web hosting and networking services agreement with Fast Search & Transfer. The release also quoted Joel Arnold, Executive Vice President, Qwest Globa l Business Markets: "This agreement further solidifies Qwest's position as an industry leader in Web hosting and broadband services."

285.     On November 28, 2001, Qwest issued a release announcing a $60 million contract

with the State of Oregon.  The release sta ted:

> This new agreement was awarded for a variety of
> communications services – data, video and voice – that will be
> used by state, county and city governments, as well as K -1 2
> schools and state -funded universities.  Qwest will be the primary
> datanet work ing provider for more than 5,000 locations around the
> state.
>
> "Qwest continues to win contracts from federal, state and
> local government agencies because these institutions realize the
> value of Qwest's network reliability and performance," said Joel
> Arnold, executive vice president of global business markets for
> Qwest.  "The majority of public -sector organizations that sign
> agreements with Qwest ultimately purchase additional services
> from Qwest because we exceed their expectations in the delivery
> and performance of the original solution."

286.     By late November 2001, Qwest's stock had stabilized in the $12.00 -$13.00 per

share range.

287.     On December 13, 2001, Qwest updated its financial guidance for the Fourth

Quarter 2001.  A release on that date stated:

> For the fou rth quarter of 2001, Qwest expects reported
> revenue of approximately $4.8 billion and earnings before interest,
> taxes, depreciation and amortization (EBITDA) of approximately
> $1.7 billion.  For the full year 2001, the company expects reported
> revenue of ap proximately $19.8 billion and EBITDA of
> approximately $7.45 billion.
>
> For 2002, Qwest expects reported revenue in the range of
> $19.4 to $19.8 billion and EBITDA in the range of $7.1 to $7.3
> billion.  This represents a reduction of zero to two percent from
> 2001 expected revenue, and two to five percent from 2001
> expected EBITDA in each case on a reported basis.  On a recurring
> revenue basis, the 2002 estimate represents a five to seven percent
> growth over recurring revenues for 2001.

- 130 -

288.   On January 22, 2002, *The Wall Street Journal* published an article about Qwest

and its accountant, Arthur Andersen, which had audited Enron.  The article stated:

> [Q]uestions have swirled about the financial statements of some of
> the telecom companies, many of which achieved specta cular
> growth rates only to see their valuations crater in last year's stock  -
> market decline.
>
>     Some of that spectacular growth came by immediately
> recognizing revenue from one -time, long-term contracts, rather
> than phasing it in gradually over the life of th e arrangements.  The
> bigger questions have centered on Qwest, of Denver.

289.   On January 29, 2002, Qwest reported its Fourth Quarter 2001 and year end 2001

results in a release which stated in part:

> Qwest Communications International Inc. (NYSE: Q) today
> announced its financial results for the fourth quarter and the full
> year of 2001.  For the quarter, the company recorded a ($0.07) pro
> forma normalized loss per diluted share compared with pro forma
> normalized earnings per diluted share of $0.16 for the same per iod
> last year.  For the year, it recorded pro forma normalized earnings
> per diluted share of $0.05 compared with pro forma normalized
> earnings per diluted share of $0.59 for 2000.
>
>     For the quarter, on a reported basis, prepared in accordance
> with Generally Accepted Accounting Principals (GAAP), the
> company reported a net loss of ($516) million or ($0.31) per
> diluted share, compared to a net loss of ($116) million or ($0.07)
> per diluted share in the fourth quarter of 2000.  The loss in the
> fourth quarter of 2001 reflects an after-tax charge of $367 million
> or ($0.22) per diluted share due primarily to previously announced
> restructuring actions that include personnel reductions, real -estate
> consolidation and other initiatives designed to streamline
> operations (see note 4 on Attachment B).  In addition, reported
> results include nonoperating restructuring charges and other one  -
> time items associated primarily with KPNQwest (see note  5 on
> Attachment B) and write-downs for certain equity investments.
> The after-tax impact of these non -operating expenses in the fourth
> quarter was $26 million or ($0.02) per diluted share.
>
>     For the year, on a reported basis, Qwest reported a net loss

of ($2.41) per diluted share, compared to a loss of ($0.06) per diluted share in 2000.

\*   \*   \*

Reported revenue for the quarter was down approximately six percent to $4.70 billion, down $314 million from $5.02 billion in the same period last year.  The decrease in revenues for the quarter was mainly due to reduced optical capacity ass et sales and certain Internet equipment sales.

\*   \*   \*

"Our substantial recent investments in service improvements and new product platforms, such as Internet dial and virtual private networks, have positioned us to better meet the needs of our customers and take advantage of the economic recovery when it occurs," said Robin R. Szeliga, Qwest executive vice president of finance and CFO.  "We remain focused on reducing costs and becoming free cash-flow positive as we gain scale and streamline operations."

290.   The January 29, 2002 press release also broke out Qwest's 4th  Q 01 revenue by category:

Three Months Ended December 31, 2001

REVENUES (in millions):

| | |
|---|---|
| Commercial services | $2,406 |
| Consumer services | $1,496 |
| Directory services | 543 |
| Switched access servic es | 259 |
| Total Revenues | $4,704 |

291.   In fact, Qwest's Fourth Quarter 2001 revenues were falsified due to Defendants' improper accounting practices as alleged herein.  When Qwest ultimately filed its 2001 Form 10-K on April 1, 2002, Fourth Quarter 2001 revenues were reduced to $4.656 billion from

$4.704 billion, a reduction of $48 million.  All of the reduction was in the Commercial Services

category.

292.    Qwest essentially lowered guidance for 2002 on its conference call after releasing

its Fourth Quarter 2001 earnings.  As Dow Jones reported:

> Qwest effectively lowered guidance for 2002 Tuesday
> morning, with Nacchio saying the sagging economy will cause the
> company to be at the low end of previously stated sales guidance
> of $19.4 billion to $19.8 billion and earnings before interest, taxes,
> depreciation and amortization (EBITDA) targets of $7.1 billion to
> $7.3 billion.

*    *    *

> "The visibility at Qwest is probably lower than at any other
> (incumbent phone service providers)," said Peter DeCaprio,
> telecommunications analyst with Thomas Weisel Partners.

293.    In fact, Defendants' statements between November  8, 2001 and January 29, 2002

were false and misleading due to the failure to disclose the improper accounting which had

inflated Qwest's 2000 and 2001 results.

294.    On February 11, 2002 Qwest announced it had received a subpoena for

documents concerning Global Crossing from the SEC in connection with the SEC's investigation

of Global Crossing.  The documents related to IRU transactions Qwest had entered into with

Global Crossing in the First Quarter 2001 and Second Quarter 2001.

295.    On February 13, 2002, *The Wall Street Journal* published an article entitled

" Deals With KMC Helped Qwest to Improve Its Books"  which stated in part:

> Qwest Communications International Inc. has been d oing
> some creative revenue boosting of its own.

> In four deals during the past two years, Qwest sold
> equipment valued at $450 million to a company, and, in turn,

- 133 -

Qwest agreed to pay the buyer hundreds of millions of dollars for Internet services using the equipment it had sold. Qwest – a telecommunications company that doesn't make equipment but had instead bought the gear – booked the equipment sales as revenue. Meanwhile, the buyer, KMC Telecom Holdings Inc., financed the equipment and put the debt on i ts books.

*   *   *

For investors, however, this type of transaction raises a question about how to best assess the financial position of the company.

"It gives the impression that they're growing at a higher -than-expected rate," said Drake Johnstone, an analyst with Davenport & Co. in Richmond, Va. While the sales may be small, Mr. Johnstone added, they are still significant enough "to affect Qwest's growth."

The KMC transactions are interesting both because Qwest is a service provider, not an equip ment provider, and the services KMC is providing for Qwest are Qwest's specialty. In essence, Qwest agreed to outsource some Internet and telecom services to KMC, a privately held Bedminster, N.J., firm. KMC, which pulled a planned initial public offering in October 2001 due to market conditions, provides telecommunications services in about 37 markets. Qwest said it did not incur any debt to purchase the equipment; it bought the gear and sold it to KMC at essentially the same time.

*   *   *

In March 2001, Qwest sold $65 million of equipment to KMC to route phone calls through the Internet. KMC agreed to install the gear at its facilities and handle service for Qwest for 48 months. Qwest agreed to pay about $28.7 million per year.

In June 2001, Qwest sold KMC $83 million of routers and switches capable of handling high-speed Internet traffic. Qwest agreed to pay $42.4 million per year for the service. The pact runs through 2006.

The largest deal occurred in June 2000, when KMC agreed to buy about $168 million of "Internet infrastructure" and maintain it for Qwest until August 2004. Service terms weren't disclosed. In March 2000, KMC bought $134 million of "portal equipment"

- 134 -

554065.1

from Qwest and agreed to maintain the equipment for 42 months.

296.    On the same day, *The Wall Street Journal* published an article on Global

Crossing's accounting which discussed Qwest's use of swaps to enhance revenues:

> Now, the Securities and Exchange Commission and the
> Federal Bureau of Investigation are probing whether Global
> Crossing falsely inflated revenues by booking hundreds of millions
> of dollars in swaps of capacity it might not have needed.

*   *   *

> At the center of the debate is a type of telecommunications
> lease known as an Indefeasible Right of Use.  Pioneered d ecades
> ago when AT&T Corp. was still a monopoly, the leases allowed
> competitors to gain access to the costly undersea cables that only
> Ma Bell could afford to build.

> Today, co-called IRUs allow a telecom carrier to buy all
> types of telecom capacity and ge ar at low rates, typically for
> periods of 20 to 25 years.  Since IRUs are technically rights to a
> physical part of an underground cable, they can be considered an
> asset.  That means their cost isn't part of a company's operating
> results, but of the propert y, plant, and equipment line listed on a
> firm's balance sheet.

> That isn't controversial. What the SEC and other
> investigators want to determine is whether Global Crossing abused
> this longstanding practice by entering into back -to-back
> transactions that al lowed the company to artificially inflate
> revenues.  Another big unknown is how prevalent the practice is
> throughout the industry.

> The type of transaction under scrutiny works like this:
> Company A sells an IRU to Company B for $100 million, and
> books the incoming cash as revenue.  Meanwhile, Company A
> buys a different IRU from Company B for $100 million, and treats
> the transaction as an asset purchase.  Even though its cash position
> doesn't budge, Company A books $100 million in new sales
> without recognizi ng a corresponding operating expense.

*   *   *

> Not all the companies account for them in the same way.

- 135 -

In some cases, the impact was dramatic.  Among the most aggressive was Qwest, which booked revenue from the swaps up front.  For the first nine mo nths of 2001, Qwest sold $870 million worth of network capacity to vendors from which it also bought $868 million worth of capacity in separate transactions.  Qwest, which began as an entrepreneurial fiber company and then bought the Baby Bell US West, sai d it recognized $664 million in revenue on the sales of capacity to these vendors.  The additional $206 million is for operation and maintenance contracts that Qwest will recognize over the life of the agreement.

The sales had a big effect on Qwest's reve nue for the first nine months of 2001.  Revenue including the swaps increased 8% to $15 billion, compared with $13.9 billion in the same period a year earlier.  Without the sales, however, revenue grew less than 3% to $14.4 billion.

\*   \*   \*

In particular, Mr. Olofson notes one $150 million exchange transaction with 360networks, which he says was done for North American and Atlantic routes on which Global Crossing already had substantial capacity.  Another first -quarter deal was with Qwest, worth $100 million.  In his public statement, he says Global Crossing "roundtripped" the cash by purchasing $100 million of capacity from Qwest.

297.   On February 13, 2002, Qwest defended its accounting but even the Company's

defense acknowledged that the KMC deals had no t been disclosed at the time they were entered

but only disclosed partially in December 2001.  Dow Jones reported:

Qwest Communications International Inc. said it accounted for all equipment sales to KMC Telecom Holdings Inc. properly and said it discussed the transactions at an analysts' meeting in December.

\*   \*   \*

Qwest said the December meeting was the only time it mentioned KMC to investors.  The meeting took place several months after the Denver telecom company came under fire for a similar equipment sale to a start -up called Calpoint LLC.  The meeting was broadcast over the Internet and via conference call

and is still available as a video.  Qwest has never disclosed the
KMC deals in any regulatory filings with the SEC, as reported in
Wednesday's article.

Analysts and investors say that Qwest should have
disclosed the transactions in their filings because they were
included as revenue and therefore skewed its financial picture.  A
spokesman for Qwest said the company didn't detail the KMC
transactions in any SEC filings because it "doesn't break out the
companies that we sell equipment to."

298.     On February 14, 2002, Dow Jones reported that Qwest had drawn down $1.1

billion in bank loans.  Dow Jones reported:

Unable to find buyers for $700 million to $800 million of its
commercial paper, Qwest Communications International Inc. (Q)
on Wednesday drew down $1.1 billion in bank loans, according to
a CNBC report.

The company would not comment on the story, which
caused investors to send shares of the dat a and phone-service
provider's stock to a new low in furious trading.

299.     On February 14, 2002, credit rating agency Standard & Poor's cut its rating for

Qwest due to "near -term liquidity concerns" after Qwest drew down $1.1 billion from a backup

credit line because it could not roll over commercial paper. Reuters reported:

"The downgrade is based on Qwest's more limited
financial flexibility and near-term liquidity concerns, a challenging
operating environment, and uncertainty" over the use of certain
accounting practices in the telecommunications industry, S&P
analyst Greg Zappin said in a statement.

S&P said Qwest, with about $25 billion of debt as of Dec.  31, drew
down on its $4 billion bank credit line because it was unable to roll
over commercial paper on  Wednesday.

300.     On February 14, 2002, it was also reported the Qwest had drawn down not just

the $1.1 billion, but $4 billion on the credit line.  Despite these adverse announcements,

554065.1

Defendants continued to conceal Qwest's massive financial manipulations, and Qwest's stock continued to trade at artificially inflated levels.

301.   On March 5, 2002, Qwest received a credit rating cut, but assured investors that "Qwest believes that it will reach agreement with the banks under the facility soon." Qwest's shares rose $ 1.05 cents or 12% in late trading to $9.90.

302.   On March 7, 2002, Qwest announced that it was offering $1.5 billion principal amount of indebtedness at an interest rate of 8 7/8%, in an unregistered offering.

303.   On March 11, 2002 Qwest announced it had received a n informal inquiry from the Denver regional office of the SEC requesting voluntary production of documents. The release stated in part: "Qwest has stated, and continues to believe, that its accounting policies, practices and procedures for all periods, i ncluding 2000 and 2001, comply with all applicable requirements."

304.   In an effort to minimize the size of the questionable transaction, Qwest's release also stated:

> The revenues attributable to all sales of optical capacity by Qwest in 2000 and 2001, including sales to customers from which Qwest also purchased optical capacity, were approximately 2.8 percent and 5.1 percent of total reported revenues in those periods and 4.7 percent of total pro forma revenues in 2000. The revenues attributable to all sales of internet equipment to customers from which Qwest bought internet services (the only types of equipment sales Qwest believes fit within this category of information requested), were approximately 0.1 percent and 0.9 percent of total reported revenues in 2000 and 2001 and 1.7 percent of total pro forma revenues in 2000. The revenues attributable to changes in the production schedules and lives of directories of Qwest Dex in the relevant periods were approximately 0.2 percent and 0.2 percent of total repor ted revenues in 2000 and 2001 and 0.2 percent of total pro forma revenues in 2000.

305.     In fact, Qwest's 1999-2001 results were misstated by billions of dollars through a myriad of accounting manipulations.

306.     On April 4, 2002, Qwest announced it had been informed by the SEC that it had approved a formal order of investigation of the company.

307.     On April 18, 2002, Qwest revised its 2002 financial guidance:

> For 2002, Qwest now expects total revenue in the range of $18.0 to $18.4 billion, adjusted EBITDA in the range of $6.4 to $6.6 billion, and capital expenditures in the range of $3.1 to $3.3 billion. The company continues to expect to be cash flow positive in the second quarter of 2002 and beyond.

> Qwest also expects to reduce its workforce by an additional 2,000 employees through attrition, continued business process improvements and layoffs, bringing the total employee count to 53,000 by September 30, 2002.

> Qwest Chairman and CEO Joseph P. Nacchio said, "While we remain optimistic about Qwest's longer-term performance based on the platforms we have built, we want to make our investors aware that current trends will affect our results in 2002. We believe this guidance is realistic, assuming no further deterioration in the regional economy or industry outlook."

308.     Qwest's stock fell to $6.50 on this news.

309.     On April 30, 2002, Qwest announced its First Quarter 2002 results in a release which stated in part:

> On a reported basis, prepared in accordance with generally accepted accounting principles in the United States (GAAP), the company reported a net loss of ($698) million or ($0.42) per diluted share, compared to a net loss of ($46) million or ($0.03) per diluted share in the first quarter of 2001.

> The loss reflects after-tax non-operating items of $536 million, or ($0.32) per diluted share, due primarily to the company's investment in KPNQwest, including both a write-down of the company's equity investment of $462 million and the

- 139 -

company's share of restructuring charges recorded by KPNQwest
in the quarter of $74 million.  After adjusting for these charges and
certain other non-recurring items, the company recorded a ($0.10)
normalized loss per diluted share compared with normalized
earnings per diluted share of $0.13 for the same period last year.

*   *   *

"These results reflect very difficult economic and industry
conditions that have been slow to improve.  We are determined to
continue reducing our costs to better scale our business to current
market realities.  We believe we can improve financial
performance, while maintaining our high levels of customer
service, and that our unique combination of assets positions us well
to grow shareowner value," said Joseph  P. Nacchio, Qwest
chairman and CEO.

*   *   *

"We took several steps to improve near term liquidity in  the
quarter," said Robin R. Szeliga, Qwest executive vice president of
finance and CFO.  "We're now focused on achieving positive free
cash flow in the second quarter and de -levering the balance sheet."

310.    On June 17, 2002, Qwest announced that Defendant Nacchio "voluntarily

resigned" as CEO, and that Defendant Phillip Anschutz had stepped down as co -Chairman of the

Board. Press Release,  *Notebaert Succeeds Nacchio As Chairman And CEO of Qwest

Communications*, 6117/02; Qwest SEC Form 8 -K, filed 6/18/02.  That same day, however, *The

Wall Street Journal* reported that Qwest's Board of Directors "ousted" Defendant Nacchio,

forcing him to resign.  Rebecca Blumenstein, Shawn Young & Deborah Solomon,  *Qwest CEO

Nacchio Resigns Post At Board Request Amid Troubles*, Wall St. J., 6/17/02.

311.    The following day, *The Wall Street Journal* carried another story further detailing

the sequence of events surrounding Nacchio's firing. Deborah Solomon & Rebecca Blumenstein,

*Qwest's Move to Oust Nacchio, Hire Notebaert Pleases Investors*, Wall St. J., 6/18/02.

According to the article,

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 146 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 146 of 187

> [Defendant Anschutz] flew to New Jersey Saturday morning
> [June 15, 2002], to deliver the news to Mr. Nacchio at home.
> Directors had already picked Mr. Notebaert, the former chief
> executive of Ameritech, to be come Qwest's new chairman and
> chief executive.

312.    The *Denver Post* added that "[i]n the weeks preceding Nacchio's forced

resignation as chief executive and co -chairman on Sunday, Qwest's independent directors —

those with no employment ties to Qwest or Anschutz  — spoke separately with Anschutz about

their desire to replace Nacchio."  Kris Hudson,  *Nacchio Exit in Works for Weeks*, Denver Post,

6/18/02.  Ultimately, three of the independent directors, " Marilyn Carlson Nelson, Linda

Alvarado and Jordan L. Haines—separately moved for former chief executive Joe Nacchio's

ouster weeks [before his resignation] and eventually found a consensus on the board."  Kris

Hudson, *3 Directors Pushed For Nacchio's Exit, Sources Say*, Denver Post, 6/19/02.  In the end,

however, Qwest's  Board of Directors was unanimous in voting to fire Mr.  Nacchio.

313.    In late June 2002, when WorldCom restated its results, concerns surfaced about

the possibility of Qwest restating.  On June  26, 2002, Qwest's stock plunged $2.40 to $1.79 after

touching $1.20.

314.    On July 7, 2002, Qwest announced that it was demoting Defendant Szeliga from

CFO to "an executive vice president of the company, focusing on Qwest's debt reduction plans."

Press Release, Qwest Communications Announces Senior Management And Organizationa 1

Changes, 7/7/02.

315.    Then, in a press release dated July  28, 2002 (a Sunday), Qwest announced that it

would in fact restate its results.  The release stated in part:

> Qwest Communications International Inc. (NYSE: Q)
> today announced the current status of the  ongoing analysis of its

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 147 of
187
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 147 of 187

accounting policies and practices, including its policies and practices with respect to revenue recognition in connection with sales of optical capacity assets (IRUs). Earlier this year the company and its board of directors began an analysis of, among other things, revenue recognition and accounting treatment for optical capacity sales (particularly sales to customers from which the company agreed to purchase optical capacity assets), the sale of equipment by the company to certai n customers and changes in the production schedules and lives of some of its directories.

Based on the analysis to date, the company has determined that it has in some cases applied its accounting policies incorrectly with respect to certain optical capac ity asset sale transactions in 1999, 2000 and 2001. Certain adjustments may be required to correct the period in which the revenue was recognized with respect to some transactions, and other adjustments may be required to reverse the recognition of revenu e with respect to other transactions. In addition, further adjustments are required to account for certain sales of equipment in 2000 and 2001 that the company had previously determined had been recorded in error. In the fourth quarter of 2001, the compan y reduced revenue and adjusted EBITDA related to these equipment transactions. The company has also determined that in a limited number of transactions it did not properly account for certain expenses incurred for services from telecommunications provider s in 2000 and 2001.

The company is continuing to analyze its accounting policies and practices in consultation with its new auditor, KPMG LLP. When the company completes its analyses, it expects to restate its financial statements for prior periods. The company will attempt to conclude these analyses promptly. However, as a result of the change in the company's auditors and the ongoing investigation by the Securities and Exchange Commission, the company cannot state with certainty when a restatement wil l be completed. In the meanwhile, the company will seek to comply with its reporting requirements under the securities laws and the rules of the New York Stock Exchange in light of the constraints on completing the restatement.

The company also announced it is withdrawing its financial guidance for the full year 2002 as management reassesses the impact of continuing weakness in the telecommunications sector and the regional economy in the company's 14 -state local service

- 142 -

area, as well as competitive press ure.  The company announced
that it will report its results for the second quarter of 2002 and
revised guidance for the full year on Thursday, August  8, 2002.

The company analyzed its application of the revenue
recognition policies approved by its previou s auditor, Arthur
Andersen LLP, with respect to optical capacity sales and
concluded that those policies were incorrectly applied to optical
capacity asset transactions in 1999, 2000 and 2001 which totaled
approximately $1.16 billion in recognized revenue, and which
represented approximately 18 percent of the optical capacity asset
transactions in this period.  Of this amount, revenue of $591
million was recognized by the company after June  30, 2000, the
effective date of the merger of Qwest and US WEST Inc  . (the
company that was deemed the accounting acquirer and whose
financial statements were carried forward as those of the combined
company).  $571 million was recognized by Qwest before June  30,
2000 and therefore not included in the company's historical
financial statements.  KPMG has not participated in this initial
analysis of these transactions.

316.    On August 15, 2002, Qwest announced that it failed to file its quarterly report

SEC Form 10-Q for the Second Quarter 2002 (April 2002 –June 2002) because of investigations.

Qwest SEC Form 12b -25, filed August 15, 2002.  And on August  16, 2002, CEO Notebaert

submitted a sworn statement to the SEC, as required by the Commission's Order Requiring the

Filing of Sworn Statements Pursuant to §  21(a)(1) of the Securiti es Exchange Act of 1934 (SEC

File No. 4-460).  *See* Qwest SEC Form 8 -K, filed 8/16/02. In the sworn statement, Notebaert

stated that he was "unable to attest" that:

no covered report contained an untrue statement of material fact as
of the end of the period  covered by such report (or in the case of a
report on Form 8 -K or definitive proxy materials, as of the date on
which it was filed); and

no covered report omitted to state a material fact necessary to
make the statements in the covered report, in light of   the
circumstances under which they were made, not misleading as of
the end of the period covered by such report (or in the case of a

- 143 -

> report on Form 8-K or definitive proxy materials, as of the date on
> which it was filed).

*Id.* at Exhibit 99.1.

317.    On August 20, 2002, Qwest announced that it had entered into an agreement to

sell off "QwestDex" – the former US West's highly profitable telephone book publishing

business – for $7.05 billion.  Press Release, Qwest Communication Sells QwestDex For $7.05

Billion, 8/20/02; Qwest SEC Form 8-K, filed 8/19/02.  Qwest pursued the proposed sale of

QwestDex as a means of supplicating Qwest's creditors and bond rating agencies.  Aldo Svaldi,

S&P lays out plan for Qwest, Denver Post, 5/26/02; see also Aldo Svaldi,  *Directory Sale Killing*

*A Cash Cow?*, Denver Post, 5/19/02.  On August  20, 2002, Qwest announced that it could only

sell the QwestDex operations via the use of junk bonds.  Aldo Svaldi,  *Qwestdex Buyers To Sell*

*Bonds For Deal*, Denver Post, 8/27/02.

318.    On October 1, 2002, Eliot Spitzer, the Attorney General for the State of New

York filed an action in the Supreme Court of the State of New York, County of New York,

against Defendants Nacchio and Anschultz, seeking $1 million and $4.8 million in restitution,

respectively, for th eir roles in accepting " IPO shares" of companies in return for steering Qwest

investment banking business to Salomon Smith Barney in a preferential manner.  Spitzer charged

that Salomon Smith Barney, now called CitiGroup Global Markets, doled out the hot  IPO stock

as an inducement for Qwest's investment banking business for which CitiGroup received $39

million between 1998-2001.  Anschutz was allocated shares in 57 hot public offerings from 1996

to 2001 and sold all of those shares, for a gain of $4.8 mill ion.

319.    In October 2004, the SEC formally charged Qwest with securities fraud.  On

November 4, 2004, United States District Judge Wiley  Y. Daniel approved a $250 million

settlement of the SEC's civil action against Qwest.  In its complaint, the SEC alleged th at Qwest

improperly booked millions in revenue between 1999 and 2002.

## XII.   <u>SCIENTER</u>

320.   Each of the Individual Defendants had knowledge of Qwest's problems and was

motivated to conceal such problems.  Anschutz received many benefits from Qwest in his

capacity as founder, Co-chairman and largest shareholder.  A May 27, 2002, article in *Business*

*Week* detailed the benefits Anschutz received through his control of Qwest as well as other

attempts he made to "put his personal interests ahead of Qwest's."  The article deta iled the

demise of Qwest Digital Media ("QDM"), which Qwest announced it was closing in April 2002.

The article stated:

> To some Qwest shareholders, QDM represents more than
> just another bad investment. . . .  QDM was created in 1999 as a
> 50-50 joint venture between Qwest and Anschutz, who was acting
> on his own behalf  Qwest contributed $85 million to the venture,
> payable over nine years, while Anschutz chipped in TV production
> assets whose value was not disclosed in public documents.  Then,
> in 2000, Anschutz received $48 million from Qwest for selling the
> company an additional 25% of the equity in QDM.  Some
> shareholders are outraged that Qwest lost its entire investment,
> while paying Anschutz tens of millions of dollars that reduced his
> losses in the ventu re. . . .  The QDM venture is an example of a
> pattern of cozy financial dealings between Qwest and its chairman.
> According to the Company's April 9, 2002 Proxy Statement,
> Qwest paid $4.5 million to rent space in an Anschutz -owned
> skyscraper in downtown De nver during 2001.  An additional
> $147,000 went to lease a suite in Staples Center in Los Angeles.
> (Anschutz is a principal owner of the Los Angeles Kings and a
> majority owner of the Staples Center.)  In May 2003, Anschutz
> agreed to pay $4.4 million to set tle charges brought by the New
> York State Attorney General for having received "hot" pre -IPO
> shares from SSB to induce him to give Qwest's banking business
> to SSB.
>
> Experts say it's unusual, though not unheard of, for a top

- 145 -

> exec to do business with a compa ny to which he has a fiduciary
> duty.  The potential problem is that Anschutz' interests as Qwest's
> chairman may conflict with his interests as an individual investor.
> "This is corporate governance 101 - you try to avoid conflicts,"
> says Steven N. Kaplan, a professor at the University of Chicago's
> Graduate School of Business.  The concern is that the largest
> shareholder or chairman takes from the other shareholders.

321.  Woodruff, and later Szeliga, as CFO, were responsible for financial reporting and communications with the market.  As CFO, many of the internal reports showing Qwest's forecasted and actual growth were prepared by the finance department under Woodruff's and Szeliga's direction and thus Woodruff, and later Szeliga, were aware of the significant do wnturn in Qwest's forecasted results.  Nacchio, as CEO and Chairman, was responsible for the financial results and press releases issued by the Company.  As alleged below, Nacchio was personally involved in certain of the accounting and reporting manipulat ions alleged herein.  Nacchio was unusually active in issuing releases, hosting conferences or conference calls, giving interviews and speaking to analysts to represent the strengths of Qwest and the strong results he said Qwest would report in 2001.  Jaco bsen, Mohebbi, Tempest, Weisberg and Smith, because of their positions as officers of Qwest, were able to control the content of Qwest's press releases and SEC filings.  Each was provided copies of the documents alleged to be misleading herein prior to or shortly after their issuance and had the ability and or opportunity to prevent their issuance or cause them to be corrected.  Slater, as a director of Qwest and as an officer of Anschutz Investment Company, Qwest's largest shareholder, also had the ability  to control Qwest's public statements and had access to the undisclosed adverse information about Qwest's finances, business and prospects.  Slater was also a member of the Executive Committee of Qwest which

- 146 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 152 of
187
Case 1:06-cv-01539-REB   Document 187   Filed 08/07/2006   Page 152 of 187

was set up to "exercise all power and authority of the board in the management of the

Company."

322.    As *The Wall Street Journal* reported on April 4, 2002, regarding Qwest's

attempted pre-merger accounting improprieties:

> One incident in particular raised eyebrows among the US
> West executives. In the fall of 1999, the Bell began routine
> paperwork to buy about $60 million worth of new computers to
> handle the demands of the coming Year 2000. But its scrappy
> merger partner had other ideas. The fiber-optic upstart, spying an
> opportunity, made US West an offer, say four former US West
> executives: Let Qwest buy the computers and sell them to US
> West. Qwest would count the purchase as a capital expenditure and
> book the $60 million payment from US West as revenue. When US
> West's finance chief relayed the request to Mr. Trujillo, the
> normally calm chief executive exploded in anger, slamming is
> hand down and barking there's "no way we will engage in activity
> like this." The deal didn't get done, and Mr. Trujillo ordered his
> financial team to give the US West board a side-by-side
> comparison of how the two companies accounted for everything
> from joint ventures to sales.

### A.    Individual Defendants' Insider Trading

323.    The Individual Defendants also wished to sell large amounts of their Qwest stock

prior to Qwest suffering the same fate as other telecommunications companies, which by mid-

2000 had already suffered enormous share price declines.

324.    Despite the decline by other telecom companies, Qwest was able to keep a strong

share price by assuring the market it would not suffer the same problems. During the relevant

period, Defendants continually represented that Qwest would not suffer the same fate as other

telecommunications companies since it had an extensive low-cost network, a strong data

platform and comprehensive product suite. Defendants told investors and analysts that Qwest

would be a "telecom survivor" and that it would not suffer from the long distance war or the fall

in data/Internet Protocol ("IP") prices, like its rivals. Nacchio also stated that while other

companies suffered from the economy, Qwest was a "market share taker" and that it would make

its "numbers."

325.    As a result, Qwest's stock did not collapse in the same way as other

telecommunications companies, and continued to be inflated throughout the relevant period.

326.    The Individual Defendants were successful in that they were able to sell enormous

amounts of their Qwest stock prior to the revelations of large losses and no revenue growth,

which were in contrast to their prior representations of revenue and earnings growth.    The insider

sales by the Individual Defendants took dramatic advantage of the stock price inflation they had

created:

| Name | Shares Sold | Proceeds | % of Holdings Sold |
|---|---|---|---|
| Nacchio | 4,298,467 | $213,477,073 | 49% |
| Szeliga[3] | 10,000 | $410,000 | 7% |
| Woodruff | 1,155,000 | $52,792,495 | 75% |
| Jacobsen | 1,036,900 | $49,566,197 | 83% |
| Tempest | 466,600 | $20,876,780 | 63% |
| Weisberg | 793,750 | $37,836,107 | 89% |
| Smith | 281,826 | $11,477,470 | 49% |
| Wilks | 1,415,000 | $65,163,770 | 98% |
| Slater | 866,771 | $38,403,875 | 90% |
| Total: | 11,009,314 | $ 490,003,767.00 | **61%** |

327.    Further, in May 1999, Defendant Anschutz sold 33,300,000 shares of Qwest stock

for total proceeds of $1,573,425,000.  Defendant Anschutz further entered into two "forward

---

[3] Prior to becoming CFO, on April  18, 2001, Szeliga was not a reporting person and not required
to disclose her sales of Qwest stock.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 154 of
187
Case 1:06-cv-01539-REB   Document 187   Filed 08/07/2006   Page 154 of 187

sales contracts" for which he received $179 million in exchange for promising to deliver so me

4.6 million shares of his Qwest stock in 2001.

328.   The Individual Defendants' stock sales identified above were not in line with their

pre-relevant period sales.  An analysis of pre -relevant period SEC Forms  4 and 5 confirms that

the Individual Defendants dramatically increased their stock sales during the relevant period.

The following table of the Individual Defendants' pre -relevant period sales, analyzed first by

number of shares sold and then by the total dollar amount of proceeds, demonstrates this

increase:

**Shares**

| Defendant | Pre-Relevant Period Sales | Relevant Period Sales | Percent Increase |
|---|---|---|---|
| Anschutz | *** | 33,300,000 | *** |
| Jacobsen | 378,000 | 1,036,900 | 174% |
| Nacchio | 2,458,516 | 4,983,467 | 103% |
| Slater | 308,336 | 866,771 | 181% |
| Smith | *** | 281,826 | *** |
| Szeliga | *** | 10,000 | *** |
| Tempest | *** | 466,600 | *** |
| Weisberg | 100,000 | 793,750 | 694% |
| Wilks | 210,000 | 1,415,000 | 574% |
| Woodruff | 320,000 | 1,155,000 | 261% |
|  | 3,774,852 | 44,309,314 | 1173% |

**Proceeds**

| Defendant | Pre-Relevant Period Proceeds | Relevant Period Proceeds | Percent Increase |
|---|---|---|---|
| Anschutz | *** | $1,573,425,000 | *** |
| Jacobsen | $12,029,760 | $49,566,197 | 312% |
| Nacchio | $81,960,227 | $213,477,073 | 160% |
| Slater | $10,672,782 | $38,403,875 | 260% |
| Smith | *** | $11,477,470 | *** |
| Szeliga | *** | $410,000 | *** |
| Tempest | *** | $20,876,780 | *** |

- 149 -

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 155 of
187
Case 1:06-cv-01539-REB   Document 1-1   Filed 08/07/2006   Page 155 of 187

| Weisberg | $3,810,500 | $37,836,107 | 893% |
| Wilks | $7,295,400 | $65,163,770 | 793% |
| Woodruff | $9,170,380 | $52,792,495 | 476% |
| | $124,939,049 | $ 2,063,428,766 | 1651% |

329.    On December 11, 1998, Anschutz transferred 19,208,000 shares of Qwest stock to

an unnamed holding company. Under the terms of the deal,  Anschutz retained the right to

"receive . . . all or a portion of the shares" five years after the deal was done. This was not an

open market sale.

330.    Defendants also benefited from their positions at Qwest by receiving shares of

supplier companies whose sto ck price these Qwest insiders could influence by purchasing

decisions they caused Qwest to make.  Qwest insiders also received lucrative IPO shares from

Citigroup's Salomon Smith Barney ("Salomon") in exchange for their cooperation in steering

investment banking business to Salomon and by making strategic purchases of equipment from

select Salomon investment banking clients.

331.    In fact, the Individual Defendants were personally involved in the manipulations

alleged herein.  Not only were the Individual Defenda nts aware of many of the manipulations,

they also helped direct them.  As *The Wall Street Journal* recently reported:

> Yesterday, in a regulatory filing, Qwest disclosed that it
> expects to take a charge of $20 billion to $30 billion this year to
> reflect a decline in the value of the assets it has acquired.  The
> company also said that the Securities and Exchange Commission
> staff has recommended action against the carrier for excluding
> certain financial information related to its acquisition of US West
> from its 2000 earnings release.  Qwest said the action would be
> "without merit."  The SEC is conducting a broad inquiry into how
> Qwest booked revenue for 2000 and 2001.
>
> Whatever the future holds, Qwest officials have done well.
> Phillip Anschutz, the Colorado min ing and railroad billionaire who
> founded the company and still serves as its chairman, has cashed

- 150 -

out $2.5 billion in stock since 1997.

**B.   Qwest/US West Merger Stock Price Terms**

332.    On July 18, 1999, Qwest entered into an Agreement and Plan of Merger ("Merger Agreement") wherein US West would merge with and into Qwest.  Qwest's acquisition of US West was to be a stock exchange transaction, with US West shareholders to receive an amount of Qwest stock equal to $69 per share.

333.    Under the Merger Agreement, if Qwest's s tock was below $38.70 per share in the trading days prior to the closing of the merger, Qwest would have to satisfy the difference with cash.  In addition, the Merger Agreement specifies that US West may terminate the Merger Agreement if the price of Qwest 's stock drops below $22 per share before the merger.  On July 19, 1999 (the day after the Merger Agreement was executed), however, Qwest's stock closed at below $34 per share, and by August  12, 1999 the price had dipped to approximately $26 per share.  As such, in order to avoid having to pay cash to US West shareholders as part of the merger.  Qwest and the Individual Defendants engaged in a campaign to artificially inflate the price of Qwest stock from this time until June  30, 2000 (the date of consummat ion of the merger)—so as to prevent it from falling under $38.70 per share before the merger  —by issuing false and misleading statements about Qwest's business and financial condition.

**XIII.   ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD**

334.    Arthur Andersen, a firm of  certified public accountants, was engaged by Qwest to provide independent auditing and accounting services throughout the relevant period. Andersen's Denver office was engaged to examine and opine on Qwest's financial statements for 1999, 2000 and 2001, to perform review services on Qwest's interim 2001 results, and to provide

- 151 -

significant consulting, tax and due diligence services throughout 1999 through 2001.  As a result of the far-reaching scope of services it provided, Andersen was intimately familiar  with Qwest's business, including its IRU capacity and KMC equipment transactions.  Andersen received large fees for its services to Qwest.  These fees were particularly important to the partners in Andersen's Denver office (including the managing partner o f the office, Clayton Peterson) as their incomes were dependent on the continued business from Qwest.  For 2000 alone, for example, Andersen received $1.1 million in fees related to the audit of Qwest's financial statements and another $6.8 million for non -audit related work.

335.    Andersen falsely represented that Qwest's financial statements for 1999 and 2000 were presented in accordance with GAAP and that Andersen's audit of Qwest's financial statements had been performed in accordance with Generally Accepted  Auditing Standards ("GAAS").  Andersen also consented to the incorporation of its false reports in Qwest's registration statements dated 7/12/01 and 10/30/01.

336.    The SEC has stressed the importance of meaningful audits being performed by independent accountan ts:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.

*Relationship Between Registrants and Independent Accountants*, SEC Accounting Series Release

No. 2961, 1981 SEC LEXIS 858 (8/20/81).

337.   GAAS, as approved and adopted by the American Institute of Certified Public

Accountants ("AICPA"), relates to the conduct of individual audit engagements.  Statements on

Auditing Standards ("SAS"), codified and referred  to as "AU"  followed by the appropriate

interpretive section, are recognized by the AICPA as the authoritative interpretation of GAAS.

**A.    Arthur Andersen's False Statements as to Qwest's 1999 Financial Statements**

338.   With respect to Qwest's financial statements f or 1999, Arthur Andersen

represented in a report dated January  31, 2000, the following:

> To the Board of Directors and Stockholders of Qwest
> Communications International Inc.:
>
> We have audited the accompanying consolidated balance sheet of
> Qwest Communications International Inc. (a Delaware
> corporation) and subsidiaries as of December  31, 1999, and the
> related consolidated statements of operations, stockholders' equity
> and cash flows for the year then ended.  These consolidated
> financial statements are the re sponsibility of the Company's
> management.  Our responsibility is to express an opinion on these
> consolidated financial statements based on our audits.
>
> We, conducted our audit, in accordance with auditing standards
> generally accepted in the United States.   Those standards require
> that we plan and perform the audit to obtain reasonable assurance
> about whether the financial statements are free of material
> misstatement.  An audit includes examining, on a test basis,
> evidence supporting the amounts and disclosur es in the financial
> statements.  An audit also includes assessing the accounting
> principles used and significant estimates made by management, as
> well as evaluating the overall financial statement presentation.  We
> believe that our audits provide a reasona ble basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to
> above present fairly, in all material respects, the financial position
> of Qwest Communications International Inc. and subsidiaries as of
> December 31, 1999, and the results of their operations and their
> cash flows for the year then ended in conformity with accounting

principles generally accepted in the United States.

/s/ Arthur Andersen LLP

ARTHUR ANDERSEN LLP

Denver, Colorado

**B.**     **Arthur Andersen's False Statements as to Qwest's 2000 Financial Statements**

339.   With respect to Qwest's financial statements for 2000, Arthur Andersen

represented, in a report dated January 24, 2001, the following:

To Qwest Communications International Inc.:

We have audited the accompanying consoli dated balance
sheets of Qwest Communications International Inc. and
subsidiaries as of December 31, 2000 and 1999, and the related
consolidated statements of operations, stockholders' equity and
cash flows for each of the three years in the period ended
December 31, 2000. These consolidated financial statements are
the responsibility of the Company's management. Our
responsibility is to express an opinion on these consolidated
financial statements based on our audits.

We conducted our audits in accordanc e with auditing
standards generally accepted in the United States. Those standards
require that we plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of
material misstatement. An audit includes examining, on a test
basis, evidence supporting the amounts and disclosures in the
financial statements. An audit also includes assessing the
accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement
presentation. we believe that our audits provide a reasonable basis
for our opinion.

In our opinion, the financial statements referred to above
present fairly, in all material respects, the financial position of
Qwest Communications International Inc. and subsidiaries as of
December 31, 2000 and 1999, and the results of their operations
and their cash flows for each of the three years in the period ended
December 31, 2000, in conformity with accounting principles
generally accepted in the United S tates.

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 160 of
187
Case 1:06-cv-01539-REB   Document 187   Filed 08/07/2006   Page 160 of 187

/s/ Arthur Andersen LLP

Denver, Colorado

340.    Andersen's report was false and misleading due to its failure to comply with

GAAS and because Qwest's financial statements were not prepared in conformity with GAAP,

as alleged herein, so that issuing the rep orts was in violation of GAAS and SEC rules.  Andersen

knew its reports would be relied upon by the Company as well as by present and potential

investors in Qwest's stock.

**C.      Arthur Andersen Ignored the Audit Evidence It Gathered**

341.    GAAS, as set forth in AU §  326, Evidential Matter, requires auditors to obtain

sufficient, competent, evidential matter through inspection, observation, inquiries, and

confirmations to afford a reasonable basis for an opinion regarding the financial statements under

audit:

> In evaluating evidential matter, the auditor considers whether
> specific audit objectives have been achieved.  The independent
> auditor should be thorough in his or her search for evidential
> matter and unbiased in its evaluation.  In designing audit
> procedures to obtai n competent evidential matter, he or she should
> recognize the possibility that the financial statements may not be
> fairly presented in conformity with generally accepted accounting
> principles or a comprehensive basis of accounting other than
> generally accepted accounting principles.  In developing his or her
> opinion, the auditor should consider relevant evidential matter
> regardless of whether it appears to corroborate or to contradict the
> assertions in the financial statements.  To the extent the auditor
> remains in substantial doubt about any assertion of material
> significance, he or she must refrain from forming an opinion until
> he or she has obtained sufficient competent evidential matter to
> remove such substantial doubt, or the auditor must express a
> qualified opinion or a disclaimer of opinion.

AU § 326.25 (footnotes omitted).

- 155 -

342.    Arthur Andersen's responsibility, as Qwest's independent auditor, was to obtain "sufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§ 110, 150.

343.    In violation of GAAS, and contrary to the representations in its report on Qwest's financial statements, Andersen did not obtain sufficient, competent, evidential matter to support Qwest's assertions regarding its income, assets, debt and shareholders' equity for 2000. As an article in the *Red Herring* noted in March 2002:

> We'll get into the particulars of my inquiries in a minute, but first let's focus on the implications of the kiss -off I received. It suggests that whatever Qwest has been doing with its account ing, it's been doing it with the seal of approval of its auditors, Arthur Andersen. And that's a problem if what insiders at Qwest have been telling me is true: that the company has apparently been pumping up its revenue and earnings in its directories bu siness as part of a drive to prettify its financials in the face of the deepening mess in the telecommunications industry.

## D.    Arthur Andersen's Audit Procedures with Respect to Qwest's Failure to Properly report Its Swap Transactions

344.    As one of the largest aud it firms in the world, Andersen was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, Andersen knew of the audit risks inherent at Qwest and in the industries in which Qwest operated because of the comp rehensive services it provided to Qwest over the years and its experience with many other telecom clients. Andersen's intentional failure to comply with GAAS and Andersen's performance on the Qwest audits rose to the level of deliberate

recklessness.  In effect, Qwest was trading away IRU capacity in exchange for capacity it did not need, just to increase reported revenues.

345.    As the auditor for not only Qwest, but also Global Crossing, Enron and Level 3, Andersen was well aware of the terms of the transactio ns and helped Qwest paper the deals so they could be recognized as revenue.

346.    Pursuant to AU § 334.09:

> Generally accepted accounting principles recognized the importance of reporting transactions and events in accordance with their substance.  The auditor s hould consider whether the substance of transactions or events differs materially from their form.

347.    Arthur Andersen ignored the guidance in this professional literature, which required that Qwest report the true substance of the deals and make adequate disc losure and proper accounting for the transactions.

348.    Arthur Andersen abandoned its role as independent auditor by turning a blind eye to each of the above indications of improper accounting.  Despite this knowledge, Arthur Andersen did not insist upon adjust ments to Qwest's audited financial statements.  Pursuant to GAAS, Arthur Andersen should have issued a qualified or adverse report, or it should have insisted that Qwest comply with GAAP.

349.    Due to Arthur Andersen's false statements and failure to identify an d modify its reports to identify Qwest's false financial reporting, Arthur Andersen violated the following GAAS standards:

a.    The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as aud itors;

b.      The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

c.      The third general standard is that due professional care is to he exercised in the performance of the audi t and preparation of the report;

d.      The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

e.      The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

f.      The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opi  nion on the financial statements under audit;

g.      The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed; and

h.      The third standard of reporting is that informative disclosures are regarde  d as reasonably adequate unless otherwise stated in the report.

350.      On May 31, 2002, Qwest announced that it had fired Andersen as its accounting firm, replacing it with KPMG.  Press Release, Qwest Communications Appoints KPMG LLP As Independent Auditor, 5/31/ 02; Qwest SEC Form 8 -K, filed 5/31/02. Qwest then amended its May 31, 2002 Form 8-K to clearly state that Qwest did not engage Andersen to perform services related to Fiscal Year 2002.  Qwest SEC Form 8 -K/A, filed 6/11/02.

E.  **Arthur Andersen Knew Qwest's Financial Statements Were Not Free of Material Misstatements**

351.    Despite Andersen's assurances to the investing public that Qwest's financial statements were free of material misstatements, Andersen knew that th is was not true.  In an October 4, 2000 report to Qwe st's audit committee members, Andersen auditor, Mark Iwan, stated:  "[The SEC] is vigorously challenging sales treatment."  Andersen was referring to the SEC's critiques of Global Crossing and its accounting methods and the practice of immediate recognition of revenue on long -term IRU transactions.  The implication was that the SEC might also scrutinize Qwest.  Though Andersen advised Qwest that the treatment was a "key financial reporting risk," neither Andersen nor Qwest discontinued their practices with r espect to Qwest's revenue recognition on IRU sales contracts.

352.    In the October 4, 2000 audit report to the Qwest Audit Committee, Andersen identified the following as "key financial reporting risks" for Qwest:

- the accounting for "goodwill and intangible li ves" of Qwest's assets, including Qwest's investment in ICPNQwest, noting that "the SEC has been scrutinizing the lives assigned to acquired intangibles and goodwill";

- the accounting of revenue from IRU sales up -front, noting "SEC vigorously challenging sales treatment";

- the accounting for capacity swaps, noting that "Fair value accounting from swapping IRUs for other assets or services may be viewed as not the culmination of the earnings process."

Despite identifying Qwest's accounting in these areas a s "financial reporting risks,"  Andersen approved Qwest's accounting.  In October 2003, the accounting improprieties documented by Andersen in October 2000 resulted in Qwest restating its financials.

353. In October 2001, Andersen identified in another audit rep ort to Qwest's Audit Committee that the following accounting practices were aggressive or unacceptable:   Up-front recognition of revenue from the sales of IRUs; impairment of assets; Pension/OPEB assumptions; Classification of Merger related expenses; IRU  swaps; and equipment sales. Qwest's Audit Committee, however, did not change Qwest's accounting practices in response to Andersen's October 2001 report.

## XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

354. At all relevant times, the mar ket for Qwest's securities was an efficient market for the following reasons, among others:

a. Qwest common stock traded in an efficient market on the NYSE during the period in which Plaintiff bought, held and/or sold Qwest common stock.  The average daily trading volume of Qwest shares was more than 8 million shares traded, calculated by downloading from the Yahoo Finance web site (http://finance.yahoo.com) the daily volume o f Qwest shares traded from July  5, 2000 to March 11, 2002.  The total number of share s traded during these 609 trading days was 3,534,422,704 shares;

b. As a regulated issuer, Qwest filed periodic public reports with the SEC;

c. Qwest regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide  -ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. The market reacted to publ ic information disseminated by Qwest;

- 160 -

e.      Qwest was followed by numerous material securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each   of these reports was publicly available and entered the public marketplace;

f.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Qwest securities; and

g.      Without knowledge of the mis represented or omitted material facts, Plaintiff purchased or otherwise acquired Qwest securities between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which time the price of Qwest secur ities was inflated by Defendants' misrepresentations and omissions.

355.    In addition to the foregoing, Plaintiff is entitled to a presumption of reliance because, as is more fully alleged above, Defendants omitted, throughout the period during which Plaintiff held, purchased or sold Qwest shares to disclose material information regarding Qwest's business, financial status, financial results and business prospects.

## XV.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Defendants Actively Concealed and Denied the Existence of Any Accounting Improprieties

356.    As a result of Qwest's failure to disclose that there were any problems with its accounting, and its many public statements, which are set forth above, including, but not limited to, Qwest's attacks on the Morgan Stanley reports,   Qwest's assurances that Qwest's accounting practices were fully in compliance with GAAP and all other applicable rules, and Qwest's explanations and change of position on the accounting for the Calpoint transaction, Plaintiff could not reasonably have lear ned that there were any problems with Qwest's accounting and its

public statements regarding its financial performance, until at least March 11, 2002, when Qwest

disclosed the existence of an informal SEC investigation into its accounting for equipment sal es

and capacity swaps.  Thus, any claims against Defendants relating to the falsity of the public

statements regarding Qwest's financial performance could not reasonably have been brought

prior to March 11, 2002.  As a result, any applicable statute of limitations was tolled until

March 11, 2002.

     **B.**    **Tolling of Statute of Limitations by the Filing of The Class Action**

357.    Plaintiff's claims have also been tolled pursuant to the doctrine announced in

*American Pipe v. & Construction Co. v. Utah*, 414 U.S. 538, 552 (1974), and *Crown, Cork &*

*Seal, Co. v. Parker*, 462 U.S. 345; 353-54 (1983).  In *Crown, Cork & Seal Co.*, the Supreme

Court held:

> "the commencement of a class action suspends the applicable
> statute of limitations as to all asserted members of the class who
> would have been parties had the suit been permitted to continue as
> a class action." [citation omitted] Once the statute of limitations
> has been tolled, it remains tolled for all members of the putative
> class until the class certification is denied.  At that poi nt, class
> members may choose to file their own suits or to intervene as
> plaintiffs in the pending action.

*Id.* at 353-54.  *American Pipe* tolling "is properly extended to claims of absent class members

that involve the same evidence, memories, and witnesses  as were involved in the initial putative

class action."  *Cullen v. Margiotta,* 811 F.2d 698, 720-21 (2d Cir. 1987), *overruled in part on*

*other grounds*, *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143 (1987).

358.    On July 27, 2001, a class action was filed against Qwest in the United States

District Court for the District of Colorado, which alleged that Qwest's first quarter 2001 results

and the statements regarding those results were false and misleading because of Qwest's

(1) improper valuation of KPNQwest, in violation of GAAP; (2) change in the discount rate used to calculate Qwest's pension obligations; (3) aggressive use of capitalization to classify interest and other software development costs as assets rather than expenses; and (4) improper classification of selling, general and administrative expenses as cost of sales. Between July 27, 2001 and October 1, 2001, seven class actions were filed in the federal district court of Colorado alleging similar and related claims. These cases were consolidated and a single consolidated class action was filed on December 3, 2001, representing purchasers of Qwest's publicly traded stock between October 24, 2000 and October 30, 2001 (the "Consolidated Class Action")

359. On February 19 and February 25, 2002, two class action complaints were filed in the federal district court of Colorado representing purchasers of Qwest publicly traded stock between April 19, 2000 and February 13, 2001, and which alleged that during the class period, Qwest and certain officers and directors had made material false statements regarding Qwest's financial condition, results, and operations in violation of federal securities laws, including the failure to disclose four transactions with Qwest and KMC, which is also the subject of the instant lawsuit.

360. On March 13, 2002, a class action was filed in the federal district court of Colorado on behalf of purchasers of Qwest's publicly traded stock between April 19, 2000 and February 13, 2002 alleging similar claims as the February class actions and also alleging the failure to disclose Qwest's transactions with Calpoint.

361. The March and February 2002 class actions were consolidated with the Consolidated Class Action.

- 163 -

362.   On May 24, 2002, the plaintiffs in the District of Colorado action filed a  motion for leave to amend along with a proposed Fourth Amended Class Action Complaint.  The Fourth Amended Complaint included claims under Section  11 of the 1933 Act, 15 U.S.C. §  77k 11, and Section 15 of the 1933 Act, 15 U.S.C. §  77o.  The motion for leav e to amend was granted and the Fourth Amended Class Action Complaint was filed on August  21, 2002.

363.   Under the doctrine announced in *American Pipe* and its progeny, the statute of limitations has been tolled since the filing of the July 27, 2001 class action, or at a minimum since the February 2002 class action.

## XVI.   <u>STATUTORY SAFE HARBOR</u>

364.   The statutory safe harbor provided for forward  -looking statements under certain circumstances does not apply to any of the allegedly false forward  -looking statements pleaded in this Complaint.  The safe harbor does not apply to Qwest's allegedly false financial statements.  None of the written forward -looking statements made were identified as forward  -looking statements, nor was it stated that actual results "could differ materiall  y from those projected."  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward  -looking statements accompany those forward-looking statements.  Each of the forw  ard-looking statements alleged herein to be false was authorized by an executive officer of Qwest and was actually known by each of the Individual Defendants to be false when made.

## FIRST CLAIM FOR RELIEF

### For Violation Of Section 10(b) Of The 1934 Act
### And Rule 10b-5 Against All Defendants

365.   Plaintiff incorporates herein by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

366.   Defendants disseminated or approved the false stateme nts alleged above, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they we re made, not misleading.

367.   Defendants used the instrumentalities of interstate commerce in connection with their sale of Qwest stock to Plaintiff.

1.   Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a.   Employed devices, schemes, and artific es to defraud;

b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   Engaged in acts, practices, and a course  of business that operated as a fraud or deceit upon Plaintiff in connection with its purchasers and acquisitions of Qwest publicly traded securities.

368.   Plaintiff and/or its agents relied on Defendants' false statements and omissions or, in the alternative, on the integrity of the market, and Plaintiffs suffered damages in that they paid artificially inflated prices for Qwest publicly traded securities. Plaintiff would not have purchased or acquired Qwest publicly traded securities at the prices they paid, or   at all, if they

- 165 -

had been aware that the market prices had been artificially and falsely inflated by Defendants'
misleading statements and omissions.

369.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff
suffered damages in connection  with their purchases and acquisitions of Qwest publicly traded
securities.

## SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act
### Against Defendants Anschutz, Nacchio, Woodruff, and Szeliga

370.     Plaintiff incorporates herein by reference and r ealleges each and every allegation
contained in the preceding paragraphs of this Complaint as if fully set forth herein.

371.     Anschutz, Nacchio, Woodruff, and Szeliga were "controlling persons" of Qwest
because they had the power to cause Qwest to engage in the   unlawful conduct alleged above and
because they could have prevented that unlawful conduct.  Nacchio, Woodruff, and Szeliga were
officers or directors of Qwest; Nacchio was not only an officer but also Chairman of the Board
of Directors of Qwest.  Anschut z was co-chairman of the Qwest Board of Directors.

372.     Anschutz, Nacchio, Woodruff, and Szeliga cannot demonstrate that they acted in
good faith in connection with the misconduct committed by Qwest.  They directly or indirectly
induced or caused Qwest to commi t the unlawful acts set forth above.

373.     Because Anschutz, Nacchio, Woodruff, and Szeliga were "controlling persons" of
Qwest, which is a primary person liable to Plaintiffs under Section 10(b) of the Exchange Act,
they are secondarily liable for Qwest's viola tions pursuant to Section 20 of the Exchange Act.

## THIRD CLAIM FOR RELIEF

### For Violations of Section 18 of the 1934 Act
### Against Qwest, Woodruff, Anschutz, Nacchio, Slater, and Szeliga

374.   Plaintiff incorporates herein by reference and realleges each and every a llegation
contained in the preceding paragraphs of this Complaint as if fully set forth herein.

375.   As set forth above, Qwest, Woodruff, Anschutz, Nacchio, Slater, and Szeliga and
each of them, made or caused to be made statements in applications, reports and   documents filed
with the SEC pursuant to the Securities Exchange Act of 1934 or any rule or regulation
thereunder, including Qwest's 10 -Ks, which were, at the time and in light of the circumstances
under which they were made, false or misleading with respe ct to material facts.

376.   Plaintiff's agents read and relied upon the false statements and omissions from the
applications, reports, and documents filed with the SEC, including Qwest's 1999, 2000 and 2001
Form 10-Ks.

377.   Plaintiff's agents relied upon the false st atements and omissions from the
applications, reports, and documents alleged above not knowing that such statements were false
and misleading.

378.   The statements and omissions from such applications, reports, and documents as
set forth above, were materially f alse and misleading because the Qwest and the Individual
Defendants:  (a) knew or had access to the materially adverse non -public information about
Qwest's accounting practices, financial results and then existing business conditions, which were
not disclo sed; (b) participated in drafting, reviewing and/or approving the misleading statements,
releases, reports and other public representations relating to the financial statements of Qwest
that were filed with the SEC; and (c)  had an obligation to inform them selves and the

- 167 -

shareholders, including Plaintiff, of the accounting policies and procedures, as well as the
financial statements of the Company.

379.     Qwest and the Individual Defendants' conduct in making or causing to be made
false and misleading statements and omissions resulted in the Company falsely reporting revenue
and net income, overstating revenues by $2.874 billion over a twenty -seven month period from
January 2000 to March 2002 and understated its losses by $25.488 billion over that period.

380.     In October and December 2003, Qwest and the Individual Defendants admitted
that they had overstated the Company's financial performance for fiscal years 2000 and 2001 and
for the fiscal quarter ending March 31, 2002, when it issued restated financial statements of
Qwest for fiscal years 2000 and 2001 and the first quarter of 2002.  In addition, on July 28, 2002,
Qwest announced that it would have to restate its financials for the 1999 fiscal year as well, thus
acknowledging that its financial reports for FY 1999 were  also inaccurate.

381.     In connection with the purchase and acquisition of Qwest stock, Plaintiff's agents
had a right to rely and did reasonably rely upon the false and misleading statements of Qwest's
financial status in applications, reports, and documents fi led by Qwest with the SEC.

382.     The false and misleading statements and omissions contained in the SEC filings
alleged above had the direct effect of artificially inflating the price of Qwest's stock, and
Plaintiff's agents relied on those material misstatement s and omissions in purchasing and
acquiring Qwest stock at such artificially inflated prices.

383.     When the truth regarding the scope of the Company's accounting improprieties
was finally revealed, Plaintiff was significantly damaged by the resulting drop in the trading
price of Qwest stock.

554065.1

384.    By virtue of the foregoing, Qwest and the individuals named in this claim have

violated Section 18 of the Exchange Act.

385.    As a direct and proximate result of Qwest and the named individuals' wrongful

conduct, Plaintiff suffered damage in connection with its purchases and acquisitions of Qwest

stock.

### FOURTH CLAIM FOR RELIEF

### For Violations of Section 18 of the 1934 Act
### Against Arthur Andersen

386.    Plaintiff incorporates herein by reference and realleges each and every allegation

contained in the preceding paragraphs of this Complaint as if fully set forth herein.

387.    As alleged above, Andersen made or caused to be made statements in

applications, reports and documents filed with the SEC pursuant to the Securities Exchange Act

of 1934 or any rule or regulation thereunder, including Qwest's 10 -Ks which were, at the time

and in light of the circumstances under which they were made, false or misleading with respect

to material facts.

388.    In particular, in certifying Qwest's financial statements fo r the fiscal years 1999,

2000, and 2001, Andersen falsely represented that Qwest's accounting methods complied with

GAAP, and that Andersen had performed its audits in accordance with GAAS.

389.    Plaintiff's agents read and relied upon Andersen's "Report of Inde pendent

Auditors" contained in documents filed with the SEC, including Qwest's 1999, 2000 and 2001

Form 10-Ks.

390.     Plaintiff's agents relied upon the statements and omissions from the applications, reports, and documents set forth above not knowing that such s tatements were false and misleading.

391.     The statements and omissions from such reports, as alleged above, were materially false and misleading because Andersen (a) knew or had access to the materially adverse non-public information about Qwest's accounting pr actices, financial results and then existing business conditions, which was not disclosed; (b)  participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations relating to the financial stat ements of Qwest that were filed with the SEC; and (c)   had an obligation to inform themselves and the shareholders, including Plaintiff, of the accounting policies and procedures, as well as the financial statements of Qwest.

392.     Andersen's conduct in making or  causing to be made false and misleading statements and omissions resulted in the Company falsely reporting revenue and net income, overstating revenues by $2.874 billion over a twenty -seven month period from January 2000 to March 2002 and understating its losses by $25.488 billion over that period.

393.     In October and December 2003, the Company admitted that Andersen had overstated the Company's financial performance for fiscal years 2000 and 2001 and for the fiscal quarter ending March 31, 2002, when the Compa ny issued restated financial statements of Qwest for fiscal years 2000 and 2001.  In addition, on July 28, 2002, Qwest announced that it would have to restate its financials for the 1999 fiscal year as well, thus acknowledging that its financial reports fo r FY 1999 were also inaccurate.

394.     In connection with the purchase and acquisition of Qwest stock, Plaintiff's agents

had a right to rely and did reasonably rely upon Andersen's false and misleading statements and

omissions regarding Qwest's accounting practi ces in reports and other documents filed by the

Company with the SEC.

395.     The material misstatements and omissions contained in the SEC filings alleged

above had the direct effect of artificially inflating the price of Qwest's stock, and Plaintiff's

agents relied on those material misstatements in purchasing Qwest stock at such artificially

inflated prices.

396.     When the truth regarding the scope of Qwest's accounting improprieties was

finally revealed, Plaintiff was significantly damaged by the resulting precipitous drop in the

trading price of Qwest's stock.

397.     By virtue of the foregoing, Andersen has violated Section 18 of the Exchange

Act.

398.     As a direct and proximate result of Andersen's wrongful conduct, Plaintiff

suffered damage in connection with its purchases and  acquisitions of Qwest stock.

### FIFTH CLAIM FOR RELIEF

### For Violation of Section 20A of the 1934 Act
### Against Nacchio, Anschutz, Szeliga, Woodruff, Jacobsen, Tempest, Weisberg, Smith, Wilks, and Slater

399.     Plaintiff incorporates herein by reference and realleges e ach and every allegation

contained in the preceding paragraphs of this Complaint as if fully set forth herein.

400.     Each of the individual Defendants named in this claim for relief occupied a

position that made him or her privy to non -public information concerning Qwest. Because of this

access, each of these Defendants knew that the adverse facts alleged herein were being concealed

- 171 -

and false and misleading statements were being made. Notwithstanding their duty to refrain from

selling Qwest stock while in the pos session of material, non -public information concerning

Qwest, these Defendants sold over 10 million shares of Qwest's stock, profiting from their

fraudulent scheme.

401.    Plaintiff who purchased or acquired shares of Qwest stock contemporaneously

with the sales of Qwest stock by these Defendants:  (1)  has suffered substantial damages in that it

paid artificially inflated prices for Qwest stock as a result of the violations of §  10(b) and Rule

10b-5 alleged herein; and (2) would not have purchased Qwest stock at t  he prices they paid, or at

all, if it had been aware that the market prices had been artificially inflated by these Defendants'

false and misleading statements.

## SIXTH CLAIM FOR RELIEF

### Violation Of Colorado Securities Act C.R.S. §§ 11-51-501 and 11-51-604(3)
### Against All Defendants

402.    Plaintiff incorporates herein by reference and realleges each and every allegation

contained in the preceding paragraphs of this Complaint as if fully set forth herein.

403.    As set forth above, Defendants, and each of them, in connecti  on with the offer,

sale, or purchase of any security, made untrue statements of a material fact or omitted to state

material facts necessary in order to make the statements made, in the light of the circumstances

under which they are made, not misleading.

404.    The statements, alleged above, were materially false and misleading because

Defendants:  (a) knew or had access to the materially adverse non -public information about

Qwest's accounting practices, financial results and then existing business conditions, wh  ich were

not disclosed; (b)  participated in drafting, reviewing and/or approving the misrepresentations

relating to the financial statements and/or financial condition and performance of Qwest; and

(c) had an obligation to inform themselves and the shareho lders, including Plaintiff, of the

accounting policies and procedures, as well as the financial statements and/or financial condition

of Qwest.

405.    The Defendants' conduct in making or causing to be made false and misleading

statements resulted in Qwest falsel y reporting revenue and net income, overstating revenues by

$2.874 billion over a twenty-seven month period from January 2000 to March 2002 and

understating its losses by $25.488 billion over that period and in causing the investing public to

have an entirely false understanding of the financial condition and performance of Qwest.

406.    The material misstatements and omissions by Defendants, all of which are alleged

above, had the direct effect of artificially inflating the price of Qwest's stock.

407.    Plaintiff and/or its agents relied on Defendants' material false statements and

omissions or, in the alternative, on the integrity of the market in purchasing and acquiring Qwest

stock at such artificially inflated prices.

408.    When the truth regarding the scope of Qwest's ac counting improprieties was

finally revealed, Plaintiff was significantly damaged by the resulting precipitous drop in the

trading price of Qwest stock.

409.    Defendants directly and indirectly, with scienter and/or recklessly, in connection

with the offer or sal e of Qwest stock, made untrue statements of material fact and/or omitted to

state material facts necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading.

554065.1

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 179 of
Case 1:06-cv-01539-REB   Document 1   Filed 08/07/2006   Page 179 of 187
187

410.    As a direct and proximate result o f Defendants' wrongful conduct, Plaintiff

suffered damage in connection with its purchases and acquisitions of Qwest stock.

411.    By reason of the foregoing, Defendants proximately caused Plaintiff's damages.

### SEVENTH CLAIM FOR RELIEF

#### Violation Of Colorado Securities Act C.R.S. § 11-51-501 and 11-51-604(5)(b)
#### Against Defendants Anschutz, Nacchio, Woodruff, and Szeliga

412.    Plaintiff incorporates herein by reference and realleges each and every allegation

contained in the preceding paragraphs of this Complaint as if fu lly set forth herein.

413.    Anschutz, Nacchio, Woodruff, and Szeliga were "controlling persons" of Qwest

because they had the power to cause Qwest to engage in the unlawful conduct alleged above and

because they could have prevented that unlawful conduct.  Nacch io, Woodruff, and Szeliga were

officers or directors of Qwest.  Nacchio was not only an officer but also Chairman of the Board

of Directors of Qwest.  Anschutz was co -chairman of the Qwest Board of Directors.

414.    Anschutz, Nacchio, Woodruff, and Szeliga cannot  demonstrate that they acted in

good faith in connection with the misconduct committed by Qwest.  They directly or indirectly

induced or caused Qwest to commit the unlawful acts set forth above.

415.    Because Anschutz, Nacchio, Woodruff, and Szeliga were "contro lling persons" of

Qwest, which is a primary person liable to Plaintiffs under Colo. Rev. Stat. §§ 11 -51-501 and 11-

51-604(3), they are secondarily liable for Qwest's violations pursuant to Colo. Rev. State § 11 -

51-604(5)(b).

- 174 -

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Qwest's Violation of C.R.S. § 11-51-501 and 11-51-604(5)(c)
### Against Arthur Andersen

416.  Plaintiff incorporates herein by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as fully set forth  herein.

417.  Qwest's fraudulent conduct violated the Colorado Securities Act, C.R.S. §   11-51-501.

418.  Andersen knew that Qwest was engaged in fraudulent conduct that violated Colo. Rev. Stat. § 11-51-501.

419.  Andersen gave substantial assistance to Qwest's fraudulent c onduct.

420.  Andersen's substantial assistance proximately caused harm to the Plaintiff which was a reasonably foreseeable result of Andersen's conduct.

## NINTH CLAIM FOR RELIEF

### Common Law Fraud
### Against All Defendants

421.  Plaintiff incorporate herein by reference an d realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

422.  As alleged above, each of the Defendants made a false representation or omission of material fact.

423.  Each of the Defendants knew the re presentations or omissions were false or made the representations or omissions recklessly without regard to whether they were true or false.

424.  The misrepresentations and omissions were made with the intent to induce Plaintiff to act, *i.e.*, purchase and/or ho ld Qwest stock.

- 175 -

425.     Plaintiff and/or its agents justifiably relied on the integrity of the market and/or upon Defendants' misrepresentations and omissions and w ere ignorant of the falsity of the representation s or of the existence of the fact s concealed.

426.     In reliance on Defendants' misrepresentations and omissions, Plaintiff and/or its agents were induced to and did purchase and/or hold shares of Qwest common stock .

427.     Plaintiffs' and/or its agents' reliance caused damage to Plaintiff.

## TENTH CLAIM FOR RELIEF

### Aiding and Abetting Common Law Fraud
### Against All Defendants Except Qwest

428.     Plaintiff incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

429.     Qwest fraudulently misrepresented and concealed information about Qwest's true financial condition.

430.     Each of the Defendants named herein was aware of the fraud.

431.     By their actions, each of the Defendants named in this claim knowingly participated in, and aided and abetted, Qwest' s fraudulent conduct by affirmatively assisting, helping conceal, or by failing to act when required to do so, thereby enabling the fraud to proceed.

432.     Defendants' assistance proximately caused harm to Plaintiff.

433.     Plaintiff' s harm was a reasonably foreseeable result of Defendants' conduct.

## ELEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### Against All Defendants

434.    As alleged above, each of the Defendants  made incorrect statements concerning

Qwest's business and finances  which they had no reasonable grounds to believe were true.

Defendants' incorrect statements were made directly to or intended to be repeated to Plaintiff

and/or their agents  in the form of  SEC filings, financial statements, press releases or other public

statements.

435.    Defendants made these incorrect statements  with the intent to induce Plaintiff

and/or their agents  to act in reliance upon such, or with  the expectation that Plaintiff  and/or its

agents  would so act.

436.    Plaintiff and/or its agents read  and/or were aware of Defendants'  incorrect

statements and actually and justifiably relied on those statements  in making and holding their

substantial investments in Qwest.

437.    The incorrect statements  relied upon by Plaintiff and/or its agents  include, without

limitation, those made by Defendants concerning  Qwest's business and finances, as described

above, and which were incorporated  in Qwest's SEC filings, financial statements, press releases

and other public statements .

438.    Defendants owed Plaintiff a duty of care, including and based on, *inter alia*, the

following:

a.    Defendants' special knowledge, including the true facts as to  Qwest's

business and finances as alleged herein, the economic substance of Qwest's  transactions as

described above, Plaintiff's ignorance of such facts, and the general unavailability of such facts

except as Defendants disclosed them;

       b.     The securities laws applicable throughout the United States requiring

Defendants to disclose all material facts and not make any material misstatements or omissions,

Plaintiff's or Plaintiff's agents' knowledge of such securities laws and reasonable expectation

and reliance that Defendants would comply therewith, and Defendants' knowledge of the same;

       c.     Defendants' knowledge that investors, like Plaintiff and/or its agents, in

making their investment decisions, would rely upon the SEC filings, press releases and public

statements specified herein to disclose all material facts and contain no material misstatements or

omissions, and that those SEC filings, press releases and public statements incorporated and

relied on Defendants' statements concerning Qwest's business and finances; and

       d.     Plaintiff's and/or Plaintiff's agents' reasonable expectation that

Defendants were aware of the truth concerning Qwest's business and finances, as described

above, and would truly and accurately disclose such matters in the SEC filings, financial

statements, press releases and public statements specified above without incorrect statements or

omissions.

     439.    Defendants breached their duty to Plaintiff by failing to investigate, confirm,

prepare and review with reasonable care the information contained in the SEC filings, press

releases and public statements specified above concerning Qwest's business and finances, and by

failing to disclose the truth concerning same, and in failing to correct the misstatements,

omissions and inaccuracies made thereof in Qwest's SEC filings, press releases and public

statements.

440.    It was specifically foreseeable and Defendants knew and specifically intended that their statements concerning Qwest's business and f inances would be distributed to potenti al investors, such as Plaintiff and/or its agents , to assist investors in making their investment decisions and such investors would rely on this information.   Defendants owed a duty to Plaintiff to disseminate accura te, truthful and complete information concernin g Qwest's business and finances.  Defendants knew that if the informatio n they supplied to investors was  incorrect, materially false or incomplete, investors, like Plaintiff, would be injured in their property .

441.    Plaintiff and/or its agents  did not know, and could not reasonably have known, of the falsity of Defendants' incorrect statements  at the time they were made.   In reliance on said statements, Plaintiff and/or its agents  were induced to and did purchase  or hold shares of Qwest common stock.

442.    Had Plaintiff and/or its agents  known the truth concerning  Qwest's business and finances as described above , they would not have paid such an inflated price for  Qwest securities, held on to those securities,  or possibly have invested in Qwest at all.

443.    As a direct, foreseeable and proximate result of  Defendants' incorrect statements which were negligently made, as described above and herein, Plaintiff  suffered economic injury in an amount to be determined according  to proof at the time of trial.

## TWELFTH CLAIM FOR RELIEF

### For Common Law Civil Conspiracy
### Against All Defendants

444.    Plaintiff incorporates herein by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as fully set  forth herein.

554065.1

445.    Defendants agreed to and joined a conspiracy and common course of conduct which was designed to and did (i) deceive Plaintiff and/or its agents regarding the accuracy of Qwest's financial statements and Qwest's financial condition; (ii) artificially inflate the market price of Qwest's publicly traded securities; and (iii) cause Plaintiff to purchase or acquire Qwest common stock at artificially inflated prices. In furtherance of this conspiracy and common course of conduct, Defendants, and each of them, took the actions as set forth herein.

446.    Each Defendant was a direct, necessary and substantial participant in the conspiracy and common course of conduct designed to artificially inflate the price of Qwest's publicly traded securities through the issuance of a series of false and misleading quarterly and year-end reports, other SEC filings, and press releases to the public, which misrepresented and failed to disclose material facts regarding Qwest's revenue and earnings, and created a false impression of growth and profitability.

447.    In committing the wrongful and overt acts alleged herein, Defendants acted in concert with one another in furtherance of a common plan, scheme or design to commit an unlawful act. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in breach of their respective duties as herein alleged.

448.    Each of the Defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would artificially inflate the price of Qwest securities. Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff.

449.    Plaintiff's harm was a reasonably foreseeable result of Defendants' conduct.

450.    As a result of the wrongful conduct alleged herein, Plaintiff suffered damages in an amount to be determined according to proof at the time of trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Awarding Plaintiff compensatory damages;

2.    Awarding Plaintiff rescissionary damages;

3.    Awarding Plaintiff prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

4.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law equity and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. Rules 64 and 65 and any appropriate state law remedies to assure that Plaintiff has an effective remedy; and

5.    Awarding such other relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 7, 2006                        Respectfully submitted,

Case 1:06-cv-17880-REB-MEH   Document 45-2   Filed 04/24/07   USDC Colorado   Page 187 of
187
Case 1:06-cv-01539-REB      Document 187      Filed 08/07/2006      Page 187 of 187

By:     s/ Ronald L. Wilcox
         Robert F. Hill
         Ronald L. Wilcox
         HILL AND ROBBINS, PC
         1441 Eighteenth Street, Suite 100
         Denver, CO  80202
         Telephone:  (303) 296 -8100
         Fax:  (303) 296 -2388
         Ema il: roberthill@hillandrobbins.com
                 ronaldwilcox@hillandrobbins.com

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Richard M. Heimann (CA State Bar No. 063607)
Joy A. Kruse (CA State Bar No. 142799)
Bruce W. Leppla (CA State Bar No. 71649)
Peter E. Leckman ( CA State Bar No. 235721)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Attorneys for Plaintiff
DENVER EMPLOYEES RETIREMENT PLAN
777 Pearl Street
Denver, CO  80203-3717

554065.1